# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **TOUCHSTREAM TECHNOLOGIES, INC.,** | § | Civil Case No. 6:21-cv-569-ADA |
| | § | |
| *Plaintiff*, | § | **JURY TRIAL DEMANDED** |
| | § | |
| v. | § | |
| | § | |
| **GOOGLE LLC,** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## GOOGLE'S OPENING CLAIM CONSTRUCTION BRIEF

## I.     INTRODUCTION

Google's proposed constructions adhere to the fundamental rule that "a word describing patented technology takes its definition from the context in which it was used by the inventor." *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (citation omitted).  Plaintiff Touchstream generally denies that any claim construction is necessary, but repeatedly offers "alternative constructions" or explanations of "plain meaning" that are in reality broad re-definitions of claim terms untethered to the Asserted Patents.  Plaintiff's approach (and its resulting constructions) are wrong as a matter of law.  Google's proposed constructions should be adopted.

## II.     BACKGROUND OF THE ASSERTED PATENTS

The Asserted Patents[1], all titled "Play control of content on a display device," claim a "system for presenting and controlling content on a display device."  *See* '528 Patent at Abstract. Claim 1 of the '528 patent is generally representative:

> 1. A method of controlling presentation of content on a content presentation device that loads anyone of a plurality of different media players, the method comprising:
>
> receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, include information associated with a synchronization code assigned to the content presentation device, specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player, and include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;
>
> using the information associated with the synchronization code to store a record establishing an association between the personal computing device and the content presentation device;

---

[1] The Asserted Patents are U.S. Patent Nos. 8,356,251 ("'251 patent"), 8,782,528 ("'528 patent"), and 8,904,289 ("'289 patent").  They all substantively share the same specification because they claim priority to the same provisional application.  Specification cites in this brief are to the '251 Patent (unless otherwise noted) as the first-issued patent.

identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player;

obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider;

loading the particular media player in the content presentation device; and

using the particular media player to execute the programming code with respect to the file.

The claimed method, illustrated below as a system in Figure 1 of the patents, includes three main components: (1) a personal computing device; (2) a server system; and (3) a display device ('251 patent) or "content presentation device" ('528 and '251 patents). As the patents explain, "[t]he mobile phone 20 [*i.e.*, the personal computing device] . . . transmits a message to the server system 24 (block 110). The message from the mobile phone 20 contains a transmission code that includes data regarding . . . the secondary display it wants to connect to (e.g., television set 22 with display 23), the location and name of the media player for the selected video, the command (e.g., play, pause, rewind, etc.), and the video file to be acted upon." *See id.* at 4:27-35. In response, among other things, the "server system … provide[s] to the display device a second message identifying the user-selected content and the media player to play the content." *Id.* at Abstract.



FIG. 1

The disclosed server system is central to facilitating and managing the communication between the personal computing device and display or content presentation device. According to the specification, "the server system stores a look-up table that includes a synchronization code uniquely associated with the display device. A message from the personal computing device can include the synchronization code, and in response to receiving the message from personal

computing device, the server system can use the synchronization code and the look-up table to identify the display device on which the content is to be played." *Id.* at 2:16-26.  The server also includes "a universal adapter 26" "to interpret and convert a standard or universal command (e.g., play, pause, etc.) into the specific command recognized by the media player." *Id.* at 5:53-6:6.  In doing so, "[e]ach time a signal is received from the mobile device 20," the adapter at the server "checks and identifies the specific media player that is being requested" then "converts the incoming commands from the mobile device 20 into the correct JavaScript (or other programming) code used by the target device 22 to control the specific player (block 120)." *See id*.

## III.   ARGUMENT[2]

### A.   Term 1: "media player" ('251 Patent, claim 1; '528 Patent, claim 1, 27, 28; and '289 Patent, claims 1, 6)

| Google's Proposed Construction | Touchstream's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | a computer application operable to present content and control presentation of the content |

The term "media player" appears in all claims.  The role of the "media player" is clear from the claims and there is no special definition or disavowal of claim scope in the intrinsic record.  "Media player" should therefore be given its plain and ordinary meaning.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).

Touchstream here departs from its mantra of "no construction necessary" to offer a definition of "media player" to include *any* "computer application operable to present content and control presentation of the content."  That proposed construction should be rejected because adopting it would render superfluous other claim language.  Specifically, the claims of the '289 patent include the following: "wherein the media player is a computer application operable to

---

[2] Terms 1-9 are presented in that order in this brief pursuant to the Court's current Standing Order Governing Proceedings - Patent Cases (Dkt. 24).

present content and control presentation of the content." *See, e.g.*, '289 patent, claim 1 (11:33-35). This is identical to Touchstream's proposed construction of "media player" and would be rendered redundant if that construction were adopted. "[I]nterpretations that render some portion of the claim language superfluous are disfavored." *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004). Touchstream's approach is not only disfavored in general, it is unnecessary and unsupported. "Media player" should be given its plain and ordinary meaning.

**B.    Term 2: "an association between the personal computing device and the [display device / content presentation device]" ('251 Patent, claim 1; '528 Patent, claim 1, 27, 28; and '289 Patent, claims 1, 6)**

| Google's Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| One-to-one mapping between the personal computing device and the [display device / content presentation device] | plain and ordinary meaning - no construction needed |

Google proposes to construe  "an association between the personal computing device and the [display device / content presentation device]" to avoid jury confusion and to adhere to the definition of "association" compelled by the claims and the intrinsic evidence. Google's proposed construction would help the jury understand the very specific "association" claimed and disclosed in the Asserted Patents.

