**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| TOUCHSTREAM TECHNOLOGIES, INC. | |
| Plaintiff, | |
| v. | Civil Action No. 6:21-cv-569-ADA |
| GOOGLE LLC | **JURY TRIAL DEMANDED** |
| Defendant. | |

## TOUCHSTREAM'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND OF THE ASSERTED PATENTS .................................................... 1

III.  AGREED CONSTRUCTIONS ................................................................................... 3

IV.   DISPUTED CONSTRUCTIONS .............................................................................. 4

    A.   "an association between the personal computing device and the [display device /
        content presentation device]" ('251 patent, claim 1; '528 patent, claims 1, 27, 28;
        and '289 patent, claims 1, 6) .................................................................................... 4

    B.   "video file" / "video content" ('251 patent, claims 1, 6, 7) ......................................... 9

    C.   "converting the command from the personal computing device into
        corresponding code to control the media player" ('251 patent, claim 2) ..................... 10

    D.   "universal command" ('251 patent, claim 5) ............................................................. 11

    E.   "unique identification code assigned to the content presentation device"
        ('289 patent, claims 1 and 6) and "synchronization code assigned to the content
        presentation device" ('528 patent, claims 1, 27) ...................................................... 14

    F.   "[identify/identifying/include information indicating] a location of the particular
        media player" ('528 patent, claims 1, 27, 28; and '289 patent, claims 1, 7) ................ 18

    G.   "action control command being independent of the particular media player"
        ('528 patent, claims 1, 27, 28; '289 patent, claims 1 and 6) ...................................... 23

    H.   "identifying, [by the server system,] programming code corresponding to the
        action control command, wherein the programming code is for controlling
        presentation of the content presentation device using the particular media player"
        ('528 patent, claims 1, 27, 28; '289 patent, claims 1 and 6) ...................................... 27

V.    CONCLUSION ......................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013) ........................................................................ 14, 15

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003) ............................................................................... 19

*AK Steel Corp. v. Sollac*,
    344 F.3d 1234 (Fed. Cir. 2003) ............................................................................... 11

*Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*,
    998 F.3d 1320 (Fed. Cir. 2021) ............................................................................... 20

*Bushnell-Hawthorne, LLC v. Cisco Sys., Inc.*,
    813 F. App'x 522 (Fed. Cir. 2018) .......................................................................... 12

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004) ................................................................................. 24

*Chimie v. PPG Indus., Inc.*,
    402 F.3d 1371 (Fed. Cir. 2005) ............................................................................... 25

*Eidos Display, LLC v. AU Optronics Corp.*,
    779 F.3d 1360 (Fed. Cir. 2015) ................................................................................. 9

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
    435 F.3d 1366 (Fed. Cir. 2006) ............................................................................... 12

*GPNE Corp. v. Apple Inc.*,
    830 F.3d 1365 (Fed. Cir. 2016) ............................................................................... 17

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) ..................................................................... 6, 16, 24

*In re Downing*,
    754 F. App'x 988 (Fed. Cir. 2018) ..................................................................... 12, 13

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
    783 F.3d 1262 (Fed. Cir. 2015) ............................................................................... 17

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009) ........................................................................... 7, 29

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ................................................. 17

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ................................................. 9, 13

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ................................................. 21

*Omega Eng'g, Inc, v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ................................................. 25

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................. 15, 20

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008) ................................................. 24, 29

*ScriptPro LLC v. Innovation Assocs., Inc.*,
    833 F.3d 1336 (Fed. Cir. 2016) ................................................. 8

*Tech. Props. Ltd. LLC v. Huawei Techs. Co.*,
    849 F.3d 1349 (Fed. Cir. 2017) ................................................. 22

*Thorner v. Sony Comput. Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ................................................. 23, 27

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012) ................................................. 4, 21

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ................................................. 8, 21

**Statutes**

35 U.S.C. § 112 ................................................. 11

## I.      INTRODUCTION

Touchstream's claim construction positions are rooted in straightforward and longstanding rules decided by the Federal Circuit. For example, if a claim term carries a customary meaning in the industry, that meaning should apply barring extraordinary circumstances. Google, by contrast, attempts to insert many narrowing limitations into its proposed constructions that are not supported by the intrinsic evidence. Google repeatedly and improperly restricts the plain and ordinary meaning of the claim terms by importing limitations that are inconsistent with the plain claim language itself, the overall context of the terms and phrases in the claims, and the disclosures provided in the specifications. The Court should also reject Google's contention that certain terms are indefinite because those terms' plain language delineate their scope with more-than-reasonable clarity.

## II.     BACKGROUND OF THE ASSERTED PATENTS

Founded in 2011, Touchstream, d/b/a "Shodogg," develops software that enables content to be cast (e.g., accessed, displayed, and controlled) from a mobile device to a second  display screen (e.g., TV, computer, tablet, etc.). As the leader in developing casting technology, Touchstream sought to protect its intellectual property, including through obtaining the patents-in-suit. The patents-in-suit share a specification, and each claims priority to the same U.S. Provisional Patent Application No. 61/477,998 (filed on April 21, 2011). The '251 patent is a continuation of the '289 patent, and the '528 patent is a continuation of the '251 patent.

Prior to the disclosures provided in the patents-in-suit, while a user of a personal computing device (e.g., a mobile device) could find, view, and control content on his or her device, this had significant disadvantages (e.g., the size of the mobile device, power limitations, ability to watch

with others, etc.). To address these disadvantages, the technology disclosed in the patents-in-suit enables a user to locate content on his or her mobile device, select a second device (e.g., a TV, computer, tablet, etc.*),* and view and control the content on the second device using the mobile device. This solution provides a user-friendly and seamless way of promoting and facilitating the consumption content.

