—1—

1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
2                              WACO DIVISION

3      TOUCHSTREAM TECHNOLOGIES, INC.
                                  *      June 15, 2022
4      VS.                        *
                                  * CIVIL ACTION NO. W-21-CV-569
5      GOOGLE LLC                 *

6             BEFORE THE HONORABLE ALAN D ALBRIGHT
                    MARKMAN HEARING (via Zoom)
7
       APPEARANCES:
8
       For the Plaintiff:   Ryan D. Dykal, Esq.
9                           Samuel J. Laroque, Esq.
                            Jordan T. Bergsten, Esq.
10                          Shook, Hardy & Bacon, LLP
                            2555 Grand Boulevard
11                          Kansas City, MO 64108

12     For the Defendant:   Tharan Gregory Lanier, Esq.
                            Evan M. McLean, Esq.
13                          Jones Day
                            1755 Embarcadero Road
14                          Palo Alto, CA 94303

15                          Edwin O. Garcia, Esq.
                            Jones Day
16                          51 Louisiana Avenue, N.W.
                            Washington, DC 20001
17
                            Michael E. Jones, Esq.
18                          Potter Minton PC
                            110 N College, Suite 500
19                          Tyler, TX 75702

20     Court Reporter:      Kristie M. Davis, CRR, RMR
                            PO Box 20994
21                          Waco, Texas 76702-0994
                            (254) 340-6114
22

23        Proceedings recorded by mechanical stenography,

24     transcript produced by computer-aided

25     transcription.

| | | |
|---|---|---|
| 02:31 | 1 | (Hearing begins.) |
| 02:31 | 2 | DEPUTY CLERK:  A civil action in Case |
| 02:31 | 3 | 6:21-CV-569, Touchstream Technologies, Inc. versus |
| 02:31 | 4 | Google LLC.  Case called for a Markman hearing. |
| 02:31 | 5 | THE COURT:  If I could have announcements |
| 02:31 | 6 | from counsel, please. |
| 02:31 | 7 | MR. DYKAL:  Yeah.  This is Ryan Dykal |
| 02:31 | 8 | with Shook, Hardy & Bacon on behalf of Touchstream. |
| 02:31 | 9 | MR. BERGSTEN:  Jordan Bergsten from |
| 02:31 | 10 | Shook, Hardy & Bacon on behalf of Touchstream. |
| 02:31 | 11 | MR. LAROQUE:  And Sam LaRoque also from |
| 02:31 | 12 | Shook Hardy & Bacon on behalf of Touchstream. |
| 02:32 | 13 | MR. DYKAL:  Your Honor, if it's okay, I |
| 02:32 | 14 | think we have a few summer associates that are going to |
| 02:32 | 15 | watch the hearing today. |
| 02:32 | 16 | MR. JONES:  And, Your Honor, on behalf of |
| 02:32 | 17 | Google, you have Greg Lanier, Evan McLean and Edwin |
| 02:32 | 18 | Garcia, as well as myself, Mike Jones. |
| 02:32 | 19 | And also attending the hearing is a |
| 02:32 | 20 | corporate representative from Google, Ms. Emily Chen. |
| 02:32 | 21 | And we're ready to proceed, Your Honor. |
| 02:32 | 22 | THE COURT:  Good afternoon.  How are you |
| 02:32 | 23 | doing? |
| 02:32 | 24 | And welcome to the corporate |
| 02:32 | 25 | representative. |

02:32  1          Give me -- my understanding is we have a

02:32  2   motion to dismiss to take up first.  And so you know,

02:32  3   we're a full-service court.  We are calling from Del

02:32  4   Rio, Texas.  So if you haven't been to Del Rio, you

02:32  5   should come down here and see it for yourself.  Come

02:32  6   see Lake Amistad.

02:32  7          So I'm happy to take up the motion for

02:33  8   summary judgment.

02:33  9          MR. LANIER:  Thank you, Your Honor.  Greg

02:33  10  Lanier of Jones Day.  And we thank the Court for taking

02:33  11  the time during -- we know it's a travel week and a

02:33  12  busy week, so we appreciate being heard.

02:33  13         My partner Evan McLean will address the

02:33  14  motion to dismiss when Your Honor's ready.

02:33  15         THE COURT:  I'm ready.  Any time.  Yes.

02:33  16         MR. LANIER:  All right.  Thank you.

02:33  17         Mr. Mclean?

02:33  18         MR. MCLEAN:  Thank you, Your Honor.  Evan

02:33  19  McLean from Jones Day on behalf of Google.  And thanks

02:33  20  for the opportunity to allow us to address our motion

02:33  21  to dismiss.  We're arguing multiple issues.  We'll try

02:33  22  to make this quick per your Court's preference --

02:33  23         (Clarification by Reporter.)

02:33  24         MR. MCLEAN:  Apologies.  Apologies.

02:33  25         So today we're going to be arguing that

| | | |
|---|---|---|
| 02:33 | 1 | Google's motion to dismiss Touchstream's willful |
| 02:33 | 2 | infringement claims.  And specifically we'll be |
| 02:33 | 3 | focusing as to the pre-suit willfulness claims. |
| 02:34 | 4 | We also argue in our brief with respect |
| 02:34 | 5 | to post-suit willfulness and injunction claims.  We'll |
| 02:34 | 6 | just plan to rest on our papers to save time here and |
| 02:34 | 7 | just really focus on those pre-suit willful claims. |
| 02:34 | 8 | Touchstream's claim for pre-suit willful |
| 02:34 | 9 | infringement should be dismissed because allegations in |
| 02:34 | 10 | the complaint fail to address both forms of knowledge |
| 02:34 | 11 | that are required by this Court.  Particularly, the |
| 02:34 | 12 | complaint lacks any allegations related to Google's |
| 02:34 | 13 | knowledge of the purported infringement of the asserted |
| 02:34 | 14 | patents. |
| 02:34 | 15 | To successfully plead willful |
| 02:34 | 16 | infringement and particularly important here for |
| 02:34 | 17 | pre-suit willful infringement, the Court has previously |
| 02:34 | 18 | held that the plaintiff must sufficiently allege that |
| 02:34 | 19 | the accused infringers -- |
| 02:34 | 20 | (Clarification by Reporter.) |
| 02:34 | 21 | MR. MCLEAN:  -- knew of the |
| 02:34 | 22 | patent-in-suit -- sorry.  That the defendant knew of |
| 02:34 | 23 | the patent-in-suit.  And then after acquiring that |
| 02:34 | 24 | knowledge, it infringed the patent.  And in doing so, |
| 02:34 | 25 | it knew or should have known that its conduct amounted |

02:34   1    to infringement of the patent.

02:34   2                   And the Court adopted this previously in

02:34   3    Parity Networks and has reaffirmed that standard

02:35   4    multiple times, including more recently in a case in, I

02:35   5    believe, February of the BillJCo v. Apple.  And

02:35   6    consistent with the Twombly Iqbal standard for 12(b)(6)

02:35   7    motion, plaintiff should plead willfulness with

02:35   8    sufficient articulation of the relevant facts.

02:35   9                   Accordingly, important here this

02:35   10   standard, as the Court has articulated multiple times,

02:35   11   contains two distinct forms of knowledge.  That is,

02:35   12   knowledge of the patent and knowledge of an

02:35   13   infringement of those patents.

02:35   14                   So here Touchstream's allegations are

02:35   15   really all directed to the first type of knowledge.

02:35   16   That is, Google's purported knowledge of the asserted

02:35   17   patent.  And while Google doesn't concede that

02:35   18   Touchstream is successful in these allegations, the

02:35   19   Court not even reach that conclusion.

