**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| TOUCHSTREAM TECHNOLOGIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Case No. 6:21-cv-569-ADA |
| | § | |
| GOOGLE LLC, | § | JURY TRIAL DEMANDED |
| | § | |
| Defendant. | § | |
| | § | |

**GOOGLE LLC'S RULE 50(b) RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

TABLE OF ABBREVIATIONS ............................................................................................ iv

TABLE OF EXHIBITS ......................................................................................................... v

I.  INTRODUCTION ..................................................................................................... 1

II. LEGAL STANDARD ................................................................................................ 1

III. NO REASONABLE JURY COULD FIND INFRINGEMENT ....................................... 1

    A.  Touchstream Failed To Prove The Accused Products Have The Claimed "Server System" ......................................................................................... 2

        1.  Properly Construed, The Accused Products Do Not Have The Claimed "Server System" ........................................................................ 2

        2.  Touchstream Failed To Show Infringement Of "Server System" Even Under Its Construction ....................................................................... 7

    B.  Touchstream Failed To Prove Divided Infringement ........................................... 8

        1.  The Accused "Media Player" Is Provided By Third Parties ...................... 9

        2.  The Accused "Messages" And "Signals" Are Provided By Third Parties ............................................................................................... 11

        3.  Certain Chromecast-Enabled Devices Are Made By Third Parties ......... 13

    C.  For Additional Reasons, No Reasonable Jury Could Find Infringement ........... 13

        1.  Touchstream Failed To Establish That The Accused Products Perform The Functionality Of The "Server System" Under Its Construction .............................................................................................. 13

        2.  Touchstream Failed To Show Infringement Of "Receiving" "Messages" That "Identify A Location" ('289 And '528 Patents) .......... 14

        3.  Touchstream Failed To Show Infringement Of The "Storing" Limitation ('251 Patent) ......................................................................... 16

IV. NO REASONABLE JURY COULD FIND THE CLAIMS NOT INVALID ............... 17

    A.  Google Is Entitled To JMOL On The Priority Dispute ....................................... 18

    B.  Google Is Entitled To JMOL That The Asserted Claims Are Obvious .............. 19

V.  CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Akamai Techs., Inc. v. LimeLight Networks, Inc.*,
797 F.3d 1020 (Fed. Cir. 2015) (en banc)................................................................8

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010)................................................................3, 5

*Brown v. Barbacid*,
276 F.3d 1327 (Fed. Cir. 2002)................................................................18

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
40 F.3d 1223 (Fed. Cir. 1994)................................................................18

*CommScope Techs. LLC v. Dali Wireless Inc.*,
10 F.4th 1289 (Fed. Cir. 2021) ................................................................7, 16

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015)................................................................17

*EMC Corp. v. Pure Storage, Inc.*,
204 F. Supp. 3d 749 (D. Del. 2016)................................................................18

*ESW Holdings, Inc. v. Roku, Inc.*,
No. 6-19-cv-00044-ADA, 2021 WL 1069047 (W.D. Tex. Mar. 18, 2021) ............................9

*Francis v. Turrack*,
2014 WL 3687311 (W.D. Tex. June 17, 2014) ................................................................1

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
757 F. App'x 974 (Fed. Cir. 2019) ................................................................17

*Kridl v. McCormick*,
105 F.3d 1446 (Fed. Cir. 1997)................................................................19

*Kyocera Senco Indus. Tools Inc. v. ITC*,
22 F.4th 1369 (Fed. Cir. 2022) ................................................................3, 5

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015)................................................................12

## TABLE OF AUTHORITIES
### (continued)

**Page**

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008).................................................................3

*Olaf Sööt Design, LLC v. Daktronics, Inc.*,
  839 F. App'x 505 (Fed. Cir. 2021) ...........................................................3

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
  587 F.3d 1324 (Fed. Cir. 2009)................................................................20

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................6

*Slip Track Sys., Inc. v. Metal-Lite, Inc.*,
  304 F.3d 1256 (Fed. Cir. 2002)................................................................19

*Thomas v. Hughes*,
  27 F.4th 995 (5th Cir. 2022) .....................................................................1

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*,
  443 F. Supp. 2d 836 (S.D. Tex. 2006) .......................................................18

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
  465 F.3d 1312 (Fed. Cir. 2006)...........................................................12, 14

## OTHER AUTHORITIES

Fed. R. Civ. P. 50.............................................................................................1

## TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| Touchstream | Touchstream Technologies, Inc. |
| Google | Google LLC |
| '251 patent | U.S. Patent No. 8,356,251 (PTX-865) |
| '528 patent | U.S. Patent No. 8,782,528 (PTX-885) |
| '289 patent | U.S. Patent No. 8,904,289 (PTX-883) |
| API | application programming interface |
| asserted patents | the '251 patent, the '528 patent, and the '289 patent |
| asserted claims | claims 1 and 8 of the '251 patent, claims 1 and 14 of the '528 patent, and claims 1 and 2 of the '289 patent |
| DCS | device configuration server |
| GTS | YouTube Remote and Leanback with Google TV System (JTX-1; JTX-3; JTX-21; JTX-51; JTX-63; DTX-118A; DTX-120; DTX-632; Tr. 892:19-904:3 (Levai)) |
| Muthukumarasamy | U.S. Patent Application Publication No. 2010/0241699 (JTX-22) |
| POSA | person of ordinary skill in the art |
| SDK | software development kit |
| Tr. | Trial Transcript, located at:<br>Dkt. 259 (Day 1, pp. 1-244);<br>Dkt. 260 (Day 2, pp. 245-647);<br>Dkt. 262 (Day 3, pp. 648-1028);<br>Dkt. 264 (Day 4, pp. 1029-1310); and<br>Dkt. 266 (Day 5, pp. 1311-1376).<br>Certain portions of the Trial Transcript are and remain under seal. |