The intrinsic evidence establishes that the claimed "association" between the personal computing device and the display device[3] is not any relationship but is a direct, one-to-one between specific devices. Each of the asserted independent claims of the Asserted Patents establish that the association between the devices is a one-to-one connection, or in other words, a direct connection between two items. The claims recite that the server stores "a record establishing an association between [a] the personal computing device and [b] [the display device / content

---

[3] "Display device" is used interchangeably with "content presentation device" in the Asserted Patents.

presentation device].'" '251 patent, claim 1 (11:32-34); *see also, e.g.*, '528 patent, claim 1 (11:33-36); '289 patent, claim 1 (11:41-44), claim 6 (12:20-23).  The claimed "record" thus associates two specific things: the personal computing device and the display device.

Moreover, the term "associate" is used elsewhere in the claims to refer to a one-to-one mapping between the two associated items.  In particular, the claims recite "wherein the synchronization code is uniquely *associated* with the display device," '251 patent, claim 8 (12:19-20) (emphasis added), and "wherein the synchronization code is different from an IP address *associated* with the display device and is different from a MAC address *associated* with the display device," *see, e.g.*, *id.* at claim 9 (12:22-25) (emphasis added).  The claims make clear that the synchronization code "associated" with the display device is unique to the display device.

Further, the specification of the Asserted Patents confirms that the claimed association between the personal computing device and the display device is limited to a "one-to-one mapping" between the devices.  The specification explains how the record associating the personal computing device and display device is stored: "The switchboard 28 also includes a look-up table 34 that stores a correspondence between a particular personal computing device (such as mobile phone 20) and target devices (e.g., the television set 22) to which the user command is directed." '251 patent, 4:55-59.  An example of the look-up table that stores the record of the association is illustrated in Figure 4.  *See id.* at 2:47-48 ("FIG. 4 illustrates an example of a look-up table that forms part of a server system.").  Figure 4 shows that each record directly maps each display device to one smartphone (*i.e.*, the personal computing device).

| Single Connection Look-up Table | |
|---|---|
| Display Device | User - Smartphone |
| 2 | A |
| 1 | C |
| 3 | D |
| 4 | B |

FIG. 4

Nor does Google's proposed construction import a limitation of one embodiment into the claims. *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("The only meaning that matters in claim construction is the meaning in the context of the patent."). But the specification makes clear that this limitation is not imported but is an integral part of the alleged invention, so integral that it is "assumed": "In this example [in Figure 4], it is assumed that, at most, a single connection is established at any given time between a particular mobile phone and a display device."[4] *Id.* at 4:60-62.

Finally, in explaining how the server creates the record of the association between the personal computing device and display device, the specification establishes that the association is a direct connection based on a synchronization code that is unique to the display device:

> The server system 24 performs a target verification (block 118), which includes checking whether a connection to a particular display device already is established for the mobile phone 20 and, if so, checking the identification of the display device. During the target verification, if the look-up table indicates that there is no connection established between the mobile phone 20 and a particular display device, then the server system 24 sends a message to the mobile phone 20 to prompt the user to identify the device on which the video is to be displayed. . . . . [T]he user can select the display device by entering a synchronization code uniquely associated with the particular display device. . . . Once the synchronization code is entered into, or captured by, the mobile phone 20, it is sent from the mobile phone 20 to the server system 24, which stores the information in the look-up table 36 so

---

[4] The specification also states that "other scenarios are also possible to establish group connections (e.g., multiple mobile phones connected to the same display device)," '251 patent, 4:63-65, but that embodiment is not found in the claims. The claims, including the recited "record" as discussed above, recite a single display device and single personal computing device.

> as to establish a connection between the mobile phone 20 and the display device 22
> through the server system 24.

*Id.* at 4:65-5:41. Through this use of the look-up table, the record that uniquely associates one

display device with one personal computing device thus allows the server to identify and find the

correct display device on which to play content.

The intrinsic evidence thus makes clear that the claimed association between the personal

computing device and display device should be a one-to-one mapping (*i.e.*, a joining or connection

of two things). Touchstream's plain and ordinary meaning construction would not help the jury

understand the meaning of this term in the context of the Asserted Patents and should therefore be

rejected. *See Trustees of Columbia Univ.*, 811 F.3d at 1363 ("The only meaning that matters in

claim construction is the meaning in the context of the patent.").

### C.   Term 3: "video file" / "video content" ('251 Patent, claims 1, 6, 7)

| Google's Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Indefinite | plain and ordinary meaning - no construction needed |

Claim 1 of the '251 Patent (in addition to claims 6 and 7) is indefinite under 35 U.S.C. §

112, ¶ 2 and *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) because the claim

interchangeably recites "video file" and "video content," but does not recite how the terms are

connected or used together by the claimed method. In particular, while the claimed "machine-

implemented method" recites that the signals from the personal computing device to the server

system "specify[] a video file to be acted upon" which is then stored in a database for later

"transmission to or retrieval by the display device," the claim does not again expressly recite what

the video file is subsequently used for or how it is "acted upon." In contrast, as originally identified

in the preamble, the method "control[s] presentation of video content" as the focus of the remainder

of the claim. For example, the signals transmitted from the personal computing device to the server

system further "identify[] a particular media player for playing the video content" and include "a

universal playback control command for controlling playing of the video content." Like the video file, the particular media player and "programming code" (the result of a conversion by the server) are also stored in the aforementioned database for "transmission to or retrieval by the display device." The claim language is included below and annotated for illustration purposes:

> 1. A machine-implemented method of controlling presentation of video content on a display device that loads any one of a plurality of different media player players, the method comprising:
>   …
> receiving, … signals specifying a video file to be acted upon and identifying a particular media player for playing the video content, the one or more signals further including a universal playback control command for controlling playing of the video content on the display device by the particular media player
>   …
> storing, … wherein the information specifies the video file to be acted upon, identifies the particular media player for playing the video content, and includes the corresponding programming code to control playing of the video content on the display device by the particular media player in accordance with the universal playback control command.