The patents-in-suit explain that a personal computing device may send a message to a server system, where the message identifies (1) content to be presented and controlled, and (2) a device on which the content will be presented and controlled. ('251 patent at 2:66-3:18). Based on the information received in the message, the patents-in-suit teach that an association (as illustrated in Figure 1, below) is created between the personal computing device and the content presentation device through the server system:



FIG. 1

'251 patent at Figure 1 (annotations added).

2

(*See also, e.g.*, '251 patent at 1:43-52). The messages that are exchanged between the personal computing device, server system, and content presentation device dictate the manner in which content is presented and controlled on the content presentation device (e.g., play, pause, etc.). (*Id.* at 3:33-41).

The asserted independent claims recite that a mobile device may transmit a message to the server system, the message identifying in part: (1) the content, (2) the second device (e.g., display device), and (3) the manner in which to present and control the content. (*See, e.g.*, '289 patent, Claim 1, at 11:28-42). These claims further recite that the association among the personal computing device and display device may be stored so that the information relating to the presentation and control over the displaying of the video content may be transmitted. (*Id.* at 11:32-34).

## III.    AGREED CONSTRUCTIONS

| Claim Term | Agreed Construction |
|------------|---------------------|
| "media player" ('251 patent, claim 1; '528 patent, claims 1, 27, 28; and '289 patent, claims 1, 6) | plain and ordinary meaning |

Touchstream originally proposed the construction "a computer application operable to present content and control presentation of the content" for this term to ensure that it was construed consistently across all three patents-in-suit. Based on Google's arguments in its opening brief, Touchstream accepts a plain and ordinary meaning construction, which encompasses the media player being both a "computer application" and further being capable of both presenting content and controlling its presentation.

3

## IV.    DISPUTED CONSTRUCTIONS

### A.   "an association between the personal computing device and the [display device / content presentation device]" ('251 patent, claim 1; '528 patent, claims 1, 27, 28; and '289 patent, claims 1, 6)

| Touchstream's Proposed Construction | Google's Proposed Construction |
|---|---|
| plain and ordinary meaning - no construction needed | one-to-one mapping between the personal computing device and the [display device / content presentation device] |

Touchstream submits that the simple term "association" is used here in its plain and ordinary sense and requires no construction. An "association," according to the patents-in-suit, is simply a "connection" or "correspondence" between two things—here the "personal computing device" and the "[display device / content presentation device]."[1] The patents-in-suit use the term "association" in its ordinary sense, which would be readily apparent to a person of ordinary skill in the art, and even to a lay juror. "Absent disclaimer or lexicography, the plain meaning of the claim controls." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012). Because the intrinsic record does not contain disclaimer or lexicography that justifies departing from the plain meaning as understood by persons of ordinary skill in the art, the plain meaning of "association" governs.

The intrinsic record shows that the term "association," as used in the patents-in-suit, does not deviate from its plain and ordinary meaning. The claims state that the "association" between the personal computing device and the display device is established by "a record" that allows the user to carry out the claimed method of using the personal computing device to control presentation

---

[1] The asserted claims of the '251 patent recite the term "display device," while the asserted claims of the '528 and '289 patents recite the term "content presentation device."

of content on the presentation device.  (E.g., '251 patent, Claim 1). The claimed "association,"
then, simply indicates a connection or relationship between the two devices so that the personal
computing device can be used to control presentation of content on the display device, consistent
with the plain and ordinary meaning of the term "association."[2]

The specification repeatedly describes an "association" broadly as a "connection" or
"correspondence" between the personal computing device and the display device.  For instance,
the specification explains how, in one embodiment, a look-up table "stores a *correspondence*
between a particular personal computing device (such as mobile phone 20) and target devices (e.g.,
the television set 22) to which the user command is directed." ('251 patent at 4:55-59) (emphasis
added). The specification then explains how the "correspondence" is used to establish a
"connection" between the personal computing device (a "mobile phone" in this embodiment) and
the display device:

> Once a *connection* is established between the mobile phone 20 and the display
> device 22, signals sent from the mobile device 20 to its associated database 32 are
> copied to a database 34 associated with the target device (e.g., television set 24)
> based on the *correspondence* between the mobile device and the target device listed
> in the look-up table 36 (block 122).

(*Id.* at 5:42-48) (emphasis added). More specifically, that "connection" or "correspondence" is
used to facilitate messaging between the personal computing device and the display device so that
the user can control playback of content on the display device using a media player:

> Thus, the database 32 entries associated with a particular display device (e.g.,
> television set 24) provide a record of the messages received for that display device,

---

[2] For instance, the 1997 Random House Webster's Unabridged Dictionary, 2nd Edition, defines
an "association" as "a connection or combination," and further as "the act of associating or state
of being associated," where "associate" is defined as "to connect or bring into relation." (Ex. A
at 3).

> as well as an indication of the identification of the device that sent each message,
> an indication of the media player required to play the video, and an indication of
> the selected video.

(*Id.* at 5:48-53). Nothing in these disclosures compels anything other than a plain and ordinary meaning construction for the term "association." The term is used in its ordinary sense, absent any lexicography or disavowal, and neither the specification nor claims justifies narrowing the term to a "one-to-one mapping."

Google's proposed construction is both confusing and unsupported by the intrinsic record. It will not aid the jury in understanding this term, as it raises more questions than it answers. For example, what constitutes a "one-to-one" mapping? Does it exclude other associations between the personal computing device and other display devices? Does it exclude other associations between a display device and other personal computing devices? Google describes a "one-to-one mapping" as a "direct connection between two items," but this is no more helpful. What, exactly, is a "direct" connection, and how does it differ here from an "indirect connection"? Does this preclude infringement when a home WiFi router is used for device connectivity? Google's proposal converts a commonly-used term understandable by a lay person into something technical and confusing.