02:35   20                   Instead, Touchstream's complaint is

02:35   21   absent of any real allegations regarding the second

02:35   22   type of knowledge.  That is, Google's knowledge of a

02:35   23   purported infringement of the patent.

02:35   24                   Per Touchstream's opposition brief,

02:35   25   willfulness allegations are really centered around two

6

02:35    1    particular sets of facts.

02:35    2                    First, that Google, during patent

02:36    3    prosecution of some of its own patents, cited to the

02:36    4    asserted patents multiple times --

02:36    5                    (Clarification by the reporter.)

02:36    6                    MR. MCLEAN:  The first set of facts are

02:36    7    that Google, during the patent prosecution of its own

02:36    8    patents, cited to the asserted patents in several of

02:36    9    those patents.

02:36   10                    And in the second set of facts,

02:36   11    Touchstream's technology was purportedly famous and in

02:36   12    press releases and for publicity announced that they

02:36   13    had patents on their technology.

02:36   14                    This is Touchstream's focus for the most

02:36   15    part in their complaint.  And while they do argue in

02:36   16    addition to these two sets of facts that they may be

02:36   17    hiding by some business meetings between the parties

02:36   18    that occurred prior to any issuance of the patents and

02:36   19    the release of the accused product, that the primary

02:36   20    focus is on these patent citations and the purported

02:36   21    publicity.

02:36   22                    But again, these allegations are centered

02:36   23    on knowledge of the patents, not knowledge of Google's

02:36   24    purported infringement of those patents.

02:36   25                    There are no comparable allegations with

7

02:37   1    respect to Google's knowledge purported for -- for

02:37   2    respect to the infringement type of knowledge.

02:37   3              Now, inapposite to the motion,

02:37   4    Touchstream claims that Google should have known of its

02:37   5    purported infringement because it purportedly knew

02:37   6    about the patent and had an infringing product.

02:37   7              But this statement is conclusory and the

02:37   8    complaint doesn't explain how Google knew or should

02:37   9    have known about its purported infringement.  Instead,

02:37   10   really, Touchstream is collapsing these two types of

02:37   11   knowledge into one type -- into one knowledge and --

02:37   12   which is contrary to this Court's pleading standard.

02:37   13             And as I mentioned previously, recently

02:37   14   the Court did address this -- a similar situation in

02:37   15   BillJCo v. Apple, which came out, I believe, in

02:37   16   February, which was after Google filed its motion.

02:37   17             In that case, the plaintiff primarily

02:37   18   alleged that, like here, the defendant cited the

02:37   19   asserted patents during patent prosecution.  And then

02:37   20   the plaintiff later sent a notice letter to the

02:37   21   defendant identifying the patents the defendant

02:37   22   purportedly infringed.

02:37   23             In that case, the Court found the

02:38   24   allegations insufficient because while the defendant

02:38   25   may have had knowledge of the patents, knowledge of

8

02:38  1    infringement of the patents was a separate requirement

02:38  2    which was not satisfied there.

02:38  3              And while we acknowledge that the Court

02:38  4    found that notice letter was not sufficiently pled

02:38  5    within the complaint in itself, it is no different here

02:38  6    where the plaintiff has provided no notice to Google

02:38  7    that it was purportedly infringing this patent.

02:38  8              Accordingly, like in BillJCo and the

02:38  9    other cases that Google has cited in its brief, which

02:38  10   we won't go into detail because they're all in the

02:38  11   papers, Touchstream's pre-suit willfulness claims

02:38  12   should also be dismissed here.

02:38  13             Thank you, Your Honor.

02:38  14             THE COURT:  A response?

02:38  15             MR. BERGSTEN:  Thank you.  Jordan

02:38  16   Bergsten for the plaintiffs.

02:38  17             So the facts that have been alleged here

02:38  18   as to willfulness takes this case beyond the typical

02:38  19   patent case.  There are powerful facts that show

02:38  20   Google's knowledge, not only of our patents, but of

02:39  21   their infringement of our patents, given the

02:39  22   information they were given directly and the

02:39  23   information shown in this new and fairly small industry

02:39  24   about how these patents applied to Touchstream's own

02:39  25   product that was available first in the market and

| | | |
|---|---|---|
| 02:39 | 1 | later, with Google's knowledge, to the Chromecast |
| 02:39 | 2 | accused product and functionalities that came out in |
| 02:39 | 3 | 2013. |
| 02:39 | 4 | And we think these facts are certainly |
| 02:39 | 5 | enough to allow discovery on willfulness issues, which |
| 02:39 | 6 | at this point is ongoing.  Both parties have served |
| 02:39 | 7 | discovery on each other.  And also to deny Google's |
| 02:39 | 8 | claim that this should be dismissed since the issue has |
| 02:39 | 9 | been fully briefed and is being argued today.  And we |
| 02:39 | 10 | don't think our client should have to, you know, refile |
| 02:39 | 11 | and take this issue up and have to brief it, given that |
| 02:39 | 12 | the facts are sufficient now. |
| 02:39 | 13 | And I would like to lay out the timeline |
| 02:39 | 14 | a little bit of these specific facts and how they tie |
| 02:40 | 15 | together, because I think it's helpful.  It was in |
| 02:40 | 16 | early December that Touchstream came out into the |
| 02:40 | 17 | market with its patented -- it wasn't patented at the |
| 02:40 | 18 | time, but patent pending, second-screen app and product |
| 02:40 | 19 | for casting video from a cell phone to a second screen |
| 02:40 | 20 | and related activities. |
| 02:40 | 21 | As we alleged in our complaint, |
| 02:40 | 22 | Paragraph 34, it was at least as of December of 2011 |
| 02:40 | 23 | when Touchstream, at every opportunity it could, told |
| 02:40 | 24 | people that a patent is pending on this second-screen |
| 02:40 | 25 | casting technology that we have out in the market. |

| | | |
|---|---|---|
| 02:40 | 1 | They said it when they met with people.  They put out |
| 02:40 | 2 | press releases.  And there was a lot of industry buzz, |
| 02:40 | 3 | not only about the quality of Touchstream's product |
| 02:40 | 4 | that was out at the time, but also the fact that they |
| 02:40 | 5 | had a patent pending on it.  The media was picking this |
| 02:40 | 6 | up and reporting it as well. |
| 02:40 | 7 | About a year later, in December of 2011, |
| 02:41 | 8 | as alleged in Paragraphs 39 and 41 of the complaint, |
| 02:41 | 9 | Touchstream met with Google.  Touchstream presented to |
| 02:41 | 10 | Google our patent pending technology on casting |
| 02:41 | 11 | technology and sending to a second screen.  We showed |
| 02:41 | 12 | them how the technology worked.  We told them that a |
| 02:41 | 13 | patent was pending on it. |
| 02:41 | 14 | And so they saw our technology, which as |
| 02:41 | 15 | the complaint lays out, is the same as theirs.  Because |
| 02:41 | 16 | they both practice the patented technology under our |
| 02:41 | 17 | assertions. |
| 02:41 | 18 | And so when we told them that our |
| 02:41 | 19 | technology practices what we're getting a patent on, |
| 02:41 | 20 | and they knew, or at least after that developed, what |
| 02:41 | 21 | they were going to release to the market, they knew the |
| 02:41 | 22 | similarities and that the patent that was pending would |
| 02:41 | 23 | apply to both. |
| 02:41 | 24 | Fast forward to January of 2013, and we |
| 02:41 | 25 | allege this in Paragraph 35, the first patent issued. |

02:41  1    And we released a press release on it.  And the media

02:42  2    took this up too and reported on this as well.