***All emphasis added unless otherwise noted.***

**TABLE OF EXHIBITS**

| Trial Exhibit | Description |
| --- | --- |
| JTX-1 | *Control YouTube on the Desktop, or the TV ... with the YouTube Remote App for Your Phone*, YouTube Official Blog (Nov. 9, 2010) |
| JTX-3 | *How to Control Google TV or YouTube Leanback with YouTube Remote*, YouTube (Nov. 14, 2010) |
| JTX-21 | U.S. Patent No. 9,490,998 |
| JTX-22 | Muthukumarasamy prior-art reference |
| JTX-51 | *Features*, Google TV (Oct. 5, 2010) |
| JTX-63 | YouTube Remote API Server Documentation |
| JTX-218 | Purported source code for Mr. Strober's prototype |
| JTX-226 | Purported source code for Mr. Strober's prototype |
| JTX-228 | Purported source code for Mr. Strober's prototype |
| JTX-254 | Purported source code for Mr. Strober's prototype |
| JTX-255 | Purported source code for Mr. Strober's prototype |
| PTX-863 | '289 patent |
| PTX-865 | '251 patent |
| PTX-885 | '528 patent |
| DTX-118A | *How to Control Google TV or YouTube Leanback with YouTube Remote*, YouTube (Nov. 14, 2010) (video file) |
| DTX-120 | Declaration of Janos Levai |
| DTX-632 | GTS Source Code Printouts |
| DTX-637 | Mr. Strober's purported draft summary of the claimed invention for the asserted patents |

| Motion Exhibit | Description |
| --- | --- |
| Exhibit A | The asserted claims of the asserted patents |
| Exhibit B | Excerpt of the prosecution history of the '251 patent |
| Exhibit C | Excerpt of Dr. Almeroth's infringement demonstratives |

## I.    INTRODUCTION

Google renews its motion for judgment as a matter of law ("JMOL") under Federal Rule of Civil Procedure 50(b) on all liability issues.  As shown in Google's Rule 59 motion for a new trial, instead of proving infringement, Touchstream biased the jury in its favor by focusing on its unmeritorious willfulness case, without carrying its burden on alleged infringement.  Indeed, Touchstream's infringement case suffered from a fundamental flaw:  Touchstream pursued a theory that requires multiple distinct components to constitute the "server system," and similarly required actions and components of third parties to meet the claims.  Yet the claims do not contemplate Touchstream's mishmash "server system" theory, and Touchstream did not even attempt to show Google directed or controlled the third parties.  No reasonable jury could find infringement.  Nor could a reasonable jury reject Google's obviousness defenses.  Touchstream's attempt to predate Google's primary art, GTS, lacked evidentiary support.  And on the merits, a (moving) picture is worth a thousand words:  Google clearly and convincingly showed obviousness—including via video evidence of GTS in use years ago.

Judgment of non-infringement and invalidity should be granted.

## II.    LEGAL STANDARD

Courts grant JMOL where "a reasonable jury would not have a legally sufficient evidentiary basis to find" for the non-movant, *Francis v. Turrack*, 2014 WL 3687311, at *3 (W.D. Tex. June 17, 2014), i.e., the record "point[s] so strongly in favor of the movant that a rational jury could not reach a contrary verdict," *Thomas v. Hughes*, 27 F.4th 995, 1008 (5th Cir. 2022).

## III.    NO REASONABLE JURY COULD FIND INFRINGEMENT

Touchstream's infringement case rested on a fundamental error that applies to all asserted claims:  Touchstream conflated the distinct components and actors set forth in the claims.  Notably, Touchstream narrowed its case to literal infringement; it dropped its doctrine-of-equivalents theory

at trial.  Tr. 701:21-24.  But for at least two independent though related reasons, Touchstream, as a matter of law, failed to show infringement.

*First*, Touchstream attempted to show infringement of the claimed "server system" limitation by pointing to functionality on the same accused device that, Touchstream argued, also constituted the claimed "content presentation device."[1]  Touchstream pursued this theory with abandon because it was freed from the guardrails of an express construction of "server system." Under a proper construction, the "server system" cannot be the same as or overlap with the "content presentation device."  And, under that construction, there can be no dispute that the accused products do not infringe because the accused "server system" overlaps with the accused "content presentation device."

*Second*, Touchstream failed to show that Google is responsible for the components and actions of third parties, including components that Touchstream included as part of the accused "server system."  Touchstream had to show that Google directed or controlled those third parties. But Touchstream failed to present *any* evidence on this issue.

Finally, even setting aside both of those fatal flaws, Touchstream failed to carry its burden for a third reason:  it failed to show infringement of other specific limitations.

## A.    Touchstream Failed To Prove The Accused Products Have The Claimed "Server System"

### 1.    Properly Construed, The Accused Products Do Not Have The Claimed "Server System"

All the asserted claims require a "server system."  The Court declined to construe that term, instead determining "to go with plain and ordinary meaning."  Dkt. 225 at 50:17-19.  But as the

---

[1] The '251 patent claims a "display device," and the '528 and '289 patents claim an analogous "content presentation device."  This brief uses the terms synonymously, and primarily uses "content presentation device."  For completeness, Exhibit A sets forth each asserted claim in full.

trial record shows, without a construed limit on the meaning of "server system," Touchstream engaged in an untenable trial presentation, pursuing its theory that the plain meaning permits the "server system" to overlap with the "content presentation device"—even though those are separately claimed components. Accordingly, this is a case in which post-trial claim construction is required. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate … when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."); *Olaf Sööt Design, LLC v. Daktronics, Inc.*, 839 F. App'x 505, 509 (Fed. Cir. 2021) (granting JMOL of non-infringement based on a new claim construction because the lack of a claim construction at trial "resulted in a claim construction dispute being 'improperly submitted to the jury'"). When properly construed in the context of the asserted patents, the claimed "server system" must be "distinct from and does not include the 'display device' or 'content presentation device.'" Dkt. 130 at 16.