Notably, the claim does not recite that the video content is also stored in the database for later "transmission to or retrieval by the display device." In fact, the claim does not explain nor describe how the video content itself is identified or specified, only that it is intended to be displayed on the display device by the media player (and also controlled). Similarly, while the specification references both files and content, it likewise does not explain how the file and content are related. This is in contrast to claim 1 of the '289 patent which recites that the particular media player plays content from the "specified video file": "wherein the one or more messages . . . (ii) specify a file to be acted upon, (iii) identify a particular media player for *playing content from the specified file* . . . ." *See* '289 patent, claim 1 (emphasis added). Indeed, while claim 1 of the '289 patent recites this express connection between the content and file, neither claim 1 of the '251 patent, nor the specification do so.

8

Despite this clear deficiency in the claim, Touchstream has not sought to construe these terms, instead claiming that there is "no construction needed" and the phrases should be given their "plain and ordinary meaning."  However, even if Touchstream sought to construe either "video file" or "video content," or any surrounding claim language, it should not be allowed to propose a construction merely to retain the validity of the claim.  Indeed, any other interpretation to retain validity would require the Court to rewrite the claims, which would be improper.  *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) ("It is not [the Court's] function to rewrite claims to preserve their validity."); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").  Thus, this claim is invalid as indefinite.

**D.      Term 4: "converting the command from the personal computing device into corresponding code to control the media player" ('251 Patent, claim 2)**

| Google's Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Indefinite | plain and ordinary meaning - no construction needed |

Like Term 3, Claim 2 of the '251 Patent (or Term 4) is also indefinite under *Nautilus* because it depends upon claim 1 but essentially repeats claim language from that claim.  *See* 572 U.S. at 901; 35 U.S.C. § 112, ¶ 2.  In particular, claim 1 recites a method comprising, among other things, "***converting***, by the server system, the universal playback control command into corresponding programming code to control playing of the video content on the display device by the particular media player."  Claim 2 depends from claim 1 and recites that the "method of claim 1" further includes:

> checking, in the server system, the identity of the media player identified in the one or more signals from the personal computing device;
> loading an appropriate set of protocols or application programming interfaces from a library based on the identity of the media player; . . .

Claim 2 further recites that the method includes:

> ***converting*** the command from the personal computing device into corresponding code to control the media player

The "checking" and "loading" steps recite new steps not present in claim 1.  In contrast, the final "converting" step of claim 2 mimics the prior "converting" step of claim 1, but fails to inform a skilled artisan whether this is a second conversion step beyond claim 1's conversion step, or whether it somehow replaces claim 1's conversion step.  Indeed, the latter interpretation would require the Court to improperly revise the claim, because claim 2 expressly recites that the method includes the "checking," "loading," and "converting" steps.  The claim does not expressly attempt to refine the original "converting" step or any other step.  Claim 2 is therefore inherently flawed and "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *See Nautilus*, 572 U.S. at 901.

Moreover, claim 2 also includes terms that lack antecedent basis.  For example, the terms "the command" and "corresponding code" from the "converting" step of claim 2, do not find antecedent basis in either claim 1 or claim 2 (reproduced above).  *Compare* claim 2 *with* claim 1 (reciting "a universal playback control command" and "a programming code").

Accordingly, given that claim 2 is fundamentally flawed for several reasons as discussed above, this claim should be rendered invalid as indefinite.  Touchstream has not even sought to construe this claim despite being indefinite on its face, instead claiming that there is "no construction needed" and should be given its "plain and ordinary meaning."  However, even if Touchstream sought to construe the "converting" term in claim 2, it could not be construed to retain validity.  Any interpretation to retain validity would require the Court to rewrite the claims for Touchstream, an improper result.  *See Allen Eng'g*, 299 F.3d at 1349; *K-2 Corp.*, 191 F.3d at 1364 ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

###### E.        Term 5: "universal command" ('251 Patent, claim 5)

| Google's Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Indefinite | plain and ordinary meaning - no construction needed  Alternatively, plain and ordinary meaning, which is "a standard command used for controlling playback of media content such as play or pause" |

In the '251 patent, claim 5, "universal command" is also indefinite because it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901; 35 U.S.C. § 112, ¶ 2.  In particular, claim 1, from which claim 5 depends, never uses the term "universal command"; instead, it uses different terms: "universal playback control command," and "a plurality of specific commands, each of which represents a corresponding playback control command."  We know these are different terms with different meanings because Touchstream proffered a construction for "universal command," but not so for either "universal playback control command" ('251 patent, claim 1) or "action control command" ('528 patent, claims 1, 27, and 28; '289 patent, claims 1 and 6).  Therefore, "universal command" recited in claim 5 lacks antecedent basis to claim 1, and it is not expressly defined anywhere in the Asserted Patents.  For these reasons, the patentee failed to inform with reasonable certainty whether the "universal command" is related to the "plurality of specific commands," much less what that relationship is.   Therefore, the term "universal command" is undefined and unexplained and should be found to be indefinite.

Touchstream's proffered construction for "universal command" is improper for several reasons.  First, a plain and ordinary meaning is improper given that "the universal command" of claim 5 lacks antecedent basis to independent claim 1, from which it depends, as discussed above. Second, Touchstream's proposed alternative construction "a standard command used for controlling playback of media content such as play or pause" is similarly inappropriate because substituting the claim term with this construction would inappropriately render other claim

language—specifically "stop playing the video content or to pause playing the video content"—
in claim 5 redundant.  *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1399
(Fed. Cir. 2014) (rejecting construction that would render a limitation "superfluous"); *Aristocrat
Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1356-57 (Fed. Cir. 2013) (same).

For these reasons, this claim term is also invalid as indefinite.

**F.     Term 6: "unique identification code assigned to the content presentation
device" ('289 Patent, claims 1 and 6) and "synchronization code assigned to
the content presentation device" ('528 Patent, claims 1, 27)**

| Google's Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| [unique identification / synchronization] code assigned by the server system to the content presentation device | plain and ordinary meaning - no construction needed. Alternatively, plain and ordinary meaning, which is "[unique identification code] / [synchronization code] associated with a content presentation device." |

These two terms play the same role in the claims of the '289 and '528 patents and should
be similarly construed.  The purpose of the claimed invention as embodied in the claim language
and the consistent characterization of the term (and the purported invention) in the specification
support Google's construction that a "unique identification code" or "synchronization code" is
assigned by the server system to the content presentation device.  The key point, and one avoided
in Touchstream's proposal, is that the codes are *assigned by the claimed server system*.