Further, Google's proposed construction is unsupported by the intrinsic record. Google improperly attempts to read a preferred embodiment into the claims without providing any justification for doing so. "The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014) (refusing to deviate from

plain and ordinary meaning where specification stated that figures were exemplary only and "merely illustrate[d] embodiments of the invention") (citations omitted). The portions of the specification to which Google cites, describing a single connection, make clear that they are exemplary only and not meant to limit the scope of the invention. The specification states, for instance, "*In this example*, it is assumed that, at most, a single connection is established at any given time between a particular mobile phone and a display device," and goes on to state "However, as explained below, other scenarios are also possible to establish *group* connections (e.g., multiple mobile phones connected to the same display device)."   ('251 patent at 4:60-65) (emphasis added).

Indeed, the specification does go on to describe embodiments with (1) *multiple* personal computing devices connected to one display device ('251 patent at 8:8-32); (2) one personal computing device connected to *multiple* display devices (*id.* at 8:33-44); and (3) *multiple* personal computing devices connected to *multiple* display devices (*id.* at 8:45-9:2), further showing that Google's proposed construction is improperly based on a non-limiting exemplary embodiment. The specification makes clear that an association or "connection" between these multiple personal computing devices and display devices is a fundamental part of these embodiments.[3] The

---

[3] *See* '251 patent at 8:29-32 ("The look-up table 36 in the server system 24 stores the connections established between the personal computing devices of the users in the group and the display device (see FIG. 15)."); 8:33-37 ("A fourth scenario involves one user's smartphone and multiple display devices (FIG. 11). In this example, a user opens the application on his smartphone to establish a connection to a first display device and then repeats the process for multiple display devices."); 8:45-51 ("A fifth scenario involves multiple users' smartphones and multiple connected display devices (FIG. 12). . . . Each user establishes a connection from her smartphone to the display device where she is located."); 8:66-9:2 ("The look-up table 36 in the server system 24 stores the connections established between the personal computing devices of the users in the group and the display devices (see FIG. 15).").

specification does not describe these embodiments as separate or distinct inventions compared to the single-phone/single-display embodiment; rather, it expressly connects them all, stating "[e]xamples of several scenarios that can be implemented *using the system described above* are described in the following paragraphs." (*Id.* at 7:12-15) (emphasis added).  As the Federal Circuit has highlighted, a claim construction that excludes other disclosed embodiments—as Google's "one-to-one" construction would—is rarely correct, and Google provides no justification for doing adopting such a construction here. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (stating that courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification"); *see also ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341-42 (Fed. Cir. 2016) (holding that where a specification expressly contemplates other embodiments or purposes," that "specification's focus on one particular embodiment or purpose cannot limit the described invention").[4]

The asserted claims use the term "association" in its ordinary sense, and thus its meaning would be readily apparent to both a person of ordinary skill in the art and a layperson. Google has failed to point to any instances of disclaimer or lexicography that would justify a departure from this plain meaning. Further, Google's proposal is both confusing and improperly narrow— excluding multiple embodiments from the asserted claims. Accordingly, the Court should reject Google's construction and construe this term as having its plain and ordinary meaning.

---

[4] In a footnote, Google argues that these embodiments involving *multiple* personal computing devices and/or *multiple* display devices are not covered by the asserted claims, because the claims "recite a single display device and single personal computing device." (Dkt. No. 25 at 7). But Google ignores the fundamental tenet that the claims at issue use open "comprising" clauses, and thus do not exclude additional personal computing devices or presentation devices from the scope of the claims.

B.  **"video file" / "video content" ('251 patent, claims 1, 6, 7)**

| Touchstream's Proposed Construction | Google's Proposed Construction |
|---|---|
| plain and ordinary meaning - no construction needed | indefinite |

While Google alleges that these terms are used interchangeably in the claims and are therefore indefinite, a person of ordinary skill in the art—and even a lay person—would readily understand the distinction between a video "file" and the video "content" stored thereon. Therefore the terms are not indefinite.

Whether a claim is indefinite is judged from the perspective of a person of ordinary skill in the art, and proving indefiniteness requires clear and convincing evidence. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). In assessing indefiniteness, a limitation should be considered "in the context of the particular claim in which the disputed term appears, [and] in the context of the entire patent, including the specification." *Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1365 (Fed. Cir. 2015) (quoting *Phillips*, 415 F.3d at 1313).

Properly considered in the context of the claims, the terms "video file" and "video content" are not used interchangeably, as Google alleges, but rather are used in an ordinary sense that would make the distinction between them clear to a skilled artisan, and even to a layperson. The plain language of the claims makes clear that a video *file* is specified in signals from the personal computing device; those signals specify the particular video *file* "to be acted upon" (E.g., '251 patent, Claim 1) (emphasis added). The plain language of the claims also makes clear that video *content* is what is actually played back and controlled by the media player in response to commands sent from the personal computing device. For instance, the claims recite that the media player is used "for *playing* the *video content*" and "for controlling *playing* of the *video content* on the display

9

device." (*Id.*) (emphasis added).

These uses of "file" and "content"—with the file storing the content, which is then played back—are also consistent with the plain and ordinary meanings of those terms. A skilled artisan—and even a lay juror—would readily understand a "file" as a container that stores "content." The file can be moved around (e.g., copied-and-pasted, downloaded, etc.), and its contents go with it. A user can double click on a file on his or her computer to view its "content." Similarly, here, a user can retrieve a "video file" and play back its "content," for instance by streaming over the Internet or by loading the file into an appropriate player and pressing "play," "stop," etc.

The specification likewise reflects this distinction between a video "file" and the video "content" contained in the file by making clear that video "files" are downloaded from "content providers," and the video associated with the file—i.e., the "content" provided by the "content provider"—is then played back and controlled using various commands such as "pause, fast forward, rewind, stop, play, etc." ('251 patent at 6:35-54, Fig. 6). The plain meaning of these terms, the context in which they are used in the asserted claims, and the specification make the distinction between them clear. Each has a definite and distinct meaning that would be understood by both a person skilled in the art and a layperson. The Court should therefore reject Google's assertion that these terms are indefinite.