02:42  3              And in something that was such a new

02:42  4    industry and a small industry, that we now know Google

02:42  5    was trying to get into, it's completely plausible that

02:42  6    Google, you know, having been told that a patent was

02:42  7    pending on our exact solution that we showed them, that

02:42  8    is what they later came out with, that they would have

02:42  9    learned about this actual patent.

02:42  10             And, in fact, under our allegations, we

02:42  11   know they did learn about the patent.

02:42  12             If -- we're now looking to Page 10 of the

02:42  13   complaint, starting in March of 2013, which is months

02:42  14   before they ever released their Chromecast patent -- or

02:42  15   their Chromecast product, Google started citing our

02:42  16   issued patent, not the application but the issued

02:42  17   patent to our inventor Mr. Strober in their own patent

02:42  18   applications in early 2013.

02:42  19             This is Page 10 of the complaint at

02:42  20   bullet, you know, 9 or IX.

02:42  21             And the title of the patent that Google

02:42  22   cited it for, is it irrelevant to the subject matter of

02:43  23   the Chromecast?  No.

02:43  24             The title of their patent on which they

02:43  25   cited on the face of it, our issued patent was titled

| | | |
|---|---|---|
| 02:43 | 1 | "Interfacing a television with a second device." |
| 02:43 | 2 | And so just looking at the titles, which |
| 02:43 | 3 | are in our complaint, you can see it's the same |
| 02:43 | 4 | technology we presented to them as patent pending and |
| 02:43 | 5 | the same technology they later released in the |
| 02:43 | 6 | marketplace. |
| 02:43 | 7 | And sure enough, later in July 2013, |
| 02:43 | 8 | about four months after they started these patent |
| 02:43 | 9 | citations, Google released the Chromecast.  And that's |
| 02:43 | 10 | Paragraph 45 of our complaint. |
| 02:43 | 11 | So now we know they had seen our |
| 02:43 | 12 | technology that we think is the same and we allege is |
| 02:43 | 13 | the same and had been told that that was patent |
| 02:43 | 14 | pending.  They've already told the patent examiner that |
| 02:43 | 15 | they know that we have an issued patent and that they |
| 02:43 | 16 | know that it's relevant to second-screen technology |
| 02:43 | 17 | and, in fact, the technology they're working on and |
| 02:43 | 18 | trying to get a patent on. |
| 02:43 | 19 | And despite all of this, they did not get |
| 02:43 | 20 | a license from us and they released their Chromecast |
| 02:43 | 21 | product, that's now accused of infringement, in July of |
| 02:44 | 22 | 2013. |
| 02:44 | 23 | And so we think each of these facts is |
| 02:44 | 24 | powerful, but we think that putting them all together |
| 02:44 | 25 | really puts them to be the -- there's no case that's |

02:44  1   exactly like this, but we think as laid out in the case

02:44  2   citations in our brief, that when you pull all of this

02:44  3   together and connect the plausible inferences, as we're

02:44  4   supposed to do at this point, that willful infringement

02:44  5   pre-suit has been sufficiently alleged such that we

02:44  6   should be able to continue doing discovery.

02:44  7         And, in fact, Google's motion should be

02:44  8   denied so that we don't have to take this up again

02:44  9   later in discovery.

02:44  10        Thank you.

02:44  11        THE COURT:  A rebuttal?

02:44  12        MR. MCLEAN:  Thank you, Your Honor.  Just

02:44  13   a couple quick points.

02:44  14        It's important -- and they did mention

02:44  15   these meetings, but it's important to know at the time

02:44  16   of those meetings there was no issued patent and there

02:44  17   was no released products.  At the time it was any sort

02:44  18   of communication or knowledge would be premature.

02:44  19        And again, all this information is just

02:44  20   with respect to Google's potential knowledge of the

02:45  21   patents themselves.  That is, patents being cited by

02:45  22   other patents.  Patents being identified within a press

02:45  23   release which, you know, again, there's no evidence

02:45  24   that Google actually saw those press releases.  They're

02:45  25   just generally out there in the public.

02:45   1              But, again, even then Google would have

02:45   2    no knowledge that it was actually infringing these

02:45   3    patents just because -- even if they knew about the

02:45   4    patents, which we don't concede that they initially

02:45   5    did.

02:45   6              So even putting all those facts together,

02:45   7    again, some of which were premature and didn't happen

02:45   8    before a patent was released or product was released.

02:45   9    And then even over those years, there was, again, no

02:45   10   formal notice provided to Google.  There was no letter

02:45   11   which, you know, we often see in these patent cases

02:45   12   that was sent to Google, by the way, we have these

02:45   13   patents and we think you're infringing the patents,

02:45   14   providing claim charts or what have you, that lays out

02:45   15   such infringement.  That isn't the case here.

02:45   16             It's really just this idea that there are

02:45   17   patents cited by the patents and patents in press

02:45   18   releases.  So in that case Google would have no way of

02:45   19   knowing that they were infringing these patents, even

02:45   20   if they had knowledge of them.

02:45   21             Thank you, Your Honor.

02:46   22             THE COURT:  You bet.  I'll be back in

02:46   23   just a second.

02:46   24             (Pause in proceedings.)

02:48   25             THE COURT:  If we could go back on the

```
02:48   1    record.
02:48   2                  The Court is going to deny the motion.
02:48   3    I'll tell you that -- just so everyone's on notice --
02:48   4    in just the last trial we had that finished last week,
02:48   5    after I'd heard all the evidence I did grant a motion,
02:48   6    a directed verdict motion, with respect to the
02:48   7    willfulness claim.
02:48   8                  And I think that on something like this,
02:48   9    where you all are at in discovery, I think that's
02:48   10   probably the more appropriate time to take it up.  I'll
02:48   11   have heard all the evidence and we can do it
02:48   12   retrospectively then.  And the plaintiff can tell me
02:48   13   what they think they've put into evidence, and I can
02:48   14   make an assessment at that time whether or not to let
02:48   15   the jury have it.
02:48   16                  So let's turn to the Markman.  Give me
02:48   17   one second.
02:49   18                  (Pause in proceedings.)
02:49   19                  THE COURT:  Regan's telling me that
02:49   20   there's post-suit willfulness and also injunctive
02:49   21   relief.
02:49   22                  I'm happy to take that up as well.
02:49   23                  MR. LANIER:  Your Honor, we're prepared
02:49   24   to submit on the papers on those two issues.
02:49   25                  THE COURT:  Okay.  I'm going to deny
```

02:49  1    those as well.

02:49  2                  Let's turn to the Markman.  And but let

02:49  3    me -- again, I don't know why I'm feeling -- being

02:49  4    prophylactic today.

02:49  5                  As everyone knows, I'm not a big fan --

02:49  6    if the only thing one has is post-lawsuit evidence,

02:49  7    that's usually not very strong evidence in my opinion.

02:49  8    I'm not going to dismiss it at this time, but I'm also

02:49  9    not changing my general belief that as long as a

02:49  10   defendant vigorously defends themselves during the

02:50  11   course of the litigation after receiving the lawsuit,

02:50  12   that that's -- there's usually -- it would be tough to

02:50  13   persuade me there's willfulness just -- if that's the

02:50  14   only evidence that there is.

02:50  15                  So let me pull up the Markman.  It's not

02:50  16   on my phone.  I'm going to lose you on the screen for

02:50  17   just a second while I use my computer.  I'll be right

02:50  18   back.

02:50  19                  (Pause in the proceedings.)

02:50  20                  THE COURT:  Okay.  We're going to take up

02:50  21   "video file" and "video content," and I'll hear from

02:51  22   the defendant, please.