As Google explained in its summary judgment papers, all of the intrinsic evidence compels this construction. Dkt. 130 at 12-20; Dkt. 184 at 1-10. For instance, the claims themselves recite that the server system "identif[ies]" programming code that "is for controlling presentation of the content by the content presentation device[.]" '289 Patent, claim 1. This plain reference to the content presentation device in relation to, and separate from, the server system makes clear the server system and content presentation device are distinct. Where, as here, a claim lists components separately, "[t]here is, therefore, a presumption that those components are distinct." *Kyocera Senco Indus. Tools Inc. v. ITC*, 22 F.4th 1369, 1382 (Fed. Cir. 2022); *accord Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254-55 (Fed. Cir. 2010) (citing additional authorities).

The specification, which is shared by all three asserted patents, not only fails to overcome the presumption, but instead reinforces that these components are separate. As the "Summary" states, the patents are directed to "a server system…, a display device…, and a personal computing device…"—components that are separately listed. *E.g.*, '289 Patent, 1:45-48. Likewise, "[t]he server system stores an association between the personal computing device and the display device" and, "in response to receiving the first message from the personal computing device," "provide[s]" a second message "to the display device"—again reinforcing that these components are distinct. *E.g.*, '289 Patent, 1:49-60; *id.* at 2:6-8 ("The server system is operable to provide to the display device…."); *see also* Dkt. 130 at 9-11, 17-20. Consistent with these disclosures, Figure 1 depicts the server system as distinct from the "television set 22" and describes that display device as "operable to link back to a server system 24," and Figure 2 depicts the functionality performed by the three separately claimed components—the "Smart Phone," "Display Device," and "Back-end Servers" (i.e., "server system 24"). *E.g.*, '289 Patent, Figs. 1 & 2, 2:66-4:37 (describing Figures 1 and 2). The specification *nowhere* contemplates that the "server system" and "display device" can be the same component or overlap in any way. Dkt. 130 at 17-20; Dkt. 184 at 5-7.

Further, permitting these components to overlap would divorce the claims from their disclosed purpose. As Google's expert Dr. Ketan Mayer-Patel explained, the written description identifies "two primary roles" for the "server system." Tr. 930:24-931:1. The first "is to act as … an agent to connect between the phone and the content display device via a synchronization code." Tr. 931:2-4. This is because "the patent is addressing" the scenario in which "the phone and the content presentation device either can't talk directly to each other or don't want to talk directly to each other," so the server system is "the thing that is managing that connection and making that connection possible." Tr. 931:10-18. The second role "is to step into th[e] communication gap

where the phone does not know how to issue commands that the media player on the content presentation device understands."  Tr. 932:11-933:11.  If the "server system" could overlap with the "content presentation device," the "server system" would not need to perform these roles.

The prosecution history confirms the server system's separateness.  In responding to an office action, Touchstream made clear that, as used in the claims, "the server system acts [as] an interface for facilitating the transfer of information contained in the one or more signals (received from the personal computing device) to the display device."  Ex. B at TS-00003404; *see also* Dkt. 130-3 at 62-63.  If the "server system" could overlap with the "display device," there would be no need for the "server system" to act as an "interface."

In opposing Google's construction, Touchstream leaned on the claims' recitation that the "personal computing device" is "separate from" both the "server system" and the "content presentation device," without reciting the relationship between the "server system" and "content presentation device" in the same way.  Dkt. 158 at 7-9.  But "separate from" is not the only way to claim distinct components, as *Kyocera* and abundant other precedent make clear.  *See Kyocera*, 22 F.4th at 1382 (construing elements as separate even though the claims and specification did not expressly describe them as separate); *Becton Dickinson*, 616 F.3d at 1254-55.  And Touchstream ignores the claims' syntax, which, in first introducing the "server system," recites the "server system" as a distinct and separate component—separate from both the "personal computing device" and the "content presentation device."[2]

The trial record reinforces that Touchstream's proffered meaning of "server system" does not comport with the intrinsic evidence of the asserted patents.  For his view of how an ordinary

---

[2] Touchstream's understanding of "server system" also renders the claims indefinite—an additional issue that Google preserves for appeal, if needed.  *See* Dkt. 130 at 20-23.

artisan would understand "server system," Touchstream's expert Dr. Kevin Almeroth pointed to extrinsic evidence: "a technical dictionary from the Microsoft Press" and its "two different similar definitions" of "server," with one defining "server" as a computer "[o]n the Internet or other network" "that responds to commands from a client," and the other defining "server" as "a computer running administrative software that controls access to the network and its resources … and provides resources to computers functioning as workstations on the network."   Tr. 431:16-432:13; Ex. C at 55 (Almeroth demonstratives).   By citing only extrinsic evidence—and only for the naked word "server" taken out of context from the claims and other intrinsic evidence—Dr. Almeroth's view violates basic tenets of claim construction:  "[W]hile extrinsic evidence can shed useful light on the relevant art, [the Federal Circuit has] explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).  Moreover, Dr. Almeroth's testimony "suffer[s] from bias that is not present in intrinsic evidence" because it was "generated at the time of and for the purpose of litigation."  *Id.* at 1318.