First, as explained in the Asserted Patents, the assignment of the "synchronization code"
('528 patent) or the "unique identification code" ('289 patent) to the content presentation device
is performed by the server.  In particular, each of claims of the Asserted Patents, including for the
'289 and '528 patents, recite a "method of controlling presentation of content on a content
presentation device."  The claims further define that the server system is utilized to facilitate the
communication and management between the user's personal computing device and the
aforementioned content presentation device.  For example, claim 1 recites that the server system

"receiv[es], … from a personal computing device, … information associated with a synchronization code assigned to the content presentation device." The "information … [is used] to store a record establishing an association between the personal computing device and the content presentation device," as further recited in the claim. Moreover, the server system is further utilized for "identifying . . . programming code corresponding to the action control command" sent from the personal computing device. Because the server system uses the "information associated with the synchronization code" as received from the personal computing device to "establish[] an association between the personal computing device and the content presentation device" and to facilitate communication for control of the content presentation device, it is axiomatic that the server system was aware that the synchronization or identification code was specific to the content presentation device. Given this recited functionality and the importance of the server to the claimed method, it is clear that the server system is the entity that assigned the code to the content presentation device at the outset.

Second, this notion is confirmed in the specification of the Asserted Patents. In particular, consistent with the claim language as discussed above, the server system that facilitates communication to the content presentation device includes a look-up table integral to connecting to and relaying pertinent information to the device. For example, the specification discloses that "the server system stores a look-up table that includes a synchronization code uniquely associated with the display device" ('251 patent, 2:16-18), and "the server system can use the synchronization code and the look-up table to identify the display device on which the content is to be played" (*id.* at 2:18-23). Furthermore, "FIG. 7B [reproduced below] illustrates an example of a synchronization code look-up table" that shows the synchronization code "435-05-342" assigned to the device illustrated in FIG. 7A. *Id.* at 2:49-50. The specification further confirms that "in

13

some implementations, the synchronization code is … assigned to the display device 22 each time it connects to the server system 24." *Id.* at 5:22-25; *see also* 5:25-35 ("Thus, a particular display device 22 may have an IP address, a MAC address, a web or browser cookie, and a synchronization code ('sync code') assigned to it at any given time.").



While the specification describes this functionality regarding the synchronization code as exemplary, this description is consistent with the repeated and consistent characteristic of the manner in which the server system is portrayed in the purported invention in the patents. The Federal Circuit "recognize[s] that when a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016). Here, from start to finish, the Asserted Patents uniformly teach that it is the server system that manages communication between the devices, including by assigning the synchronization code (or unique identification code) to the content presentation device. Consistently, the server is tasked with such similar responsibilities including: receiving messages from the personal computing device ('251 patent, 4:40-42), authenticating users and storing messages from the user (*id.* at 4:42-50), establishing the connection between the devices (*id.* at 5:36-41), and interpreting and converting standard commands to specific commands recognized by the media player (*id.* at 5:58-62), among

14

others.  Accordingly, Google's construction gets to the heart of the invention and is supported by the consistent characterization of the functionality throughout the specification.

Touchstream's alternative proposal of "[unique identification / synchronization] code *assigned to* the content presentation device" being construed as "[unique identification code] / [synchronization code] *associated with* a content presentation device" is improper for two reasons. First, it inappropriately attempts to broaden the meaning of the claimed "*assigned to*" by simply exchanging the term with "*associated with*," and second, it ignores that the server system performs the assignment.  That latter point is amply explained above.  The attempted substitution of "associated with" for "assigned by" should also be rejected.  The term "associated with" is broader than "assigned to" because, for example, "assigned to" requires a form of affirmation (*e.g.*, a component needs to affirmatively make an assignment, for example, of a code to a device) in contrast with "associated to."  Moreover, the claims in the Asserted Patents use forms of "associated" in several other claim terms and would have done so here if "associated with" was the intended meaning.

G.    **Term 7: "[identify/identifying/include information indicating] a location of the particular media player" ('528 Patent, claims 1, 27, 28; and '289 Patent, claims 1, 7)** [5]

| Google's Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| [identify/identifying/including information indicating] an Internet address from where the media player is obtained by the content presentation device | Plain and ordinary meaning, which is, provide information that locates or may be used to locate the particular media player |

The claim language, specification, and extrinsic evidence support Google's construction that "a location of the particular media player" is an Internet address for the media player, not any information somehow related to its physical location.

---

[5] Term 7 also includes a substantially similar claim term recited in dependent claims 15 of the '528 patent, which references a "second media player" rather than a "media player."

We start with the claim language.  In particular, Claim 1 recites that the server system "receiv[es] … one or more messages from a personal computing device …, wherein the one or more messages… identify a particular media player for playing content from the file" and "identify a location of the particular media player…."  Using the identification of the particular media player as well as the location of the player, claim 1 of the '528 patent further recites that the "content presentation device" "obtain[s] … the particular media player, wherein the particular media player is obtained over a network from a content provider."  Because the content presentation device obtains the particular media player over a network, a location of the particular media player must be a network location.  A network location is an Internet address, as confirmed by the specification and the extrinsic evidence, as discussed below.