**C.** **"converting the command from the personal computing device into corresponding code to control the media player" ('251 patent, claim 2)**

| Touchstream's Proposed Construction | Google's Proposed Construction |
|---|---|
| plain and ordinary meaning - no construction needed | indefinite |

Google alleges that this term is indefinite because it "repeats language from claim 1," but Google's indefiniteness argument requires contorting the disputed claim language in an attempt to create confusion and ignores the more plausible and common-sense reading. Claim 1 requires "converting, by the server system, the universal playback control command into corresponding programming code to control playing of the video content on the display device by the particular media player." Claim 2 recites "the method of claim 1 including . . . converting the command from the personal computing device into corresponding code to control the media player." "Dependent claims are presumed to be of narrower scope than the independent claims from which they depend." *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1242 (Fed. Cir. 2003); *see also* pre-AIA 35 U.S.C. § 112, ¶ 4 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."). Thus a person of ordinary skill in the art would understand claim 2 to simply add a further limitation requiring "converting." Under this straightforward interpretation, there is no confusion about the scope of claim 2, and Google has not met its heavy burden to show otherwise by clear and convincing evidence.

### D.   "universal command" ('251 patent, claim 5)

| Touchstream's Proposed Construction | Google's Proposed Construction |
|---|---|
| plain and ordinary meaning - no construction needed<br><br>alternatively, plain and ordinary meaning, which is "a standard command used for controlling playback of media content such as play or pause" | indefinite |

A person of ordinary skill in the art, and even a lay juror, would readily understand that the "universal command" recited in this dependent claim 5 is merely a shorthand for the "universal

playback control command" of independent claim 1, and that both the "universal playback control command" and "universal command" terms are used in their ordinary sense to mean exactly what the terms "universal," "playback control," and "command" suggest: a standard command used for controlling playback of media content, such as "play" or "pause."  Accordingly, this term should be afforded its plain and ordinary meaning, and the Court should reject Google's argument that this term is indefinite.

Google's primary argument—that  "universal command" is indefinite because it lacks an antecedent basis in claim 1—fails because "the lack of an antecedent basis does not render a claim indefinite as long as the claim apprises one of ordinary skill in the art of its scope and, therefore, serves the notice function required by [§ 112 ¶ 2]." *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018) (citations omitted); s*ee also Bushnell-Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526 (Fed. Cir. 2018) ("The lack of antecedent basis . . . does not end the [indefiniteness] inquiry."). Indeed, "[w]hether [a] claim, despite lack of explicit antecedent basis . . . nonetheless has a reasonably ascertainable meaning must be decided in context." *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006).

*Energizer* is on-point. There, an independent claim recited "an anode gel comprised of zinc," and its dependent claim recited "said zinc anode." The Federal Circuit reasoned that it was "apparent that the claim can be construed" and concluded that "'anode gel' is by implication the antecedent basis for 'said zinc anode.'" *Id.* at 1371 (overturning the lower court's indefiniteness finding). There was, after all, no other "anode" claimed that was made of "zinc." The case for indefiniteness is even weaker here, given that there is no real possibility of confusion (as might be possible with "anode gel" and "anode"). Here, the term "universal playback control command" in

claim 1 of the '251 patent is by implication the antecedent basis for "universal command" in claim 5. Claim 1 refers to only one "universal" command; the term "universal" is not used anywhere else in the claims. What else, then, could the "universal command" of claim 5 be? *See in re Downing*, 754 F. App'x at 996 (finding term "the end user" not indefinite for lack of antecedent basis where independent claim recited only one "end user," and asking "[w]ho else could the end user be?").

Further, the specification makes it clear that the "universal command" recited in claim 5 is the same as the "universal playback control command" of claim 1. *See Nautilus*, 134 S. Ct. at 2124 (claims must be "read in light of the specification" in evaluating indefiniteness). For example, when discussing a particular embodiment, the specification describes the "universal command" as a command that is converted into a specific command recognized by a media player. (E.g., '251 patent at 5:58-62, "[I]n the illustrated implementation, a universal adapter 26 is provided to interpret and convert a standard or universal command (e.g., play, pause, etc.) into the specific command recognized by the media player."). The "universal playback control command" is the _only_ command that is "converted" for use "by the particular media player" in claim 1. Therefore a person of ordinary skill in the art, reading the claims in view of the specification, would readily understand that the "universal command" of claim 5 is the same as the "universal playback control command" of claim 1: these terms both refer to a command that is converted into the command used by the media player.

Finally, Touchstream's alternative proposed construction does not render any claim terms superfluous, as Google contends; rather, the examples given therein ("play" and "pause") merely help the jury understand what a playback command could be, to the extent the Court feels that would be necessary in this case. The language in Touchstream's alternative construction is

13

exemplary only: the universal command is a standard playback command "*such as* play or pause." Claim 5 then narrows "universal command" further by reciting the three commands of which the universal command *must* be one: play, pause, or stop.

For these reasons, the Court should reject Google's indefiniteness assertions, and find that the term "universal command" has its plain and ordinary meaning. To the extent to Court feels that a definition of the plain and ordinary meaning is needed, it should be "a standard command used for controlling playback of media content such as play or pause."