02:51  23                  MR. LANIER:  Thank you, Your Honor.  Greg

02:51  24   Lanier of Jones Day.

02:51  25                  We've divided up the terms, and so Edwin

02:51  1  Garcia who's on the line will take up Term No. 2.

02:51  2              THE COURT:  Are you doing that just

02:51  3  because you're not in the room that has the guitar and

02:51  4  you feel that may have lost a little advantage?

02:51  5              MR. LANIER:  Your Honor will have to

02:51  6  accept my representation that there's a guitar in the

02:51  7  case on the floor behind me.

02:51  8              THE COURT:  Okay.

02:51  9              MR. LANIER:  So I wouldn't go too far

02:51 10  without one, like Mr. Dykal.

02:51 11              Thank you, Judge.

02:51 12              Mr. Garcia, please.

02:51 13              MR. GARCIA:  Thank you, Your Honor.

02:51 14              We appreciate the Court's tentative

02:51 15  construction, so we instead will attempt to focus today

02:51 16  really on the term "video content" and also on the

02:51 17  "video file."

02:51 18              Can we please get to the next slide?

02:51 19              Next slide, please.

02:51 20              So to put the claim into context, the

02:52 21  claim recites video file and recites video content.

02:52 22  The specification never uses the term "video content."

02:52 23  The term "video file" appears in the specification.

02:52 24  This term "video" on its own appears in the

02:52 25  specification.  The term "content" appears in the

02:52   1    specification on its own.  "Data file," "file."  And so

02:52   2    does "video data" appears in the specification.  But

02:52   3    "video content" never does.  So it's important to keep

02:52   4    in mind.

02:52   5            Now, the claim itself sets up how these

02:52   6    two terms are supposed to be connected.  But yet it

02:52   7    doesn't explain how they are used together.  If we look

02:52   8    at the specific claims, for example, we know that the

02:52   9    claims says the "signals specifying a video file that

02:52   10   is to be acted upon..."

02:52   11           So we know signals set up the video file.

02:52   12           And then it goes on to recite that

02:52   13   there's an identification of the media player that --

02:53   14   from which content is intended to be displayed and

02:53   15   further controlled.

02:53   16           What it doesn't tell us is how the video

02:53   17   content is being identified.  Nor is it telling us

02:53   18   directly where that video content is being specified

02:53   19   from or identified from.

02:53   20           And that's important because that

02:53   21   indefiniteness, which is further plagued by the way

02:53   22   that the specification uses all of these terms, these

02:53   23   various terms, interchangeably and without any

02:53   24   specification unique to video content, creates an

02:53   25   indefiniteness issue in terms of reasonable certainty

02:53   1   in to how a person skilled in the art would be able to

02:53   2   practice the scope of the invention.  And specific with

02:53   3   the "video content" term, how that identification

02:53   4   occurs.

02:53   5               Can we please go on to the next slide?

02:53   6               Now, this is -- it's helpful to contrast

02:53   7   the claim language of the '251 patent which is the only

02:54   8   one where we're raising the video content

02:54   9   indefiniteness argument in comparison to the claim in

02:54  10   the '289 patent.

02:54  11               And specifically there the setup is much

02:54  12   more specific in terms of actually telling a person of

02:54  13   ordinary skill in the art how these two terms are

02:54  14   connected to each other.  It tells us that one or more

02:54  15   messages specify a file to be acted upon, and that the

02:54  16   content comes from that specified file.

02:54  17               Now, notice here in particular that the

02:54  18   term "video content" is not being used nor is the term

02:54  19   "video file."  Nonetheless, we know that the content

02:54  20   that is being played is -- resides in the specified

02:54  21   file because the claim's telling us.

02:54  22               So in that regard the comparison and

02:54  23   contrast between that claim and the way that the claim

02:54  24   of the '251 is set up, it's telling of the

02:54  25   indefiniteness.

| | | |
|---|---|---|
| 02:54 | 1 | Can we please go on to the next slide? |
| 02:54 | 2 | So when we look at the specification and |
| 02:55 | 3 | the portions of the specification that Touchstream |
| 02:55 | 4 | cites to attempt to resolve the ambiguity or to allege |
| 02:55 | 5 | that the ambiguity is resolved, when you look at the |
| 02:55 | 6 | actual recitations and what they say, it's clear that |
| 02:55 | 7 | there is no ambiguity resolved. |
| 02:55 | 8 | All that it's telling us is that the |
| 02:55 | 9 | video content is really -- it's only talking about |
| 02:55 | 10 | content providers, content providers that are providing |
| 02:55 | 11 | content in general and, not only that, content |
| 02:55 | 12 | providers that are just providing video files.  Nothing |
| 02:55 | 13 | about how the video content is actually being selected |
| 02:55 | 14 | or how a person of ordinary skill in the art would know |
| 02:55 | 15 | how to select the video content that may reside in a |
| 02:55 | 16 | video file. |
| 02:55 | 17 | Can we please go on to the next slide? |
| 02:55 | 18 | Lastly, the important -- the last point |
| 02:55 | 19 | that I think is important to keep in mind is that |
| 02:55 | 20 | Touchstream in their response raised how a file might |
| 02:55 | 21 | be a container that stores content and so on, but the |
| 02:55 | 22 | specification never says that and there's no language |
| 02:56 | 23 | in the specification that actually demonstrates that. |
| 02:56 | 24 | So to the extent that Touchstream is |
| 02:56 | 25 | relying on its attorney argument to safeguard the |

02:56  1   validity of the video content claim, since it has no

02:56  2   support in the intrinsic record, we submit that the

02:56  3   Court should reject those arguments as mere attorney

02:56  4   argument.

02:56  5              Thank you, Your Honor.

02:56  6              THE COURT:  Thank you.

02:56  7              A response?

02:56  8              MR. DYKAL:  Yes, Your Honor.  Ryan Dykal.

02:56  9   I'll argue on behalf of Touchstream.

02:56  10             And can I -- I don't see any videos.

02:56  11  Google's -- are their slides still on the screen?

02:56  12             THE COURT:  They're not on my screen.

02:56  13             MR. DYKAL:  Okay.  Maybe that's just me.

02:56  14  Okay.

02:56  15             Well, I'll try to be brief, Your Honor.

02:56  16  So two points here.  One, the Supreme Court has said in

02:56  17  Nautilus that indefiniteness must be evaluated from the

02:56  18  standard of one of reasonable skill in the art.  And,

02:57  19  notably, Google has not specified what they contend one

02:57  20  of skill in the art is or what that person would

02:57  21  understand.

02:57  22             And so at the outset, there's a failure

02:57  23  of proof here.  And it's notable that the burden is

02:57  24  high for indefiniteness.  It's a clear-and-convincing

02:57  25  standard.  And without even specifying the level of

02:57  1    skill in the art or what a person of ordinary

02:57  2    understanding would view these claims and how they

02:57  3    would view them and how they would be unable to define

02:57  4    the scope of the claims, we think there's a failure in

02:57  5    the first instance to meet their burden of clear and

02:57  6    convincing evidence.

02:57  7              And our second point is really these are

02:57  8    not confusing claims.  These are not technical terms

02:57  9    that would be confusing to a person of ordinary skill

02:57  10   or even a lay juror.  You know, the words that they're

02:57  11   alleging are indefinite are ordinary and understood by

02:57  12   almost anyone.

02:57  13             The word "video file" is easily

02:57  14   understood.  The word "video content" is understood.

02:58  15   And particularly, as Nautilus dictates, these words are

02:58  16   to be evaluated in the scope of the claims in light of

02:58  17   the specification.