Furthermore, under the proper construction, Touchstream cannot prove infringement.  In the accused products, it is undisputed that the accused "media player" is a software application that runs on the accused "content presentation device."  Tr. 425:9-426:1, 476:6-478:6 (Almeroth); Tr. 955:7-956:20 (Mayer-Patel).  Yet, for its alleged infringement read, Touchstream cobbled together the accused "server system" from parts of the accused "media player"—such as the "receiver SDK"—and parts of the accused "content presentation device."  *E.g.*, Tr. 430:5-433:4, 439:4-440:7, 464:1-5.  This theory is nonsensical under a proper construction of "server system" because the functionality of the accused "server system" cannot come from the accused "content

presentation device" if the two are distinct.  No reasonable jury could accept that the accused products have the "server system" as claimed.  The Court should grant JMOL of non-infringement.

### 2. Touchstream Failed To Show Infringement Of "Server System" Even Under Its Construction

Even applying its flawed view that the claimed "server system" "responds to commands from a client" or "run[s] administrative software that controls access to the network and its resources," Touchstream failed to prove the accused products infringe.  There was no evidence that the accused "server system" interacts with "a client" or runs software "that controls access to" a network.  In fact, although Dr. Almeroth invoked those definitions, he never explained how the numerous components he alleged made up the accused "server system" meet them.  Instead, unrebutted evidence showed that the accused products utilize a peer-to-peer approach, which definitionally is the opposite of Touchstream's construction because there is no "server-client relationship" and no software "control[ling] access"; rather, "the different component[s] on the network are equal and they are talking to each other directly."  Tr. 725:2-7 (Bakar).  Indeed, the evidence established that Google "deliberately design[ed]" Chromecast for the second screen, typically a phone, "to talk directly to the display device over the local network" via "peer-to-peer communication."  Tr. 723:15-726:7 (Bakar); *see also* Tr. 842:1-847:8 (Van Der Staay) (the peer-to-peer approach was intentionally selected); 928:18-930:2 (Mayer-Patel) (Google's products use a peer-to-peer relationship because "communication happens directly with no intermediary service system … performing the steps as claimed in the patents"); 940:5-942:18 (Mayer-Patel) (there is no external server between the cast device and phone because of Google's peer-to-peer architecture).  JMOL is appropriate when there is a lack of evidence showing infringement and "unrebutted evidence showing the opposite."  *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1297-98 (Fed. Cir. 2021).

Touchstream instead engaged in handwaving, pointing to components that are labeled "server" and interact with the casting device in some respect—e.g., the "mDNS server," "MDx server," "Orbit server," or "DIAL server"—in an attempt to overcome the accused devices' non-infringing peer-to-peer architecture.  Tr. 430:5-24 (Almeroth) (referencing the accused products' servers, some of which are "on Google servers in the cloud" and others which are "on the device"); 432:14-20 (Almeroth) (same).  The unrebutted evidence established that these "servers" were red herrings and did not have anything to do with the functionality of the claimed "server system."  Tr. 866:1-18 (Van Der Staay) (mDNS server is "used by tons of different companies," performs the "prerequisite step" of "find[ing] a cast device," and has no "role in the communications between the phone and the Chromecast during the casting process"); Tr. 870:12-23 (Van Der Staay) (DIAL/MDx relates to "second screen experiences on noncast-enabled devices" for YouTube and "is actually not related to Google Cast at all"); JTX-116 ("MDx" now called "Orbit").  Touchstream's efforts to obfuscate cannot sustain the verdict.

### B.     Touchstream Failed To Prove Divided Infringement

Touchstream also relied on a mash-up of distinct components to sidestep its burden on divided infringement—an independent failure of its infringement case.  "Where more than one actor is involved in practicing" a claimed method, the patent owner must prove that "the acts of one are attributable to the other such that a single entity is responsible for the infringement." *Akamai Techs., Inc. v. LimeLight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc).  As relevant here, an entity can be held responsible for others' performance of method steps where "that entity directs or controls others' performance."[3]  *Id.*  No reasonable jury could have found

---

[3] Only a direction or control theory, and not *Akamai*'s alternate divided-infringement theory of a "joint enterprise," is at issue in this case; the jury was instructed only on direction or control (Tr. 1286:1-1287:7), and Touchstream did not object to that instruction or its scope.

that Touchstream made this showing.  In fact, the only mention of "direct" or "control" in the relevant context was when the Court instructed the jury on divided infringement.  Tr. 1286:1-1287:7.  Touchstream *never* argued or even referred to these concepts.  Where the patentee fails to even present evidence of direction or control, there can be no infringement.  *See ESW Holdings, Inc. v. Roku, Inc.*, No. 6-19-cv-00044-ADA, 2021 WL 1069047, at *2-5 (W.D. Tex. Mar. 18, 2021) (granting summary judgment of non-infringement given lack of showing of direction and control).

Touchstream cannot dispute its lack of proof of divided infringement.  Nor can it claim that its infringement theory did not invoke the law on divided infringement.  As the claims and specification make clear, and as Touchstream itself pursued at trial, the alleged infringement requires actions and components provided by third parties.  Because Touchstream failed to present any evidence that Google directed or controlled those parties, JMOL of non-infringement is warranted for this additional, independent reason.