Consistent with the claim language, the specification supports Google's construction that "a location of the particular media player" is an Internet address from where the media player is obtained by the content presentation device.  In particular, the specification discloses that "the personal computer [(which is an example of display device)] obtains a copy of the required video player and the selected video from an appropriate content provider over the Internet."  '528 Patent, at 7:43-48.  The specification iterates the same concept when it discloses that "the display device is operable … to obtain the first media player from the content provider."  *Id.* at 1:54-57.  "The information is provided through the server system 24 to the display device, which obtains a copy of the required video player and the selected video from an appropriate content provider over the Internet and begins to play the video."  *Id.* at 7:64–8:1.  Further, the specification clarifies, with reference to FIG. 1 (presented above for the '251 patent), the manner in which the media players are accessed over the Internet:

> The television set 22 is operable to link back to a server system 24 from which
> the television set receives commands. When a user makes a selection using

the personal computing device 20 for particular content to be displayed on the television display 23, a signal is sent through the Internet (or other network) 21 to the server system 24. A corresponding command signal then is passed along to the connected television set 22, which acts on a transmission code contained within the signal and performs specified commands. For example, in some scenarios, *the command instructs the television set 22 to access a content provider 30 through the Internet 21, load a specific media player, load the media player-specific content (e.g., a video) and play the content on the television display 23*. The user can use the personal computing device 20 to control how the content is played on the television display 23. The user may subsequently visit the same or another Web site using the personal computing device 20 to select different content (e.g., a second video) to be played on the television display 23. In that case, another signal would be sent through the server system 24 to the television set 22. *A transmission code associated with this command signal instructs the television set 22 to load a new media player (if needed) over the Internet and to load the specified video file to be played on the display 23*. Thus, the system 10 allows a personal computing device 20 to be used to select different content to be played on a remote display 23 even if different media players are required for the different content.

*Id.* at 3:5-31 (emphasis added).

Accordingly, the intrinsic record makes it unequivocal that the media player is obtained over the Internet, and, thus, a location of the media player must be an Internet location.

A person of ordinary skill would also understand that an Internet location (for obtaining the media player) is an Internet address.  This understanding is supported by several technical dictionaries that describe Internet addresses in the form of Uniform Resource Locators ("URLs") and Internet Protocol ("IP") Addresses.  "Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation." *Phillips*, 415 F.3d at 1322.  Further, "dictionaries or comparable sources . . . have the value of being an unbiased source accessible to the public in advance of litigation." *Praxair*, 543 F.3d at 1325.  These contemporaneous sources describe that for an Internet-connected device to communicate with a remote server (such as a

content provider) or to obtain software (such as a media player) over the Internet, an Internet address is required to locate such server and corresponding media player:

- FLATIRON PUBLISHING, NEWTON'S TELECOM DICTIONARY, 624 (26th Ed., 2011) (Ex. A) ("**Internet address** *When you travel the Internet or its World Wide Web area, you need an address to get to where you want to go—just like you need an address on a letter you mail or a phone number you wish to reach*. … No one wants to remember all those numbers when they go checking out their favorite site. So they come up with a neat idea of naming sites and having a bunch of computers do the translation, very similar to what happens with 800 toll-free numbers in North America. As a result *Web URLs (Uniform Resource Locators) … (such as www.horrynewton.com …) are textual addresses that are translated into correlating IP addresses through DNSs (Domain Name Servers, i.e. dedicated translation computers), which maintain tables of both domain names and IP addresses. For example, if you wish to reach www.Javanet.com, you can type www.Javanet.com in your browser or you can simply type 209.94.128.8. But www.Javanet.com is easier to remember*.") (emphasis added);

- *Id.* at 796 ("**network address** *Every node-computer, PDA, iPhone-on an Ethernet network has at least two addresses associated with it*. One is called a MAC (Media Access Control) address. It's a fixed hardware address such as 'ae-34-2c-1d-69-f1' and it's assigned by the device's manufacturer. It's the unique number assigned to the network adapter inside your computer or gadget. No one else can have your number. Additionally, *on all Ethernet networks, there's an IP (Internet Protocol) address. That address is typically assigned to your device on the fly by a router*

*connected to the Internet. Think of this address which looks like this—192.168.10.108—as your postal address. It enables the postal service (i.e. the Internet) to find you. Without your IP address you wouldn't be able to receive email or surf the Internet.*") (emphasis added);

- *Id.* at 1211 ("**URL l.** Uniform Resource locator. An Internet term. *A URL is a fancy name for an Internet address. A URL is an address that can lead you to a file on any computer connected to the Internet anywhere in the world. Thus, its name Universal Resource Locator. In more technical terms, a URL is a string expression that can represent any resource on the Internet or local TCP / IP system.*") (emphasis added);

- DOUGLAS A. DOWNING, MICHAEL A. COVINGTON, AND MELODY MAULDIN COVINGTON, DICTIONARY OF COMPUTER AND INTERNET TERMS, 256 (10th Ed., 2009) (Ex. B) ("**Internet** … *Every machine on the Internet has an address.* For example, the address beetle.ai.uga.edu means:

  | | |
  |---|---|
  | beetle | machine ('beetle') |
  | ai | subnetwork (Artificial Intelligence Lab) |
  | uga | site (University of Georgia) |
  | edu | type of site (U.S. educational) |

  Here *beetle.ai.uga.edu is a domain address that gets translated into a numeric IP address, such as 128.192.12.9, by the network itself.*") (emphasis added);

- *Id.* at 260 ("**IP address, IP number** (**I**nternet **P**rotocol address) the *numeric address of a machine*, in the format used on the Internet (IPv4 or IPv6).") (emphasis added);

19

- *Id.* at 505-06 ("**URL** (Uniform Resource Locator, Universal Resource Locator) *a way of specifying the location of publicly available information on the Internet*, in the form protocol://machine:port number/filename[.]")  (emphasis added);

- WILEY PUBLISHING, INC., WEBSTER'S NEW WORLD® TELECOM DICTIONARY, 512 (2007) (Ex. C) ("**URL (Uniform Resource Locator)** A type of *uniform resource identifier (URI) that consists of a uniform address that both identifies an abstract or physical resource on the World Wide Web (WWW) and indicates how to locate it*. As specified in IETF RFC 3986, the syntax follows a standard convention….")  (emphasis added).