**E.  "unique identification code assigned to the content presentation device" ('289 patent, claims 1 and 6) and "synchronization code assigned to the content presentation device" ('528 patent, claims 1, 27)**

| Touchstream's Proposed Construction | Google's Proposed Construction |
| --- | --- |
| plain and ordinary meaning - no construction needed<br><br>alternatively, plain and ordinary meaning which is "[unique identification code] / [synchronization code] associated with a content presentation device" | [unique identification / synchronization] code assigned by the server system to the content presentation device |

Here Google improperly imports the limitation "assigned *by the server system*" from an exemplary embodiment in the specification into the claims, without providing any legitimate reason for restricting the claim scope in this fashion. "It is axiomatic that we will not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of the claim, the specification, or the prosecution history." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013). Further, courts must "avoid the danger of reading limitations from the specification into the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). Here, nothing in the specification, prosecution history, or the claims

themselves points to anything other than plain and ordinary meaning for this term, and they certainly do not compel reading in a limitation from a preferred embodiment. The Court should reject Google's transparent attempt to improperly import a limitation from an exemplary embodiment into the claims, and should instead adopt Touchstream's plain meaning construction, which is amply supported by the intrinsic evidence.

The language of the claims themselves supports Touchstream's proposed plain and ordinary meaning construction. The independent claims recite the identification/synchronization code only twice: first, information about the code must be included in a message received by the server system from the personal computing device; and second, that information must be used to "store a record establishing an association between the personal computing device and the content presentation device." (E.g., '289 patent, Claim 1). The primary purpose of the code, then, is simply to facilitate the association between the personal computing device and the content presentation device.

The asserted claims of the '528 and '289 patents are agnostic as to who or what actually assigns the code. Nothing in the claims limits _what_ does the assigning, or _how_ the code is assigned, so there is no support in the claims themselves for limiting the term "assigned to the content presentation device" beyond its plain and ordinary meaning. *See 3M*, 725 F.3d at 1333. Touchstream's alternative construction, in which the "unique identification code assigned to the content presentation device" is simply the code associated with the content presentation device, properly reflects this purely functional treatment of the code in the claims without regard to who are what does the assigning.

Google argues that because the server system is aware that the code is specific to the

15

content presentation device, "it is clear that the server system . . . assigned the code to the content presentation device at the outset." (Dkt. No. 25 at 14). But Google's conclusion does not follow—the server system could be made aware that the code is specific to the content presentation device sometime after the code is assigned, even though the server system did not itself assign the code. The server system could just as easily receive that information in messages from the content presentation device, and from the personal computing device after the user enters the synchronization code into his or her device as disclosed in the patent specification. (E.g., '251 patent at 5:14-21).

Google's other assertion, that the server system must assign the code because of "the importance of the server to the claimed method," is unsupported attorney argument and does not follow from any disclosure in the claims, or even the patent specification, which say nothing of what is "important" to the invention and what is not. "There are no magic words that must be used, but to deviate from the plain and ordinary meaning of a claim term to one of skill in the art, the patentee must, with some language, indicate a clear intent to do so in the patent." *Hill-Rom*, 755 F.3d at 1373. There is no such language here.

The patent specification likewise supports Touchstream's plain meaning construction, rather than Google's overly-narrow one. Google's claim that the specification "repeatedly and consistently" characterizes the identification/synchronization code as assigned by the server system is demonstrably false, as Google points to only one sentence in the entire patent specification that suggests this limitation. And the specification could hardly make clearer that this apparent limitation is only a preferred embodiment, stating "[*f*]*or example*, in *some implementations*, the synchronization code is generated randomly and assigned to the display

device 22 each time it connects to the server system 24." ('251 patent at 5:26-29) (emphasis added). Google's reliance on *GPNE Corp.* is unavailing, as the words ultimately imported into the claim in that case "appear[ed] in the specification over 200 times." *See GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016). Here, the specification alludes to assignment by the server just once, and it clearly states that it is describing only one possible embodiment of the invention.

Even if that was the only embodiment described (which it is not), there would still be no justification for importing a preferred embodiment into the claims. "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (citations omitted). No such "words or expressions of manifest exclusion or restriction" are present here, and there is no reason to limit the claims to assignment by the server.

Indeed, the specification expressly contemplates an embodiment in which the identification/synchronization code is *not* assigned by the server. The specification discloses in the "Summary" section that "[t]he synchronization code *can* be different from an IP address associated with the display device and/or a [MAC] address associated with the display device," and later, in describing a preferred embodiment, that "[*p*]*referably*, the synchronization code is different from the IP address associated with the device 22." ('251 patent at 2:22-25, 5:23-24) (emphasis added). "The mention of a preferred [non-IP address, non-MAC address embodiment] implies the invention's ability to operate in a manner in which" the synchronization code *is* the IP or MAC address. *See Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1267 (Fed. Cir. 2015). And Google's own cited extrinsic evidence makes clear that IP addresses and MAC addresses are

17

typically assigned by entities other than the claimed server system. For instance, according to those sections of Newton's Telecom Dictionary cited by Google, the IP address "is typically assigned to your device on the fly *by a router connected to the internet*." And the MAC address is "a fixed hardware address . . . *assigned by the device's manufacturer*." (Dkt. No. 25 at 19-20, emphases added). The specification therefore expressly contemplates embodiments in which the identification/synchronization code would typically *not* be assigned by the server system, and the Court should reject Google's attempt to read a preferred embodiment into the claims. In contrast, a plain and ordinary meaning construction would properly reflect the full scope of the patent disclosure, as would Touchstream's proposed alternative construction, to the extent the Court thinks further clarification is needed.