02:58  18             And the claims are clear that the video

02:58  19   file is what is specified in the signal.  So the signal

02:58  20   goes from the mobile device.  It specifies a video file

02:58  21   to be acted on.  And then video content is displayed to

02:58  22   the screen and video content can be controlled.

02:58  23             And this is not uncertain.  It's

02:58  24   certainly not the level of indefiniteness.  It is

02:58  25   apparent what is going on here.  There is a video file

02:58  1   that is specified in the signals.  Once that video file

02:58  2   is acted upon, the video content that is contained

02:58  3   within that file can be displayed to the screen.  And

02:58  4   there is no ambiguity here.

02:58  5            The claims are reasonably certain, easily

02:58  6   up to the level of the standard dictated in Nautilus.

02:58  7   And the claims are not indefinite for both of those

02:58  8   reasons.

02:58  9            Thank you.

02:59  10            THE COURT:  Rebuttal?

02:59  11            MR. GARCIA:  Yes, Your Honor.

02:59  12            As to the first one regarding the person

02:59  13   of ordinary skill definition.  There is no precedent,

02:59  14   controlling precedent, from the Federal Circuit or the

02:59  15   Supreme Court that requires that every court examining

02:59  16   112 issues or claim construction, that they must

02:59  17   ascertain -- they must delineate at the outset the

02:59  18   level of skill of the art.

02:59  19            What is required is to review the

02:59  20   disclosures of the specification and ascertain if the

02:59  21   claims are -- would be properly understood by one

02:59  22   skilled in the art.

02:59  23            As it relates to the technicality -- or

02:59  24   the points about technicality of the terms and whether

02:59  25   they are easily understood or not, I think it, again,

02:59   1   it's telling to go back to the specification and look

02:59   2   at the variations and the numerous variations of how

02:59   3   these terms are being used.

02:59   4            Video content is never there.  Now, the

02:59   5   word "content" appears on its own.  The word "video"

02:59   6   appears on its own.  The word "video data" appears on

02:59   7   its own.  The word "data file" appears on its own.  The

02:59   8   word "video data file" appears on its own.

03:00   9            So the point is, Your Honor, when you go

03:00   10  back to the specification and you truly go through how

03:00   11  these disclosures are going on, it's very telling that

03:00   12  the word -- the video content is not being delineated

03:00   13  within the term -- the way that the claims are set up.

03:00   14            The more important point is that there's

03:00   15  no indication of how that content is being selected in

03:00   16  the '251 patent claim the way that they are in the '289

03:00   17  patent.  So I think the comparison between how those

03:00   18  two claims are drafted is telling enough.

03:00   19            Thank you, Your Honor.

03:00   20            THE COURT:  You bet.  I'll be back in one

03:00   21  second.

03:02   22            (Pause in proceedings.)

03:02   23            THE COURT:  Thank you all.

03:02   24            The Court is going to maintain its

03:02   25  preliminary construction.  I don't believe it's

03:02   1    indefinite.

03:02   2               The next claim term is "unique

03:02   3    identification code."  Who will be arguing that?

03:02   4               MR. LANIER:  I will, Your Honor.  Greg

03:02   5    Lanier of Jones Day.

03:02   6               Thank you for the time in this busy week.

03:03   7               Mr. McLean, if we could put up Slide 8,

03:03   8    please.

03:03   9               So we've illustrated here, Your Honor,

03:03   10   where the two terms that we're taking together here,

03:03   11   "unique identification code" and "synchronization

03:03   12   code," appear in Claim 1 of each of the two of the

03:03   13   asserted patents.

03:03   14              The issue here isn't the meaning of

03:03   15   either of those terms.  It is who assigns them.  And I

03:03   16   put up all this claim language just to illustrate that

03:03   17   this assignment is done as part of a complex system or

03:03   18   method, depending on the particular claims, that has a

03:03   19   lot of moving parts.  A lot of different things are

03:03   20   done by different parts of the system.

03:03   21              And so it's not about what these things

03:03   22   are, but who assigns them.

03:03   23              If we could go to the next slide, Slide

03:03   24   9, if you're looking at a hard copy.

03:03   25              So there's really two issues here, Your

| | | |
|---|---|---|
| 03:04 | 1 | Honor, to focus in on our argument.  The first is that |
| 03:04 | 2 | there is no disclosure in the specification -- in the |
| 03:04 | 3 | claims themselves.  If you look at the language of the |
| 03:04 | 4 | claims, to us, it seems very clear that the server |
| 03:04 | 5 | system is always assigning either the unique |
| 03:04 | 6 | identification code or the synchronization code. |
| 03:04 | 7 | When you go to the specification, it is |
| 03:04 | 8 | also crystal clear to us that only the server system is |
| 03:04 | 9 | assigning that.  And we put some exemplar specification |
| 03:04 | 10 | language up here. |
| 03:04 | 11 | Now, in response, Touchstream makes two |
| 03:04 | 12 | points.  The first is a legal point.  Liebel-Flarsheim |
| 03:04 | 13 | and that line of cases, but you can't just limit us -- |
| 03:04 | 14 | we haven't disavowed anything beyond that just because |
| 03:04 | 15 | there's no express words of disavowal, et cetera. |
| 03:04 | 16 | But this is not a situation where the -- |
| 03:04 | 17 | you can learn from the patent of any other way of |
| 03:04 | 18 | practicing these claims.  Nothing else in it is taught, |
| 03:04 | 19 | nothing else is disclosed, no other claims disclose |
| 03:04 | 20 | anything.  Nothing -- there is no discussion of any |
| 03:05 | 21 | other alternative embodiment where anything other than |
| 03:05 | 22 | the server system does the assignment. |
| 03:05 | 23 | So this isn't a disavowal or disclaimer |
| 03:05 | 24 | situation.  This is more like GPNE where the only thing |
| 03:05 | 25 | that is taught to help you understand the claim is this |

03:05 1   particular method of operation that has multiple

03:05 2   embodiments, where the server system does the

03:05 3   assignments.

03:05 4            If we could go to the next slide.

03:05 5            The next point is that -- that

03:05 6   Touchstream makes is that, well, there are some

03:05 7   discussion of whether the server system uses the IP

03:05 8   address or a MAC address occasionally in some examples,

03:05 9   as opposed to creating a new sync code.

03:05 10           But that's a distraction, Your Honor.

03:05 11  That's not actually the issue.  Because the question

03:05 12  here is not what does the server system choose to use

03:05 13  to say you are the thing to which I'm going to send

03:05 14  things, whether -- and whether it borrows that number

03:05 15  from something else.  It is who does the assigning?

03:06 16           And I thought an analogy might help.

03:06 17  This being June, it's baseball season.  If I were lucky

03:06 18  enough to manage the San Francisco Giants, for example,

03:06 19  I'd fill up my lineup card and I'd say my first baseman

03:06 20  is going to lead off.

03:06 21           Now, I could write next to Slot No. 1

03:06 22  first baseman.  I could write Brandon Belt.  I could

03:06 23  write No. 9.

03:06 24           Now, first baseman and No. 9 are things

03:06 25  that I, as the manager of the team, assigned to that

03:06  1   thing who's going to stand there, that person who's

03:06  2   going to bat first and stand at first base.  Brandon

03:06  3   Belt's name was given to him presumably by his parents

03:06  4   way long ago.

03:06  5            The fact that it doesn't matter for

03:06  6   purposes of filling out that lineup card, in that

03:06  7   system I am using that as his unique identifier.

03:06  8            So the question isn't where did the

03:06  9   unique identifier label come from?  It's that I, the

03:06  10  server system, I'm the one who's assigning it.