### 1. The Accused "Media Player" Is Provided By Third Parties

Each of the claimed methods requires a "media player."  For example, the claimed "server system" must "identify[]" "programming code … for controlling presentation of the content by the content presentation device," and "the content presentation device" must "use[] [a] particular media player to execute the programming code."  '289 Patent, claim 1; '528 Patent (same); '251 Patent (same but requiring "converting" rather than "identifying").  The specification expressly contemplates that parties other than those providing the "server system" will provide the "media player," e.g., media players from "YouTube," "Ted.com," and "Vimeo."  '289 Patent, 6:7-18, Fig. 5.  The specification also explains that "companies that provide on-line video platforms that host videos for other individuals or companies can obtain useful advantages by integrating the platforms with the server system," and that "[p]rogramming hooks can be created in the API so that the on-line video platform's media player can communicate with the server system."  *Id.* at 9:11-33.

The only record evidence regarding the accused "media players" was that they are provided by third parties.  This is true even under Touchstream's theory that the claimed "server system" included Google's "receiver SDK," which is a "software development kit" that third parties can customize for their media players.  Dr. Almeroth highlighted the receiver SDK as a key to his infringement opinion, explaining that it "acts as the bridge or the glue to the cast browser," Tr. 430:15-18, "enables the communication between the cast service and the phone," Tr. 454:2-10, and performs the '289 and '589 patents' "identifying" step concerning the "action control command" and the '251 patent's equivalent "converting" step for the "universal playback control command," Tr. 453:6-23, 455:15-456:20.  But Dr. Almeroth ignored the undisputed evidence that this "glue" is customized by *third parties* in creating their media players.

Although Google hosts the receiver SDK on its website for downloading, it is undisputed that third-party content providers building their apps and media players to interface with Chromecast-enabled devices "could use all of [the receiver SDK], they could use some of it, [or] they could use none of it if they wanted to."  Tr. 849:23-25, 848:20-850:20 (Van Der Staay); Tr. 955:7-956:20 (Mayer-Patel).  Third parties "can do whatever they want," "they [can] decide to do all their own experience, build their own things," and "[i]f they want to go down to the low level and handle everything themselves, they can."  Tr. 850:11-20 (Van Der Staay).  Google engineer Mr. Van Der Staay further emphasized that "some of [Chromecast's] biggest apps," such as "Netflix" "don't use all of the receiver SDK"; "Facebook" may use "a tiny bit" or not "any of the receiver SDK" at all.  Tr. 850:1-10.  Even when Touchstream pressed Mr. Van Der Stay regarding the receiver SDK, he reiterated that "how much is used *or if it's used is optional*."  Tr. 887:13-17.

In fact, Touchstream's expert Dr. Almeroth confirmed this.  He agreed there are "third parties involved in this cast ecosystem," such as "Netflix and Spotify," and that those parties

"provide … the media player." Tr. 501:22-502:8. He also agreed that when an accused product asks Netflix to send what is needed "to display that video," what "Netflix sends" is "built" and "designed by Netflix." Tr. 502:7-21. While he noted that Google informs third-party content providers about what is needed "to use" the accused products, Tr. 503:1-3, he underscored that "Netflix provides what it builds," Tr. 504:8-11. Meanwhile, Touchstream presented no evidence that Google directs or controls the third-party content providers.

Finally, Dr. Almeroth's testimony that the accused products have "an application programming interface," that "[t]here are rules that have to be in place for that app to be able to work in a cast-enabled device," and that "the browser in [the accused] devices has to be able to request from Netflix, for example, the app to download it and display it in the Chrome browser on the device," Tr. 548:2-11, was insufficient. He pointed to no evidence that such interactivity establishes direction or control.

For this independent reason, JMOL of non-infringement is required.

## 2.    The Accused "Messages" And "Signals" Are Provided By Third Parties

Each asserted claim requires receiving "messages" or "signals" sent from a user's personal computing device (e.g., phone) to the "server system," and those messages and signals must contain and provide specific data and information. The following italicized steps of claim 1 of the '289 patent are representative of the user-performed steps:

> receiving, in a server system, one or more *messages from a personal computing device* that is separate from the server system and separate from the content presentation device, wherein the one or more message, taken together, (i) *include information associated with a unique identification code assigned to the content presentation device*, (ii) *specify a file to be acted upon*, (iii) *identify a particular media player for playing content from the specified file* wherein the media player is a computer application operable to present content and control presentation of the content, (iv) *identify a location of the particular media player*, and (v) *include an action control command for presentation of the content on the content presentation device by the particular media player*, ….

The specification likewise makes clear that users are involved.  For example, it emphasizes that the messages identify "*user-selected* content and a media player to play the content," and that the invention "allow[s] the *user to control* how the content is displayed on the display device *using the personal computing device*," by "*user-initiated* play commands."  '289 Patent, 1:51-57, 2:29-33, 3:12-41.  In fact, every example discusses a user's actions, underscoring their central involvement to the claims.  *Id.* at 2:66-9:33.  Even Dr. Almeroth agreed that the claims require signals and messages from a user's device—"that kind of information *has to be received in the server system*."  Tr. 401:22-402:13; 436:7-9 (the pieces of information in the claims are "required"); 445:12-448:21 (source code contained all requirements of the claimed messages); 434:12-435:2 (outlining user involvement); 435:9-24 (same); 435:7-439:16 (same); 440:18-22 (same).  Indeed, he admitted that it is users "who pick[] the movie to play" and "who decide[]" "to watch Netflix."  Tr. 503:24-504:4.

Yet, even though end users—not Google—make the selections on their devices that result in the claimed messages and signals, Touchstream presented *no evidence* that Google directs or controls that user action.  Instead, Dr. Almeroth asserted without evidence that, "when you look at the words of the steps, that is functionality performed by Google, provided by Google."  Tr. 547:17-21.  Such unsupported, "[c]onclusory statements by an expert … are insufficient to sustain a jury's verdict."  *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015); *see also Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (same).  In any event, Dr. Almeroth's bald assertion was directly contrary to his extensive testimony, just discussed, that the claims require messages or signals from a *user's* device.