Accordingly, consistent with the claim language and specification, the extrinsic record similarly supports Google's construction.

In contrast, Touchstream's alternate construction of "provid[ing] information that locates or may be used to locate the particular media player" is erroneous.  This claim term was added to the claims in order to overcome prior art.  Referring to Applicant Arguments After Non-Final Rejection, the "Summary of Examiner telephone interview" notes that:

> Independent claim 31 was discussed, as were the following references: US 2008/0301737 (Hjelmeland Almas), US 2002/0146122 (Vestergard) and US 2006/0062544 (Southwood). Examiner Huffington then proposed several amendments for applicant's consideration, any one of which in the Examiners' view would patentably distinguish the claims from the references of record. One of the suggestions proposed by the Examiners was to amend the independent claims to recite that, collectively, the one or more messages received in the server system from the personal computing device identify the "location of the media player" for playing the content from the specified file.

*See* Ex. E, '528 Patent File History, Nov. 6, 2013 Applicant Arguments/Remarks Made in an Amendment, at 9.  The independent claims were thus amended to recite "receiving, in a server system, one or more messages from a personal computing device that is separate from the server

system and separate from the content presentation device, wherein the one or more messages, taken together, . . . <u>identify a location of the particular media player</u>."  *See* Ex. E, File History, Nov. 6, 2013, Amended Claims.

Now, during claim construction, Touchstream attempts to improperly broaden the scope of this term to include "information that locates or may be used to locate the particular media player" rather than provision of the location (*i.e.*, "Internet address") itself.  "Information that locates or may be used to locate the particular media player" is broader than a "location" because while the internet address is merely an address of a particular location, information that locates or used to locate a media player can alternately or additionally include, for example, communication pathways that ultimately lead to an address or particular location.  Such broadening of the claim terms constitutes an impermissible rewriting of the term.  "It is not [the Court's] function to rewrite claims to preserve their validity."  *Allen Eng'g*, 299 F.3d at 1349; *K-2 Corp.*, 191 F.3d at 1364 ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").  Moreover, as discussed directly above, Touchstream's construction is fundamentally different from the scope of the claims.  As discussed above in Newton's Telecom Dictionary, "When you travel the Internet or its World Wide Web area, you need an address to get to where you want to go." Ex. A at 624.  This is analogous to traveling within a city, where the address of the intended destination is required to reach said destination.  Touchstream's construction, however, would allow, for example, provision of a map and *not* the address for identifying the intended destination. In such a scenario, while a map may be utilized to locate the destination (consistent with Touchstream's construction), the map alone is not sufficient.  Rather, the address in addition to the map is necessary to define the location of the destination.  Likewise, here, it is the Internet address

of the media player, as provided by the personal computing device, that is required to obtain the particular media player at the content presentation device.

Touchstream's proposal demonstrates that a construction is necessary, and the intrinsic record and extrinsic evidence demonstrate that Google's proposed construction is correct.

### H.     Term 8: "action control command being independent of the particular media player" ('528 Patent, claims 1, 27, 28; '289 Patent, claims 1 and 6)

| Google's Proposed Construction | Touchstream's Proposed Construction |
| --- | --- |
| action control command being in a standard format that must be converted for use by the particular media player | plain and ordinary meaning - no construction needed |

Google's construction of "action control command being independent of the particular media player" for claims 1, 27, and 28 of the '528 patent and claims 1 and 6 of the '289 patent should be accepted because it is consistent with the purpose of the patent's purported invention, compelled by the claims and the specification, and supported by Touchstream's proffered constructions of related terms.  Google's construction clarifies two aspects of the "action control command": (1) the command is in a standard format and (2) must be converted for use by the particular media player.  This construction will improve the jury's understanding of being "independent of the particular media player," unlike Touchstream's non-construction.

As an initial matter, Google's construction should be accepted because the precise phrasing of Term 8, specifically that the "action control command" is "independent of the particular media player," was important to the issuance of the claim.  While the term appears simple at initial reading, it requires special attention as it was amended by the Applicant during prosecution to obtain issuance and embodies one of the primary purposes of the purported invention.  *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1997) (construction should be "consistent with and further[] the purpose of the invention").  In particular, during prosecution of the '528 patent, the Applicant amended the claim to add the "independent" clause to avoid prior

22

art cited by the Examiner.  This is express in the prosecution history of the patent, where the Applicant, following a Non-Final Rejection by the Patent Office Examiner, participated in an interview with the Examiner.  *See* Ex. D ('528 Patent File History, July 31, 2013 Applicant Arguments/Remarks Made in an Amendment) at 10.  This interview is summarized in the Applicant's Remarks: "It was agreed that claim 25 would be allowable if it were clarified (i) that the action control command is independent of the particular media player and (ii) that the step of 'identifying programming code corresponding to the action control command' is performed by the server system."  *Id.*  Claim 25 (now claim 27) in the file history was thus amended to recite (with the underline reflecting the amendments):

> A method of controlling presentation of content on a content presentation device that loads anyone of a plurality of different media players, the method comprising:. . . receiving, in the server system, a second message from the personal computing device, the second message . . . including an action control command for presentation of the content on the content presentation device by the particular media player, ***the action control command being independent of the particular media player***; . . . *identifying, <u>by the server system</u>, programming code corresponding to the action control command*, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player . . . ."

*See* Ex. D ('528 Patent File History, July 31, 2013, Amended Claims) at 5-6 (emphasis added, underline in original); *see also id.* at 8-9 (new claim 31).  Applicant also added new claim 31, which corresponds to asserted claim 1, and which the Applicant represented was "similar to claim 25, except that instead of reciting different messages from the personal computing device for the synchronization code and the other information . . . , claim 31 recites 'one or more messages' . . . ."  *See id.* at 10.  Because this claim language was used to avoid prior art during prosecution, Google's construction will help impart this importance to the jury—specifically that the original command is standard and then converted to a format understandable to the media player—and

avoid a potential attempt by Touchstream to read this language out of the claim by merely proposing a construction of plain and ordinary meaning.