### F.   "[identify/identifying/include information indicating] a location of the particular media player" ('528 patent, claims 1, 27, 28; and '289 patent, claims 1, 7)

| Touchstream's Proposed Construction | Google's Proposed Construction |
| --- | --- |
| plain and ordinary meaning, which is, provide information that locates or may be used to locate the particular media player | [identify/identifying/including information indicating] an Internet address from where the media player is obtained by the content presentation device |

The primary flaw in Google's argument with respect to this term is its fixation on just one word in isolation: "location."   Google devotes several pages of its brief to explaining why "location" should be an Internet address, but Google misses the broader context of this claim term: the parties did not propose the term "location" alone, but instead proposed the term "identify," "identifying," or "including information indicating" "a location (of a particular media player)." This added context is critical to properly construing the term. "While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also

must be considered in determining the ordinary and customary meaning of those claims." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

Both the pertinent claims and the patent specification are primarily directed to providing information to the server that allows it to find the media player at some location, and far less concerned with what or where that location actually is. And even where the claims and specification describe a particular location, it is not limited to an Internet address, as Google alleges; rather, the patent both describes and claims an embodiment in which the media player *is already located on the content presentation device* and is therefore not on the Internet at all. Therefore, Google's core argument—that the media player *must* be located on the Internet, and hence the "location" *must* be an Internet address—fails. When the term "location" is properly considered in the context of the surrounding words "identifying" and "including information indicating" a location, and further in view of the various embodiments disclosed by the patents, Touchstream's plain and ordinary meaning construction—which is to "provide information that locates or may be used to locate the particular media player"—is correct.

The claim language in the patents at issue shows that the media player may not even be located on the Internet, meaning that Google's proposed construction—which limits "location" to an Internet address—cannot be correct.  Independent claim 10 of the '289 patent recites providing one or more messages that "identify a location of the particular media player," and dependent claim 11 narrows claim 10 further by reciting that "the content presentation device is operable to load the particular media player in the content presentation device *if the particular media player*

*is not already loaded* in the content presentation device." (Emphasis added).[5] As claim 11 expressly contemplates that the media player may be "already loaded in the content presentation device," the claims of the '289 patent must be broad enough to encompass this situation in which the media player is *not* located on the Internet, and the claimed "location" is therefore not an "Internet address."

Claim differentiation similarly shows that Google's narrow construction, which limits the media player to being located on the Internet, is not correct. Claim differentiation applies across independent claims of related patents, at least where the accused infringer maintains that the disputed term has the same meaning in both. *Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1334 (Fed. Cir. 2021). Here, both parties have proposed the same construction of this term across both patents. Notably, only the '528 patent recites that the media player must be "obtained over a network from a content provider"; the '289 patent claims say nothing of where the media player should be located. That the '528 patent adds this limitation creates a presumption that the limitation in question—the media player being obtained over a network—is *not* required by the '289 patent, and therefore the term "location" should not be limited to "an Internet address," as Google proposes.

The specification itself, which never defines the "location" as an "Internet address" or "network address," further supports Touchstream's plain and ordinary meaning construction. Here, the specification simply discloses that the message from the personal computing device

---

[5] Touchstream does not presently assert claims 10 or 11 of the '289 patent, but "[o]ther claims of the patent in question, both asserted and unasserted, can [] be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314–15.

"includes data regarding . . . the location and name of the media player." "Absent disclaimer or lexicography, the plain meaning of the claim controls." *Toshiba*, 681 F.3d at 1369. There is no disclaimer or lexicography whatsoever in this straightforward statement about including data regarding the location of the media player. Rather, this disclosure—and in particular, the use of the broad phrase "data *regarding* . . . the location"—is consistent with the plain and ordinary meaning of the term "[identify/identifying/include information indicating] a location of the particular media player" as "provid[ing] information that locates or may be used to locate the particular media player."

Far from making it "unequivocal that the media player is obtained over the Internet," as Google alleges, the specification (like the claims) discloses an embodiment in which the media player *is not located on the Internet at all*, and therefore its location would not be an Internet address. In particular, the specification describes an embodiment in which "the appropriate media player already is loaded in the display device," rather than being on the Internet. ('251 patent at 6:41-46; Fig. 6). "We normally do not interpret claim terms in a way that excludes disclosed examples in the specification." *Verizon*, 503 F.3d at 1305; *see also Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) (interpreting claims to exclude embodiments only "where those embodiments are clearly disclaimed in the specification"). Google's proposed construction would exclude this disclosed embodiment in which the media player is already located on the display device, which, without clear disclaimer (not present here), is improper.

While the limitation "identify . . . the location of the particular media player" was added during prosecution of the '528 patent to distinguish prior art, nothing about this amendment compels anything other than a plain and ordinary meaning construction. Any disavowal of claim

scope in the prosecution history must be "both clear and unmistakable to one of ordinary skill in the art." *Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017). There is no disavowal here. The applicant merely distinguished prior art by amending his claims to recite that the message from the personal computing device further identifies a location of a media player. In doing so, the applicant made no argument whatsoever about the meaning of the term "identifying . . . the location of the particular media player," and therefore nothing about the amendment points to anything other than plain and ordinary meaning.

With no limiting language in the specification, claims, or prosecution history, Google relentlessly focuses on the meaning of "location" (which, as discussed above, is not limited to an "Internet address"), but says nothing about the surrounding terms that the parties agreed to construe: "identify" and "include information indicating." Google's map analogy, which *requires* provision of an address, is therefore inapt. A better analogy, accounting for the context of the "location" term that comes from the surrounding claim language, would be providing information that *leads to* locating the house *at* a particular address, which is broad enough to include, for example, the name of the street and the color or shape of the house. These properties would "identify" or be "information indicating" the location of the house, without necessarily providing the address itself. So, for instance, while the location of the house *could* be identified by an address, it could also be identified in other ways (such as "the house on the northwest corner of 55th and Main Streets"). Such information is all that the message from the personal computing device is meant to provide, consistent with the plain and ordinary meaning of this term: "provide information that locates or may be used to locate the particular media player," or, if the Court prefers, "provide information that locates or leads to locating the particular media player."