03:06  11           So that's our argument truly, Your Honor,

03:06  12  in a nutshell.  If we recognize that what the digit or

03:07  13  numbers or symbols of the unique identification code or

03:07  14  synchronization code might be is not the question.  But

03:07  15  that who chooses that that is the unique identification

03:07  16  code or synchronization code, that's the question.

03:07  17           Then I think that Touchstream's

03:07  18  opposition falls.  It's not a Liebel-Flarsheim

03:07  19  situation.  There's no other embodiments disclosed.

03:07  20  And that the Court's construction respectfully should

03:07  21  include the note that the unique identification code

03:07  22  and synchronization code are assigned by the server

03:07  23  system to the content presentation device.

03:07  24           And I'll stop there.

03:07  25           THE COURT:  A response?

| | | |
|---|---|---|
| 03:07 | 1 | MR. LAROQUE:  Yes.  Thank you, Your |
| 03:07 | 2 | Honor.  Sam LaRoque on behalf of Touchstream. |
| 03:07 | 3 | We agree with the Court that the plain |
| 03:07 | 4 | and ordinary meaning should control here.  That sync |
| 03:07 | 5 | code, synchronization code, is assigned to the content |
| 03:07 | 6 | presentation device means just that.  The |
| 03:07 | 7 | synchronization code is assigned to the content |
| 03:08 | 8 | presentation device.  And we don't need to read in |
| 03:08 | 9 | anything further that says who does the assigning. |
| 03:08 | 10 | A couple of points responsive to |
| 03:08 | 11 | Mr. Lanier.  First, you know, the -- we think about |
| 03:08 | 12 | what the synchronization code is intended here to do. |
| 03:08 | 13 | The synchronization code is provided to the server |
| 03:08 | 14 | system in a message from the content presentation |
| 03:08 | 15 | device.  And ultimately it is used as an association, |
| 03:08 | 16 | to set up an association between the personal computing |
| 03:08 | 17 | device, the mobile phone for instance, and the content |
| 03:08 | 18 | presentation device. |
| 03:08 | 19 | It's that association that is claimed. |
| 03:08 | 20 | It doesn't matter for purposes of associating the |
| 03:08 | 21 | personal computing device with the content presentation |
| 03:08 | 22 | device, what does that assignment, what actually |
| 03:09 | 23 | assigned that code.  And the specification does not |
| 03:09 | 24 | suggest otherwise. |
| 03:09 | 25 | To look at the language that Mr. Lanier |

03:09  1    quoted from the specification, it starts with "for

03:09  2    example, in some implementations the synchronization

03:09  3    code is generated randomly and assigned to the display

03:09  4    device each time it connects to the server system."

03:09  5                   That's very permissive language.  That

03:09  6    doesn't evidence any intent on the patentee's part to

03:09  7    limit this claim to assignment by the server system.

03:09  8                   And I would also point out, Your Honor,

03:09  9    that there are -- there are other independent claims in

03:09  10   the '289 patent in particular, one of the three patents

03:09  11   asserted in this case, and one of the patents asserted

03:09  12   here, where the independent claims actually do recite

03:09  13   that the synchronization code is assigned by the server

03:09  14   system to the content presentation device.

03:10  15                   But the claims, the independent claims,

03:10  16   of the '289 patent that Touchstream is asserting,

03:10  17   Claims 1 and 6, do not include that additional

03:10  18   limitation that assignment must be by the server

03:10  19   system.  So where patentee intended for it to be by the

03:10  20   server system, he said so.  But in the asserted claims

03:10  21   and in the term before the Court, he did not say so.

03:10  22   And there is no reason to interpret it so broadly.

03:10  23                   So we agree with Your Honor's preliminary

03:10  24   plain and ordinary meaning construction.

03:10  25                   Thank you.

```
03:10    1                    THE COURT:  A reply?

03:10    2                    MR. LANIER:  Very briefly, Your Honor.

03:10    3    And thank you again for the time.

03:10    4                    Three points.  First is, it sounds like

03:10    5    that argument was an attempt to resurrect part of what

03:10    6    had been Touchstream's alternative proposal,

03:10    7    alternative plain language meaning.

03:10    8                    So if the Court is not inclined to accept

03:10    9    the construction that Google has proposed, we do not

03:10   10    believe that there's any basis to conflate

03:10   11    "association" and "assignment."  Those are different

03:10   12    words used for different purposes at different places

03:11   13    in the claims.  And so association isn't the issue for

03:11   14    this construction.

03:11   15                    So if it is not going to be -- if the

03:11   16    Court is not going to say the unique identification

03:11   17    code is assigned by the server system, it should not

03:11   18    include the other language that Touchstream had

03:11   19    previously included and was not in the Court's

03:11   20    preliminary construction.  That's point one.

03:11   21                    Point two.  I think if we look at the

03:11   22    same language, and rather than pulling up the slide,

03:11   23    I'll just direct the Court to -- on considering this --

03:11   24    to the '251 patent at Page -- or Column 5, Lines 27 to

03:11   25    35.
```

03:11  1              In every one of those examples, it is

03:11  2  actually clear that what's at issue is not who's doing

03:11  3  the assignment -- assigning, but what the server system

03:11  4  chooses to use as that unique code.

03:11  5              First, "in some implementations the

03:11  6  synchronization code is generated randomly and assigned

03:11  7  to the delay device each time it connects to the server

03:11  8  system."

03:12  9              The second sentence emphasizes that this

03:12  10  isn't a question about the IP address or the MAC

03:12  11  address because they're all different things.  Even if

03:12  12  you happen to use one for the other, they're different

03:12  13  things that play a different role in the system.

03:12  14              And the third thing, for example, is the

03:12  15  same set of language.  This information can be stored,

03:12  16  for example, in a look-up table in the server system.

03:12  17              So there's no disclosure anywhere of the

03:12  18  assignment, which is the key, not association,

03:12  19  assignment of the unique identification code or

03:12  20  synchronization code other than by the server system.

03:12  21              So I'll stop there, Your Honor.  I think

03:12  22  everything else is in the papers.  Thank you.

03:12  23              THE COURT:  If I could hear a rebuttal

03:12  24  just to the final point that counsel just made.

03:12  25              MR. LAROQUE:  Thank you, Your Honor.

| | | |
|---|---|---|
| 03:12 | 1 | Again, we read this claim -- this |
| 03:12 | 2 | language in the specification differently.  It just |
| 03:12 | 3 | says that:  In some implementations the synchronization |
| 03:12 | 4 | code is generated randomly and assigned to the display |
| 03:13 | 5 | device each time it connects to the server system. |
| 03:13 | 6 | It does not say that that's the only way |
| 03:13 | 7 | that the synchronization code can ever be assigned or |
| 03:13 | 8 | that the server is the only entity that ever does that |
| 03:13 | 9 | assignment. |
| 03:13 | 10 | And as we said in the papers, the |
| 03:13 | 11 | specification clearly contemplates that that code might |
| 03:13 | 12 | be the IP address, that it might be the MAC address. |
| 03:13 | 13 | And Google's own extrinsic evidence that it presented |
| 03:13 | 14 | in this case makes clear that neither the IP address |
| 03:13 | 15 | nor the MAC address typically would be assigned by the |
| 03:13 | 16 | server system. |
| 03:13 | 17 | And I'll leave it at that.  Thank you, |
| 03:13 | 18 | Your Honor. |
| 03:13 | 19 | THE COURT:  Anything else? |
| 03:13 | 20 | MR. LANIER:  Only the last two sentences, |
| 03:13 | 21 | Your Honor, that the server system might choose to use |
| 03:13 | 22 | the IP address as the synchronization code to play the |
| 03:13 | 23 | unique role of the synchronization code in that system |
| 03:13 | 24 | doesn't mean that whoever gave that IP address is doing |
| 03:13 | 25 | the assignment.  It's the server system. |

03:14  1              So it's not the question of who assigned

03:14  2    the numbers one, two, three, four, however IP addresses

03:14  3    are structured.  Your Honor's seen that.  It's not who

03:14  4    named it, it's who decided that's the thing that is

03:14  5    used as the unique identification code or

03:14  6    synchronization code.