For this additional reason, the jury's infringement verdict cannot stand.[4]

---

[4] Because the '251 patent claims only "video files," Touchstream does not dispute that audio-only

### 3.      Certain Chromecast-Enabled Devices Are Made By Third Parties

Touchstream accused a category of third-party products consisting of televisions and other Chromecast-enabled devices that Touchstream alleged are the claimed "content presentation devices."   But Touchstream presented *no* evidence that Google directs or controls those manufacturers in their numerous design and other choices, including whether their products have any display screens or speakers for presenting content, the media-player applications that are installed (including use, or not, of the receiver SDK), or the content that is included through the apps on the televisions and devices.   Accordingly, while the Court should find no divided infringement as a matter of law for all accused products, Touchstream's independent failure with respect to this category of products would require, at minimum, a new damages trial that excludes them from trial.

*          *          *

In short, in multiple respects, Touchstream failed to prove divided infringement, even though the asserted claims and Touchstream's infringement theory invoked that theory.   The jury's infringement verdict should be reversed for any and all of these additional reasons.

### C.      For Additional Reasons, No Reasonable Jury Could Find Infringement

Even under Touchstream's understanding of "server system," and setting aside the divided-infringement failure of proof, Touchstream failed to prove infringement.

### 1.      Touchstream Failed To Establish That The Accused Products Perform The Functionality Of The "Server System" Under Its Construction

Touchstream alleged that the "receiver SDK" is a critical aspect of the "server system" under its theory, labeling it the "glue" that "enables communication between the cast service and

---

accused devices—e.g., Chromecast Audio, third-party speakers with "Chromecast Built-In," Google Home, Google Home Mini, Google Home Max, Google Nest Audio, Google Nest Mini, Google Nest Wifi Point (wifi extender with speaker)—cannot infringe that patent.  Tr. 482:12-17.

the phone." *See supra* Section III.B.1. But it is undisputed that, while Google offers the receiver SDK for use by media-player developers, developers can use as much or as little (including none) of the receiver SDK as they want. *See id.* Indeed, undisputed testimony established that various media players only use bits and pieces of the receiver—and some may use no part of the receiver SDK at all. *See id.* "Netflix, for example, does not use all of the receiver SDK," "YouTube does not use all of the receiver SDK," and Facebook may not use any of it. Tr. 850:3-10 (Van Der Staay). In short, it is up to each developer what pieces of the receiver SDK it may use.

Touchstream did not identify the precise part(s) of the receiver SDK that perform the "server system" functionality necessary under its infringement theory, nor did it show that *any* media player on which it relies (e.g., Netflix, YouTube, Facebook) uses such functionality. Because media players need not and do not use the receiver SDK wholesale, Touchstream's complete lack of proof precludes infringement.

### 2. Touchstream Failed To Show Infringement Of "Receiving" "Messages" That "Identify A Location" ('289 And '528 Patents)

Certain asserted claims (claims 1 and 2 of the '289 patent and claims 1 and 14 of the '528 patent) recite: "receiving, in a server system, one or more messages from a personal computing device," and the messages "identify a location of the particular media player." For at least two reasons, no reasonable jury could have found infringement of this limitation.

*First*, Dr. Almeroth's conclusion that the Cast App ID "identif[ies] a location of the particular media player" misinterpreted the evidence. The only evidence regarding the Cast App ID was that it is merely a number and does not itself identify a location. *E.g.*, Tr. 853:15-857:8 (Van Der Staay); 963:13-965:13 (Mayer-Patel). As Mr. Van Der Staay testified, there is *not* a one-to-one correspondence between the Cast App ID and a webpage, and the Cast App ID merely identifies an app, e.g., Spotify. Tr. 853:15-857:8. His unrebutted testimony made clear that a

particular app is not the same as the location.  *Id.*  He further testified that the purported media player (i.e., the webpage) itself may vary based on the device used.  Tr. 856:19-24 (explaining that "it's up to each individual app developer" to "optimize that experience to get the best possible experience to their users," and they "can target different web apps or different URLs for different devices … that support Cast").  Because the Cast App ID itself does not identify a location, Dr. Almeroth's conclusion was unsupported, and Touchstream did not prove infringement.[5]

 *Second*, the claims require that the "*personal computing device*" (e.g., phone) send the messages that identify the location of a particular media player.  But under Touchstream's theory, the accused "*content presentation device*," i.e., the accused *Chromecast-enabled device*, identifies the location of a particular media player.  Indeed, Dr. Almeroth testified that "the cast service box," which resides on the accused "content presentation device"—not the personal computing device— "will send a request to the [device configuration server ('DCS')] and say, Take this app ID and return to me information about it."  Tr. 522:20-524:14; Ex. C at 67 (Almeroth demonstratives).  It was undisputed that the DCS provides this information directly to the Chromecast-enabled device when it starts up.  Tr. 862:8-24 (Van Der Staay).  And the record shows several reasons why the personal computing device, as used with the accused products, is expressly designed *not to send* messages that identify the media player's location.  *E.g.*, Tr. 853:15-857:8 (Van Der Staay) (Google intentionally did not want messages to include a URL or web address in order to let "partners build unique experiences" for different types of devices); 963:13-965:13 (Mayer-Patel) (agreeing with Mr. Van Der Staay).  Because the "personal computing device" does not "identify the location of a particular media player" (rather, the DCS separately provides this information to

---

[5] Because Touchstream dropped its doctrine-of-equivalents case at trial, *see supra*, this difference is legally significant to the infringement inquiry.

the *Chromecast-enabled device*), none of the accused products infringe.  *See CommScope*, 10 F.4th at 1297-98 (JMOL warranted where "unrebutted evidence" shows non-infringement).