The patents' claim language and the specification similarly compel Google's construction, as discussed directly below.  First, the asserted independent claims of the '528 and '289 patents illustrate that Google's construction is correct.  In particular, the claims define a communication flow between a personal computing device (*e.g.*, a phone or tablet) and a content presentation device (*e.g.*, a television) facilitated and managed by a server system.  In addition, the claims recite that, among other things, the server system is responsible for (1) receiving an "action control command" from the personal computing device; and then (2) identifying a "programming code" that corresponds to the action control command and is used by the particular media player.  The claims also recite the intended function for each of the "action control command" and "programming code."  However, the claims recite that the "action control command" is intended "for presentation of the content on the content presentation device by the particular media player" while the "programming code" is similarly intended "for controlling presentation of the content by the content presentation device using the particular media player."  Importantly, unlike the "programming code," the "action control command" is also expressly "independent from the particular media player" so it cannot be used to directly control the particular media player.  Given that the claim language recites almost identical attributes for these two distinct components, Google's construction seeks to clarify the function of the "action control command."  In particular, the construction shows that the command is originally in a standard format that cannot control the particular media player, which must be converted to a *different* format (*i.e.*, the "programming code") in order for use by the content presentation device with "the particular media player".

Second, Google's construction is consistent with the specification, and, in fact, relies on the specification consistently described as being performed "[e]ach time" at the server.  *See* '251 patent, 5:53-6:6.  "Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term."  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004).  In particular, the specification describes a "universal adapter 26" that "is provided to interpret and **convert** a **standard** or universal command (e.g., play, pause, etc.) **into the specific command recognized by the media player**."  *See* '251 patent, 5:53-6:6 (emphasis added).  In doing so, "**[*e*]*ach time*** a signal is received from the mobile device 20," the adapter first "checks and identifies the specific media player that is being requested" and using information stored at the server "**converts the incoming commands** from the mobile device 20 into the correct JavaScript (or other programming) code used by the target device 22 **to control the specific player** (block 120)."  *See id.* (emphasis added); *see also id.* ("The server system 24 then copies the converted version of the message to the database 34 associated with the target device 22").

Illustrative of this implementation, the specification further describes that the "universal adapter 26" described above can be used, for example, "for a universal command 'New Video,'" where "the universal adapter 26 provides the corresponding command for each of several specific media players (e.g., 'yt_loadVideo' for YouTube)."  *See id.* at 6:7-18.  "Similarly, for a universal command 'Pause,' the universal adapter 26 provides the corresponding command for each of several specific media players (e.g., 'pauseVideo' for Ted.com)."  *See id.*  Consistent with the above description, that is performed "each time" at the server, this additional example describes how the standard or universal commands received by the server system are converted to the corresponding programming code of the chosen media player.  *See id.*; *see also, e.g., id.* at 2:3-7

("The server system is operable, in response to receiving the message, to convert the command into a corresponding command recognizable by the media player . . . ."). Accordingly, Google's construction is also consistent with the specification, which describes the purported invention of the patent in its entirety.

Finally, Google's construction is also consistent with Touchstream's proposals regarding related claim terms. *W. H. Wall Fam. Holdings, LLLP v. Celonova Biosciences, Inc.*, No. 1-18-CV-00303-LY, 2019 WL 4016454, at *2 (W.D. Tex. Aug. 26, 2019) ("Other claims, asserted and unasserted, can provide additional instruction because 'terms are normally used consistently throughout the patent...'" (*quoting Phillips*, 415 F.3d at 1314)). In particular, the alternative construction Touchstream advances for "universal command" (Term 5) is "a standard command used for controlling playback of media content such as play or pause." Consistent with this construction, Touchstream's construction confirms that the commands received by the server system (prior to conversion) are indeed "standard" commands. Touchstream's use of "standard" is also consistent with the specification, as discussed above, and further supports Touchstream's construction. Similarly, Touchstream's alternative construction for "programming code" (construed as "instructions that the media player can recognize and execute") recognizes that the action control command is not in a format that is recognized and executed by the particular media player, reinforcing that an "action control command independent of a particular media player" requires conversion to a format that the player can "recognize and execute."

I.  **Term 9: "identifying, [by the server system,] programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device**

using the particular media player" ('528 Patent, claim 1, 27, 28; '289 Patent,
claims 1 and 6) [6]

| Google's Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| by the server system, identifying the specific media player that is being requested and converting the incoming commands into the correct programming code used by the content presentation device to control the specific media player | plain and ordinary meaning - no construction needed.  Alternatively, plain and ordinary meaning for "programming code," which is "instructions that the media player can recognize and execute," otherwise plain and ordinary meaning - no construction needed |

Term 9, the "identifying" step for the '528 and '289 patents relates to the server activity
following receipt of the "action control command" in Term 1.  Google's construction for the
"identifying" step serves two primary purposes: (1) emphasizing that the step is performed by and
at the server and (2) describing the step as requiring that the incoming "action control command"
is converted into the correct "programming code" required by the requested media player.
Google's construction should be accepted because it is consistent with the purpose of the patent's
purported invention and supported by the claims and the specification.  And, construction of Term
9 is necessary and appropriate because it was necessary to "clarify" that term to obtain issuance.

We start with that critical point – as summarized in the Applicant's Remarks: "It was
agreed that claim 25 would be allowable if it were clarified (i) that the action control command is
independent of the particular media player and (ii) *that the step of 'identifying programming code
corresponding to the action control command' is performed by the server system*."  *Id.* (emphasis
added).  Claim 25 (now claim 27) in the file history was thus amended to recite (with the underline
reflecting the amendments):

> A method of controlling presentation of content on a content presentation
> device that loads anyone of a plurality of different media players, the
> method comprising:. . . receiving, in the server system, a second message
> from the personal computing device, the second message . . . including an

[6] Term 9 also includes substantially similar claim terms recited in dependent claims 14 and 15 of
the '528 patent, which reference a "second programming code" rather than "programming code."