**G.   "action control command being independent of the particular media player" ('528 patent, claims 1, 27, 28; '289 patent, claims 1 and 6)**

| Touchstream's Proposed Construction | Google's Proposed Construction |
|---|---|
| plain and ordinary meaning - no construction needed | action control command being in a standard format that must be converted for use by the particular media player |

Touchstream submits that this phrase is used here in its plain and ordinary sense and requires no construction. The parties' primary dispute is over the meaning of the term "independent," which is used in the claims in its ordinary sense—consistent with Touchstream's construction—and whose meaning would be readily apparent not only to a person of ordinary skill in the art, but even to a lay juror. The term "independent" here simply means that an action control command is not specific to (i.e., is not *dependent* upon) a particular media player.[6] Because there is no lexicography or disavowal in the record, "action control command being independent of the particular media player" should be given its plain meaning. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Yet Google proposes an overly narrow and confusing construction in which "independent" means being "in a standard format that must be converted for use," even though the term "standard format" appears nowhere in the intrinsic record, and no inventor lexicography or disavowal supports narrowing the term in this way. Google contends that its proposed construction is needed to distinguish the "action control command" from the "programming code" (Dkt. No. 25 at 25), but the distinction between these terms is already clear from the plain language of the claim: the

---

[6] For reference, the 1997 Random House Webster's Unabridged Dictionary, 2nd Edition, defines "independent" in part as "not dependent; not depending or contingent upon something else for existence, operation, etc." (Ex. A at 4).

"action control command" is independent of the particular media player, while the "programming code" is not. Far from clarifying the claim language, Google's injecting of a "standard format" limitation into the claim raises unnecessary questions about which formats are, and are not, standard. Google's supposed clarification is really an improper narrowing of this claim term that is unsupported by the intrinsic record and will only confuse the jury.

The specification also supports Touchstream's plain and ordinary meaning construction rather than Google's overly-narrow construction, which improperly incorporates a preferred embodiment into the claims.  Google's reliance on *C.R. Bard* is misplaced; there, the limiting language at issue appeared in the summary of the invention and "before the embodiments of the invention [were] described." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004). Here, by contrast, the language Google cites appears in the "Detailed Description" section, not in the "Summary" section, and describes an "illustrated implementation"—i.e., a preferred embodiment. ('251 patent at 5:54). Google's cited statements therefore do not describe the invention as a whole and do not support importing limitations from particular embodiments into the claims. *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1325 (Fed. Cir. 2008) (refusing to limit meaning of claim language where "nearly all of the parts of the specification that discuss[ed]" that limitation "cover[ed] only specific embodiments of the invention . . . and not the invention as a whole"); *see also Hill-Rom*, 755 F.3d at 1373 (finding "no basis for deviating from the plain and ordinary meaning" where language in specification was exemplary and only described preferred embodiment).

Indeed, the statements in the specification that <u>do</u> describe the invention as a whole support Touchstream's plain meaning construction. For example, the "Summary of the Invention" section

24

states:

> The server system is operable, in response to receiving the message, to convert the command into a corresponding command recognizable by the media player if the command received from the personal computing device is not recognizable by the media player.

('251 patent at 2:3-7). A command could be unrecognizable by the media player, but not necessarily in a "standard format." Google's addition of the "standard format" limitation in its proposed construction improperly narrows the term beyond its plain and ordinary meaning, and the Court should reject Google's construction accordingly.

Nor is Touchstream trying to read the term "independent" out of the claim, as Google alleges; rather, Google is trying to read in a limitation about a "standard format" that does not appear anywhere in the intrinsic record. While the claim term at issue was added during prosecution of the '528 patent, the applicant made no accompanying limiting argument to justify anything other than a plain and ordinary meaning construction here. "The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citations omitted). Touchstream is not arguing for any disclaimed interpretation; Touchstream does not dispute that the claims are limited to embodiments in which the "action control command" is "independent of the particular media player." Touchstream merely contends that the term "independent" has its ordinary meaning here, rather than the special meaning Google ascribes to it. Any narrowing of the ordinary meaning of a term based on statements in the prosecution history requires "clear and unmistakable" disavowal. *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003). Here, the applicant, following the examiner's suggestion, simply amended the claims to distinguish implementations in which a command was *<u>not</u>* independent of a particular

25

media player. The applicant did not disavow any further claim scope, did not provide any special definition of "independent," and certainly said nothing about an action control command being in a "standard format." There is no "clear and unmistakable" disavowal in the prosecution history that compels anything other than Touchstream's plain and ordinary meaning construction here.

Finally, Google misses the mark in arguing that its construction is somehow supported by Touchstream's other proposed constructions. Google contends, for instance, that Touchstream's description of a "universal command" as a "standard command" supports reading a "standard format" limitation into this claim, but Google is looking to the wrong term. Touchstream's use of the modifier "standard" in its construction for "universal command" describes _the command itself_ (e.g., play, pause, or stop), not the _format_ of the command.[7] Certainly a "standard command" does not have to be in a "standard format," whatever that might be. Similarly, Google points out that Touchstream's proposed alternative construction for "programming code" "recognizes that the action control command is not in a format that is recognized and executed by the particular media player." (Dkt. No. 25 at 26). But just because a command is in a format not recognized by the particular media player does not mean it is in a "standard format." Thus, Google's proposed limitations are overly narrow, and Touchstream's proposal of plain and ordinary meaning construction should control.

---

[7] Notably, in the one place where the patent specification uses the term "standard," it likewise refers to the _command_ ("a standard or universal command", '251 patent at 5:60-61); the patents never use the term "standard" to describe a format.