03:14  7              That's all we have, Your Honor.  Thank

03:14  8    you.

03:14  9              THE COURT:  Anything else from plaintiff?

03:14  10             MR. LAROQUE:  No.  Nothing further, Your

03:14  11   Honor.

03:14  12             THE COURT:  Okay.  I'll be right back.

03:14  13             (Pause in proceedings.)

03:16  14             THE COURT:  If we can go back on the

03:16  15   record.

03:16  16             The Court is going to maintain its

03:16  17   preliminary construction.

03:16  18             The final claim term is "action control

03:16  19   command being independent of the particular media

03:16  20   player."  And I'll hear from the defendant.

03:16  21             MR. LANIER:  Thank you, Your Honor.

03:16  22   Mr. McLean is going to briefly and slowly walk you

03:16  23   through that one.

03:16  24             THE COURT:  You'll understand if I'm

03:16  25   skeptical.

| | | |
|---|---|---|
| 03:16 | 1 | MR. LANIER:  Understood, Your Honor. |
| 03:16 | 2 | MR. MCLEAN:  Thank you, Your Honor.  I'm |
| 03:16 | 3 | just trying to bring the slides back up hear. |
| 03:17 | 4 | Okay.  Thank you again, Your Honor. |
| 03:17 | 5 | The term here is "action control command |
| 03:17 | 6 | being independent of the particular media player."  And |
| 03:17 | 7 | while we understand the Court's tentative construction |
| 03:17 | 8 | was plain and ordinary meaning, given the Court's |
| 03:17 | 9 | constructions, we attempted to refine this construction |
| 03:17 | 10 | to something that provided more of a middle ground. |
| 03:17 | 11 | And really what we're going for here |
| 03:17 | 12 | primarily is that the command is a standard command |
| 03:17 | 13 | independent of the particular media player. |
| 03:17 | 14 | So the focus here now is really the fact |
| 03:17 | 15 | that it's a standard command.  And that's language that |
| 03:17 | 16 | you might find familiar, given some of the other |
| 03:17 | 17 | constructions that have happened in this case so far. |
| 03:17 | 18 | And, again, one of the issues we |
| 03:17 | 19 | understand that Touchstream had with Google's prior |
| 03:17 | 20 | construction was that it was a standard format.  So we |
| 03:17 | 21 | revised it to be a standard command rather than a |
| 03:17 | 22 | format to help alleviate any issues with the language |
| 03:17 | 23 | there. |
| 03:17 | 24 | THE COURT:  Can you all give me just one |
| 03:17 | 25 | second?  I'll be right back.  I just need to ask my |

03:18  1    clerk something.  I'll be right back.

03:18  2                    MR. MCLEAN:  Yep.  No problem.

03:18  3                    (Pause in proceedings.)

03:18  4                    THE COURT:  Okay.  Thank you all.  I'm

03:18  5    sorry to interrupt you.

03:18  6                    MR. MCLEAN:  No problem.  Thank you, Your

03:18  7    Honor.

03:18  8                    We can move on to the next slide here.

03:18  9                    With respect to the claim language itself

03:18  10   and -- which is consistent with the specification, what

03:18  11   happened here on the claim is that the server system

03:18  12   received the action control command from the personal

03:19  13   computing device, but the media player at the content

03:19  14   presentation device, which is actually used to display

03:19  15   the video file is unable to understand or utilize the

03:19  16   incoming action control command.

03:19  17                    With that in mind, the claim here does

03:19  18   provide two different types of commands or information.

03:19  19   That is the action control command, which is the

03:19  20   incoming command from the personal computing device,

03:19  21   and the programming code, which is -- which is the code

03:19  22   that is a translator converted from the action control

03:19  23   command.

03:19  24                    However, as can be seen in the claim

03:19  25   language, both of these terms are described in the

03:19  1   claim itself in very, very similar terms.

03:19  2                For example, the action control command

03:19  3   is utilized "for presentation of the content on the

03:19  4   content presentation device by the particular media

03:19  5   player."

03:19  6                Similarly, the programming code, which is

03:19  7   highlighted in green here, is "for controlling

03:19  8   presentation of the content by the content presentation

03:19  9   device using the particular media player."

03:20  10               And what's clear here is that the term

03:20  11   that we are talking about here, that is the "action

03:20  12   control command" being independent of a "particular

03:20  13   media player," was actually added during prosecution by

03:20  14   the applicant pursuant to discussions with examiner in

03:20  15   order to gain issuance of the patent.

03:20  16               And in doing so, the examiner and the

03:20  17   applicant decided that it was needed to differentiate

03:20  18   the action control command from the programming code.

03:20  19               Google's construction here is consistent

03:20  20   with that focus, that it's for differentiating the

03:20  21   action control command to the particular media player.

03:20  22               Again, this is from the prosecution

03:20  23   history.  And the claim was allowed because the

03:20  24   applicant clarified that the action control command was

03:20  25   independent of a particular media player and that was

03:20  1    the primary reason for issuance of this patent here.

03:20  2                    Accordingly, the patent examiner thought

03:20  3    that this limitation was very important for issuance of

03:20  4    the patent.  And now, Google here merely seeks to

03:21  5    further clarify this limitation more for the jury to

03:21  6    understand the distinction.

03:21  7                    Notably, the specification never actually

03:21  8    uses the term "action control command."  And the first

03:21  9    time it shows up is in the actual claims themselves.

03:21  10                   And as Your Honor likely recognizes, when

03:21  11   he construed the term "for" here, which we're not

03:21  12   arguing today but was in the tentative constructions

03:21  13   for "universal command," "standard command" and

03:21  14   "universal command" were used interchangeably in the

03:21  15   specification.

03:21  16                   And here's some of the language here with

03:21  17   "standard" highlighted in green, which is really

03:21  18   defining this command that is being passed from,

03:21  19   again -- or received by the server system from the

03:21  20   personal commuting device.

03:21  21                   And, again, as perhaps more notably in

03:21  22   the Court's tentative, the Court construed "universal

03:21  23   command" which was a term -- Term 4 in the tentative

03:21  24   from the '251 patent, as a standard command.

03:21  25                   Again, these are really representing two

| | | |
|---|---|---|
| 03:22 | 1 | of the same things here.  One using action control |
| 03:22 | 2 | command, the other one using universal command.  But |
| 03:22 | 3 | again, the specification uses the word "standard" in |
| 03:22 | 4 | defining sort of both of these terms here. |
| 03:22 | 5 | So really what happens here is the |
| 03:22 | 6 | specification, both the parties have now used standard |
| 03:22 | 7 | command for this term.  The Court has now also used it |
| 03:22 | 8 | as well. |
| 03:22 | 9 | And therefore Google submits that this |
| 03:22 | 10 | term should also be used to provide standard command |
| 03:22 | 11 | for consistency, given that courts typically like to |
| 03:22 | 12 | have consistency across the claims.  And as shown here |
| 03:22 | 13 | by the Court's order quoting Phillips, other claims |
| 03:22 | 14 | asserted, unasserted can provide additional |
| 03:22 | 15 | instructions because terms are normally used |
| 03:22 | 16 | consistently throughout the patent. |
| 03:22 | 17 | And, again, this isn't a case where |
| 03:22 | 18 | Google's trying to, you know, read in a term from the |
| 03:22 | 19 | specification.  Instead, you know, this is Google |
| 03:22 | 20 | trying to clarify the construction of the term which |
| 03:22 | 21 | was deemed important by the examiner during |
| 03:23 | 22 | prosecution. |
| 03:23 | 23 | And it's further distinguishing the |
| 03:23 | 24 | action control command in the corresponding programming |
| 03:23 | 25 | code for this term, and which we think will be helpful |

03:23  1    for the jury.