> **3.    Touchstream Failed To Show Infringement Of The "Storing" Limitation ('251 Patent)**

The asserted claims of the '251 patent (claims 1 and 8) recite: "storing, in a database associated with the server system, information for transmission to or retrieval by the display device, wherein the information … includes the corresponding programming code to control playing of the video content on the display device by the particular media player in accordance with the universal playback control command."  For at least two reasons, Touchstream failed to meet its burden on this limitation as a matter of law.

*First*, Touchstream contended that memory on the "personal computing device," e.g., a phone, stores the programming code to control playing of the video content by the particular media player.  Tr. 485:17-23 (Almeroth).  But unrebutted testimony showed that the phone does not store the claimed "programming code."  *See* Tr. 859:17-860:21 (Van Der Staay); 959:13-963:8 (Mayer-Patel).  The only time Dr. Almeroth referred to the claimed "programming code" was when he explained that the allegedly infringing code resides on the cast-enabled device—not the phone. Tr. 451:19-454:10.  Dr. Almeroth based his opinion on testimony from Mr. Van Der Staay that the phone stores certain information when it enters a low power state.  Tr. 484:3-485:23.  However, both Mr. Van Der Staay and Dr. Mayer-Patel confirmed that this stored information does not include any "programming code to control playing of the video content on the display device by the particular media player"; instead, the system stores a single "session identifier" to resume the peer-to-peer connection between the phone and the accused device.  *See* Tr. 859:17-860:21 (Van Der Staay) (a "store session" "keep[s] one ID … that tells the phone … I had a connection" and "allows it to resume that connection"); 959:13-963:8 (Mayer-Patel) (the information stored on the

phone, like the session ID, re-establishes a peer-to-peer connection; there is no evidence that the phone stores "any sort of programming code").   Jurors may not disregard unchallenged and unimpeached testimony.   *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 757 F. App'x 974, 979 (Fed. Cir. 2019) (citing Fifth Circuit cases).

*Second*, and relatedly, Touchstream also failed to show that the phone stores the claimed programming code for transmission to or retrieval by the display device.  Dr. Almeroth opined that the accused products' "session identifier" functionality meets this limitation because, in his view, the "session ID includes all of the information that the device keeps track of, where Spotify is, what the content that's being requested is, how it's being played."  Tr. 450:11-16.  But Mr. Van Der Staay's testimony, as further confirmed by Dr. Mayer-Patel, showed that the accused functionality stores a single "session identifier" that does not include any "programming code." *See* Tr. 859:17-860:21 (Van Der Staay); 959:13-963:8 (Mayer-Patel).   Because the "session identifier" does not include any programming code, there was no evidence that the phone stores programming code for transmission to or retrieval by the display device as required by the claims.

*       *       *

Because Touchstream failed to show the accused products practice these three limitations, even under its construction of "server system," JMOL of non-infringement is further warranted.

## IV.    NO REASONABLE JURY COULD FIND THE CLAIMS NOT INVALID

Google presented clear and convincing evidence that the asserted claims were invalid. Moreover, Touchstream failed to meet its burden to come forward with evidence of its asserted priority date of October 8, 2010, to predate the GTS system that was the sole or primary reference for Google's obviousness defenses.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1379-80 (Fed. Cir. 2015) (discussing patentee's burden on priority).  Touchstream left whole portions of its alleged priority case unsupported.

## A.      Google Is Entitled To JMOL On The Priority Dispute

The parties disputed whether Touchstream was entitled to its asserted priority date of October 8, 2010, predating the GTS system used in all of Google's obviousness theories.  For at least two reasons, the patents' priority date was their April 21, 2011 filing date, making the GTS system prior art.

*First*, Touchstream failed to corroborate Mr. Strober's testimony that he conceived of the claimed inventions by October 2010.  Because conception is a mental act, courts require corroborating evidence of contemporaneous enabling disclosure.  *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228-29 (Fed. Cir. 1994).  Notably, though, there was no evidence of a 2010 prototype.  *See* Tr. 115:5-12.  The only reference to a prototype related to a meeting *in 2011*— well past the alleged October 2010 conception date.  Tr. 184:8-185:17 (Rinzler); 252:15-253:19 (Mitschele).  Touchstream's only other evidence of conception by October 2010 consisted of five source code snippets and a purported draft summary of the claimed invention.  JTX-218; JTX-226; JTX-228; JTX-254; JTX-255; DTX-637.  But those documents' metadata showed that they were modified after that date.  The fact that Mr. Strober was in control of these documents further prevents them from serving as corroboration.  *See Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002) ("an inventor's own unwitnessed documentation does not corroborate an inventor's testimony about inventive facts"); *EMC Corp. v. Pure Storage, Inc.*, 204 F. Supp. 3d 749, 761-62 (D. Del. 2016) (photographs with metadata not corroborative of inventor's testimony because inventor "took the photographs and had control of the camera, the photograph file names, and the metadata"); *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, 443 F. Supp. 2d 836, 856 (S.D. Tex. 2006) (given drawings' "Last Modified Date," inventor's testimony that he created the drawings before then required corroboration).