> action control command for presentation of the content on the content presentation device by the particular media player, <u>the action control command being independent of the particular media player</u>; . . . *identifying, **by the server system**, programming code corresponding to the action control command*, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player . . . ."

*See* Ex. D ('528 Patent File History, July 31, 2013, Amended Claims) at 5-6 (emphasis added, underline in original); *see also id.* at 8-9 (new claim 31). As discussed above, Applicant also added new claim 31, which corresponds to the current claim 1, which the Applicant represented was "similar to claim 25." *See id.* at 10. Notably, Google has emphasized the "by the server system" clause by moving it to the front of its proposed construction. This more prominent placement will emphasize to the jury the purpose of this claim language – that the identifying step (*i.e.*, converting the action control command to the correct programming code) is performed by and at the server system. *See CVI/Beta Ventures*, 112 F.3d at 1160.

Second, similar to Term 8, Google's construction is also consistent with the asserted independent claims of the '528 and '289 patents, which define that the server system facilitates a communication flow between a personal computing device (*e.g.*, a phone or tablet) and a content presentation device (*i.e.*, a television). In particular, among other things, the server system is responsible for (1) receiving an action control command from the personal computing device; and then (2) identifying a "programming code" that corresponds to the action control command, which is subsequently executed by the media player at the content presentation device. Importantly, both the "action control command" and "programming code" are used "for presentation of the content on the content presentation device by the particular media player." However, it is apparent from the claims that the "action control command" and "programming code" are of two separate formats and the former must be converted to the latter in order for the chosen media player to execute the command. Moreover, logically, and as explained further below in the specification, in order to

28

convert to the appropriate programming code, the server must also use the identified media player to facilitate such conversion.  Accordingly, the claims support Google's construction.

Third, and as discussed with Term 8, Google's construction is also consistent with the specification, and again leverages language that the specification describes as being performed "[e]ach time" at the server.  *See* '251 patent, 5:53-6:6; *see also C.R. Bard*, 388 F.3d at 864; *Phillips*, 415 F.3d at 1315.  In particular, pertinent to the "identify" step, the specification describes a "universal adapter 26" that "is provided to interpret and ***convert* a *standard*** or universal command (e.g., play, pause, etc.) ***into the specific command recognized by the media player***."  *See* '251 patent, 5:53-6:6 (emphasis added).  In doing so, "[***e]ach time*** a signal is received from the mobile device 20," the adapter at the server first "checks and ***identifies the specific media player that is being requested***" and "***converts the incoming commands*** from the mobile device 20 into the correct JavaScript (or other programming) code used by the target device 22 to control the specific player (block 120)."  *See id*. (emphasis added); *see also id.* ("The server system 24 then copies ***the converted version*** of the message to the database 34 associated with the target device 22") (emphasis added).

Notably, the specification never uses the word "identify" to describe this step.  The specification does, however, use the word "convert" multiple times, as shown above.  Moreover, in the "Summary" of the invention, the specification likewise leverages "convert" to describe this functionality: "The server system is operable, in response to receiving the message, ***to convert the command*** into a corresponding command recognizable by the media player . . . ."  *Id.* at 2:3-7 (emphasis added).  "Although a statement's location is not 'determinative,' the location can signal the likelihood that the statement will support a limiting definition of a claim term. . . . Statements that describe the invention as a whole are more likely to be found in certain sections of the

specification, such as the Summary of the Invention." *C.R. Bard, Inc.*, 388 F.3d at 864; *Trustees of Columbia Univ.*, 811 F.3d at 1363-64 ("The only meaning that matters in claim construction is the meaning in the context of the patent.").   Accordingly, Google's construction is supported by the specification as described in both the summary of the invention and in the detailed description, which is performed "each time" at the server.  *See Eon Corp.*, 815 F.3d at 1320.

Finally, while Touchstream does not offer a construction for this term as a whole, it does provide an alternative construction for "programming code": "instructions that the media player can recognize and execute."   As discussed above for Term 8, Touchstream concedes that the "action control command" is not in a format that is recognized and executed by the particular media player, reinforcing that the incoming command requires conversion to a format that the player can "recognize and execute," namely the programming code.  It is undeniable that this process occurs during the "identifying" step.   Accordingly, Google's construction is consistent with Touchstream's construction for programming code, in part.  Touchstream's full construction, however, is flawed because it exchanges code with the more generic term, "instructions." "Instructions," unlike "programming code," is untethered from the specification, because it potentially includes subject matter not readable or executable by a computer or software.  *Trustees of Columbia Univ.*, 811 F.3d at 1363-64.

Dated: December 16, 2021

By: */s/  Michael C. Hendershot with permission,*
*by Michael E. Jones*
Michael C. Hendershot

JONES DAY
Tharan Gregory Lanier  (*Admitted pro hac vice*)
CA State Bar No. 138784
E-mail: tglanier@jonesday.com
Michael C. Hendershot  (*Admitted pro hac vice*)
CA State Bar No. 211830
E-mail: mhendershot@jonesday.com
Evan M. McLean  (*Admitted pro hac vice*)
CA State Bar No. 280660
E-mail: emclean@jonesday.com
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:   (650) 739-3939
Facsimile:    (650) 739-3900

POTTER MINTON PC
Michael E. Jones
TX State Bar No. 10929400
E-mail:  mikejones@potterminton.com
Patrick C. Clutter
TX State Bar No. 24036374
E-mail:  patrickclutter@potterminton.com
110 N. College Ave., Suite 500
Tyler, TX 75702
Telephone:   (903) 597-8311
Facsimile:    (903) 593-0846

***Attorneys for Defendant***
***GOOGLE LLC***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to all counsel of record who have appeared in this case per Local Rule CV-5(b) on December 16, 2021.

*/s/ Michael E. Jones*
Michael E. Jones