**H. "identifying, [by the server system,] programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content presentation device using the particular media player" ('528 patent, claims 1, 27, 28; '289 patent, claims 1 and 6)**

| Touchstream's Proposed Construction | Google's Proposed Construction |
|---|---|
| plain and ordinary meaning - no construction needed | by the server system, identifying the specific media player that is being requested and converting the incoming commands into the correct programming code used by the content presentation device to control the specific media player |
| alternatively, plain and ordinary meaning for "programming code" which is "instructions that the media player can recognize and execute," otherwise plain and ordinary meaning - no construction needed | |

Similar to the previous claim term, Touchstream submits that this term is used here in its plain and ordinary sense and requires no construction. The parties' primary dispute with this term is over the meaning of the term "identifying," with Google proposing an overly-narrow construction in which the single "identifying programming code" step effectively incorporates two separate, unclaimed steps in which the server must further identify "the specific media player that is being requested" and "convert[] the incoming commands" into "correct programming code." Once again, in the absence of any lexicography or disavowal in the record, "identifying . . . programming code corresponding to the action control command" should be given its plain and ordinary meaning as Touchstream proposes. *See Thorner*, 669 F.3d at 136.

Touchstream's plain and ordinary construction is supported by the intrinsic record. The claims of the '528 and '289 patents repeatedly use the term "identify" in its plain and ordinary sense: they recite messages that "identify a particular media player" and "identify a location of the particular media player" without providing any special definition for the term "identify." Similarly, the specification repeatedly uses the term "identify" and the related term "identification" in their

27

plain and ordinary sense, sometimes interchangeably with "indicate" or "indicating," as for instance:

> Thus, the database 32 stores a record of all messages received from a user's personal computing device 20, as well as the user's identification, an *indication* of the target device 22, an *identification* of the media player that is required for the selected video, and an *identification* of the selected video.

('251 patent 4:50-54) (emphasis added). In the context of this particular claim term "identifying programming code corresponding to the action control command," the specification—in describing the invention more broadly—explains how the system "is operable to provide to the display device a message that includes the corresponding command, and the display device is operable, in response to receiving the message from the server system, to execute the command." (*Id.* at 2:7-11). Consistent with the plain and ordinary meaning of the term "identifying," then, the term "identifying programming code corresponding to the action control command" simply means indicating or allowing the system to find the code that the content presentation device can feed to the media player to actually execute. This non-technical meaning would be apparent to a person of ordinary skill in the art, and even to a lay juror.

If any clarification of this claim term is needed for a lay juror, it is to provide the plain and ordinary meaning for the technical term "programming code," which is not defined in the patent. A person of ordinary skill in the art would readily understand "code" to refer to "instructions"; this is consistent with the definition of "code" as "program instructions" in the 1997 third edition of the Microsoft Computer Dictionary. (Ex. B at 3). Based on more general descriptions of the invention (e.g., '251 patent at 2:3-10, describing how the command received by the display device from the server should be recognizable to the media player), a person of ordinary skill in the art would further understand that the media player should be able to "recognize and execute" the

28

programming code. Therefore, Touchstream submits an alternative construction for "programming code," which a person of ordinary skill in the art would understand to be "instructions that the media player can recognize and execute."

As with the previous term, Google again improperly imports limitations from a preferred embodiment into its construction, this time to support reading in an unclaimed method step about "identifying the specific media player that is being requested." But "[t]he patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims." *Kara Tech.*, 582 F.3d at 1348. Google cites to the '251 patent specification at column 5, line 53 to column 6, line 6 for support, but Google's cited language repeatedly makes clear that it is exemplary only ("*In the illustrated implementation*, the command in the transmission code contains a JavaScript reference . . . Therefore, *in the illustrated implementation*, a universal adapter 26 is provided to interpret and convert a standard or universal command [e.g., play, pause, etc.] into the specific command recognized by the media player."). Thus, Google's reliance on *C.R. Bard* is again misplaced because the language at issue does not describe the invention as a whole, and Google should not be permitted to limit the scope of this claim term by importing limitations based on statements that are merely exemplary. *See Praxair*, 543 F.3d at 1325. And again, where the specification describes the invention more broadly, it supports Touchstream's plain and ordinary meaning construction.

Google's proposed construction also confusingly adds a second unclaimed step, in which the server system must further convert incoming commands "into the correct programming code" as part of the simple step of identifying programming code corresponding to the action control command. Google's proposed construction again confuses rather than clarifies. It is already

implicit that "the programming code [] for controlling the presentation of the content by the content presentation device" would be "correct" code, or at least not "incorrect," by virtue of the fact that the programming code can control presentation of the content. Google's unnecessary proposal amounts to surplusage that will only confuse a jury. Once again, the Court should reject Google's overly-narrow and confusing construction. The Court should adopt Touchstream's plain and ordinary meaning construction, which properly reflects the full scope of the patent disclosure, as does Touchstream's proposed alternative construction for "programming code" to the extent the Court thinks further clarification of that term is needed.

## V.      CONCLUSION

For the reasons provided above, Touchstream respectfully requests that the Court adopt its proposed claim constructions and reject Google's proposed constructions and assertions of indefiniteness.

Date: January 6, 2022                          Respectfully submitted,

                                               SHOOK, HARDY & BACON L.L.P.

                                               */s/ Samuel J. LaRoque*
                                               Samuel J. LaRoque, *pro hac vice*
                                               B. Trent Webb, *pro hac vice*
                                               Ryan D. Dykal, *pro hac vice*
                                               Jordan T. Bergsten, *pro hac vice*
                                               Shook, Hardy & Bacon, LLP
                                               2555 Grand Boulevard
                                               Kansas City, MO 64108
                                               (816) 474-6550
                                               Fax: (816) 421-5547
                                               Email: slaroque@shb.com
                                               Email: bwebb@shb.com
                                               Email: rdykal@shb.com
                                               Email: jbergsten@shb.com

Fiona A. Bell (TX Bar No. 24052288)
**SHOOK, HARDY & BACON L.L.P.**
600 Travis Street, Suite 3400
Houston, TX 77002
(713) 227-2008
Fax: 713-227-9508
Email: fbell@shb.com

*Counsel for Plaintiff*
*Touchstream Technologies, Inc.*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on January 6, 2022.

By: *<u>/s/ Samuel LaRoque</u>*