03:23  2                    Thank you very much.

03:23  3                    THE COURT:  Thank you very much.

03:23  4                    A response?

03:23  5                    MR. LAROQUE:  Yes.  Thank you, Your

03:23  6    Honor.  Several points.

03:23  7                    First, we agree with the Court's plain

03:23  8    and ordinary meaning preliminary construction.  We

03:23  9    don't see any need to read in any additional words

03:23  10   about a standard command to clarify this distinction

03:23  11   between the action control command and the programming

03:23  12   code.  We think that's already clear from the plain

03:23  13   language of the claim.

03:23  14                   We have an action control command that is

03:23  15   independent of the particular media player.  And the

03:23  16   claim goes on to say that you then identify programming

03:23  17   code that corresponds to that action control command.

03:23  18   Or actually controlling presentation of content on the

03:23  19   content presentation device.

03:23  20                   So it's already clear from the plain

03:24  21   language of the claim that the action control command

03:24  22   is distinct from the programming code.  And we don't

03:24  23   see any need to read in any additional language beyond

03:24  24   the plain and ordinary meaning of those words.

03:24  25                   To the point of, you know, reading in

| | | |
|---|---|---|
| 03:24 | 1 | this limitation about a standard command, we don't |
| 03:24 | 2 | dispute Google counsel's assertion that for the term |
| 03:24 | 3 | "universal command" we did propose a construction that |
| 03:24 | 4 | includes the term "standard command." |
| 03:24 | 5 | But importantly, the term "universal |
| 03:24 | 6 | command" does not appear here.  That is not claimed in |
| 03:24 | 7 | the '289 or '528 patents.  That's a term that was in a |
| 03:24 | 8 | different patent, in the '251 patent. |
| 03:24 | 9 | And the universal command in the patent |
| 03:24 | 10 | specification is also described as a standard command. |
| 03:24 | 11 | So in clarifying in our proposed construction for a |
| 03:24 | 12 | different patent in a different claim term what a |
| 03:24 | 13 | universal command is, we proposed the term "standard |
| 03:25 | 14 | command." |
| 03:25 | 15 | But there's no reason or need to read |
| 03:25 | 16 | standard command into this term, into action control |
| 03:25 | 17 | command.  The specification, the patent specification, |
| 03:25 | 18 | describes more broadly a command that's included in a |
| 03:25 | 19 | message from the personal computing device that is for |
| 03:25 | 20 | controlling playing of the content on the display |
| 03:25 | 21 | device, for instance.  It doesn't say anything about |
| 03:25 | 22 | that being a standard command. |
| 03:25 | 23 | So, again, in the absence of any, you |
| 03:25 | 24 | know, unequivocal disclaimer, lexicography, we agree |
| 03:25 | 25 | with the Court's preliminary construction that plain |

| | | |
|---|---|---|
| 03:25 | 1 | meaning should control here.  And there's no reason to |
| 03:25 | 2 | read anything further into this term "action control |
| 03:25 | 3 | command" independent of the particular media player. |
| 03:25 | 4 | Thank you. |
| 03:25 | 5 | THE COURT:  A rebuttal? |
| 03:25 | 6 | MR. MCLEAN:  Thank you, Your Honor.  Just |
| 03:25 | 7 | real briefly. |
| 03:25 | 8 | It is true that one patent has the term |
| 03:26 | 9 | "universal command" while the other has "action control |
| 03:26 | 10 | command."  But it's also clear that both patents are |
| 03:26 | 11 | using that term in the same context.  They're both the |
| 03:26 | 12 | command that's being received by the server system and |
| 03:26 | 13 | then translator converted into the programming code |
| 03:26 | 14 | which is provided to the media player for playback |
| 03:26 | 15 | purposes. |
| 03:26 | 16 | In both cases it's talking about the |
| 03:26 | 17 | exact same command.  The spec does not reference a |
| 03:26 | 18 | action control command.  As we mentioned earlier, the |
| 03:26 | 19 | first time it shows up is in a complaint that might |
| 03:26 | 20 | refer -- in the claim.  Excuse me. |
| 03:26 | 21 | It might refer to command in the |
| 03:26 | 22 | specification.  But, again, it's not an action control |
| 03:26 | 23 | command.  So it's a little unclear where that language |
| 03:26 | 24 | is stemming from.  But it's also clear that the spec |
| 03:26 | 25 | consistently refers to universal or standard command. |

03:26  1              And the case here, it would be consistent

03:26  2  with the construction for -- that Your Honor made for

03:26  3  the "universal command" term, to also include

03:26  4  "standard" with respect to the action control command

03:26  5  here.

03:26  6              Thank you, Your Honor.

03:26  7              THE COURT:  Anything else?

03:27  8              MR. LAROQUE:  Thank you, Your Honor.

03:27  9  Just very briefly.

03:27  10              To reiterate again that the term

03:27  11  "universal command" is used interchangeably with

03:27  12  "standard command" in a particular embodiment.

03:27  13              And then universal command is claimed in

03:27  14  the '251 patent but not the '289.  The '289 and '528

03:27  15  use the term "action control command."  And these

03:27  16  commands are described more broadly elsewhere in the

03:27  17  specification.  So there's no need to limit them here

03:27  18  to universal or standard commands.

03:27  19              Thank you.

03:27  20              THE COURT:  I'll be back in a second.

03:27  21              (Pause in proceedings.)

03:28  22              THE COURT:  Thank you very much for the

03:28  23  break.

03:28  24              I'm going to maintain my preliminary

03:28  25  construction.

03:28  1          Is there anything else we need to take

03:28  2  up?

03:28  3          MR. LANIER:  Not for Google, Your Honor.

03:28  4          MR. DYKAL:  Nothing for Touchstream, Your

03:28  5  Honor.  Thank you for your time.

03:28  6          THE COURT:  You bet.  It takes a day of

03:28  7  sentencing over 30 people to make you really want to

03:29  8  cuddle up with a good Markman hearing.

03:29  9          (Laughter.)

03:29  10         THE COURT:  And so I know, you know,

03:29  11  it's -- I have to say, it's been a while since I felt

03:29  12  really grateful to go have a Markman hearing, but I did

03:29  13  today and it's always nice when you have really good

03:29  14  lawyers too.

03:29  15         So you guys have a good afternoon.  I

03:29  16  hope to see y'all soon.  Take care.

03:29  17         (Hearing adjourned.)

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS      )

3

4     I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of

6   Texas, do certify that the foregoing is a correct

7   transcript from the record of proceedings in the

8   above-entitled matter.

9     I certify that the transcript fees and format comply

10  with those prescribed by the Court and Judicial

11  Conference of the United States.

12    Certified to by me this 13th day of October 2022.

13
                            */s/ Kristie M. Davis*
14                          KRISTIE M. DAVIS
                            Official Court Reporter
15                          800 Franklin Avenue
                            Waco, Texas 76701
16                          (254) 340-6114
                            kmdaviscsr@yahoo.com
17

18

19

20

21

22

23

24

25