*Second*, both alleged conception and reduction to practice "must include every feature or

limitation of the claimed invention."  *Kridl v. McCormick*, 105 F.3d 1446, 1449 (Fed. Cir. 1997) (conception); *Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1265 (Fed. Cir. 2002) (same, for reduction to practice).  Dr. Almeroth *admitted* to this evidentiary failure—he "ha[dn't] gone through all of the steps" of the claims for Touchstream's alleged priority date.  Tr. 408:6-9.  While he said he later "might go through and actually do a step-by-step analysis … *to really establish that the conception date was October 2010*," Tr. 408:9-15, he never delivered on that promise:  he never revisited priority at all.  The jury had only Dr. Mayer-Patel's unrebutted testimony that Touchstream's alleged documentation of priority lacked at least four limitations.  Tr. 1015:3-22.

Touchstream's evidentiary failures leave the claims with their April 2011 filing date.

## B.      Google Is Entitled To JMOL That The Asserted Claims Are Obvious

With GTS as prior art, a reasonable jury would have been compelled to find that Google presented clear and convincing evidence of obviousness.

By reference to, among other things, a video showing GTS in use (DTX-118A), Dr. Mayer-Patel provided a detailed, element-by-element analysis of how GTS alone rendered obvious the '251 claims and, for the '528 and '289 claims, rendered them obvious in view of GTS and Muthukumarasamy.[6]  Dr. Mayer-Patel cited Muthukumarasamy only for the "identify a location of the particular media player" limitation of the '528 and '289 patents.  He showed that Muthukumarasamy disclosed this and that a POSA would have been motivated to combine it with GTS to achieve the claims.  Tr. 1001:4-1006:22; JTX-22; *see also, e.g.*, JTX-1; JTX-3; JTX-21;

---

[6] Dr. Mayer-Patel's full testimony on invalidity can be found as follows: *common limitations across the asserted claims, including all of '251 patent, claim 1*—Tr. 980:24-982:6 (preamble); 982:13-986:5 ("synchronization" limitations); 968:12-990:4 ("receiving" limitations); 990:17-993:10 ("converting" limitation); 993:11-997:6 ("storing" limitation); *'251 patent, dependent claim 8*—Tr. 998:1-999:17; *'528 patent, claim 1*—Tr. 1005:25-1006:22 ("identify a particular media player" limitation); 1007:11-1008:13 ("obtaining" limitation); *'528 patent, dependent claim 14*—Tr. 1008:22-1009:20; *'289 patent, claim 1*—Tr. 1010:18-1011:15 ("media player" "operable to present content" limitation); and *'289 patent, dependent claim 2*—Tr. 1011:25-1012:16.

JTX-51; JTX-63; DTX-118A; DTX-120; DTX-632 (supporting documentation); Tr. 892:19-904:3 (Levai).

Touchstream presented only a limited opposition and failed to rebut Google's showing. Dr. Almeroth opined that GTS could not invalidate because it supported only one media player, whereas the claims' preamble requires a "plurality of different media players."  But the Court did not construe the preamble as limiting, Tr. 1251:1-9, and in any event, Google showed obviousness of using a plurality of media players.  It is undisputed that GTS *controlled* at least one media player, *see* Tr. 980:24-982:6 (Mayer-Patel); Tr. 1225:4-11 (Almeroth), and that GTS *supported* multiple media players, *see* Tr. 986:12-990:4 (Mayer-Patel); Tr. 1250:1-9 (Almeroth).  It thus would have been obvious to apply the means for controlling the one media player to the other GTS-supported media players.  *E.g.*, *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1330-31 (Fed. Cir. 2009) (recitation of steps known in the art rendered claim obvious).

Touchstream's only other counterargument was that a POSA would not have combined GTS and Muthukumarasamy because they used two "fundamentally different kinds of architectures."  Tr. 1241:13-1243:10.  That argument was limited to the '528 and '289 claims because Google's obviousness case for the '251 claims relied on GTS alone.  And Dr. Almeroth's conclusory testimony could not overcome Google's clear and convincing evidence that both GTS and Muthukumarasamy had the same basic architecture and were directed to the same concept as the asserted claims—controlling media systems from a personal computing device with "a server in the middle that is facilitating this."  Tr. 1001:4-1005:15.

## V.    CONCLUSION

Google is entitled to JMOL of no infringement and of invalidity.

Dated:  September 20, 2023

Respectfully submitted,

By: */s/ Shaun W. Hassett, with permission for T. Gregory Lanier*

Michael C. Hendershot (admitted *Pro Hac Vice*)
Tharan Gregory Lanier (admitted *Pro Hac Vice*)
Evan M. McLean (admitted *Pro Hac Vice*)
Gurneet Singh (admitted *Pro Hac Vice*)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
(650) 739-3939
Fax: (650) 739-3900
mhendershot@jonesday.com
tglanier@jonesday.com
emclean@jonesday.com
gsingh@jonesday.com

Tracy Ann Stitt (admitted *Pro Hac Vice*)
Jennifer L. Swize (admitted *Pro Hac Vice*)
Edwin O. Garcia (admitted *Pro Hac Vice*)
John R. Boulé III (admitted *Pro Hac Vice*)
JONES DAY
51 Louisiana NW
Washington, DC 20001
(202) 879-3939
Fax: (202) 626-1700
tastitt@jonesday.com
jswize@jonesday.com
edwingarcia@jonesday.com
jboule@jonesday.com

Michael E. Jones
TX State Bar No. 10929400
E-mail: mikejones@potterminton.com
Shaun W. Hassett
TX State Bar No. 24074372
E-mail: shaunhassett@potterminton.com
POTTER MINTON PC
102 N. College Ave., Suite 900
Tyler, TX 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846

**Attorneys for Defendant Google LLC**

-21-