███████████████████████████████

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| TOUCHSTREAM TECHNOLOGIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Case No. 6:21-cv-569-ADA |
| | § | |
| GOOGLE LLC, | § | JURY TRIAL DEMANDED |
| | § | |
| Defendant. | § | |
| | § | |

**GOOGLE LLC'S RULE 59 MOTION FOR A NEW TRIAL**

████████████████

████████████████████████

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

TABLE OF ABBREVIATIONS ........................................................................................... iv

TABLE OF EXHIBITS ........................................................................................................ v

I.      INTRODUCTION ................................................................................................... 1

II.     LEGAL STANDARD .............................................................................................. 1

III.    TOUCHSTREAM'S WILLFULNESS CASE MARRED THE TRIAL WITH
        PREJUDICIAL ERROR, WARRANTING A NEW TRIAL UNTAINTED BY
        THAT ISSUE AND EVIDENCE ............................................................................ 2

        A.      Touchstream Prejudicially Leveraged A Legally Inadequate Willfulness
                Case To Imply That Google Copied Its Technology .............................................. 2

        B.      Touchstream's Strategy To Pursue An Unmeritorious Willfulness Case At
                Trial Was Highly Prejudicial To Google's Defenses ............................................ 8

IV.     A NEW TRIAL ON DAMAGES IS WARRANTED ................................................ 10

        A.      Mr. Chandler Relied On A Noncomparable Agreement And License Fee ......... 10

        B.      Mr. Chandler's So-Called "Discounts" Were Plucked Out Of Thin Air ............. 16

        C.      Touchstream's Billion-Dollar-Revenue Arguments Compounded The
                Flaws ...................................................................................................................... 18

V.      A NEW TRIAL WITH "SERVER SYSTEM" CONSTRUED IS NECESSARY ......... 20

VI.     THE JURY VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE ............... 20

VII.    CONCLUSION ........................................................................................................ 20

███████████████████████

# TABLE OF AUTHORITIES

Page

**CASES**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002)..................................................................9

*Apple, Inc. v. Wi-Lan, Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ..................................................................10

*Bayer Healthcare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021)..................................................................2

*Callwave Commc'ns LLC v. AT&T Mobility LLC*,
No. 12-1701, 2014 WL 5363741 (D. Del. Jan. 28, 2014) .......................7

*Cham v. Station Operators, Inc.*,
685 F.3d 87 (1st Cir. 2012).................................................................8, 9

*EcoFactor, Inc. v. Google LLC*,
No. 6:20-cv-00075-ADA, Dkt. No. 236 (W.D. Tex. 2022)......................7

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
927 F.3d 1292 (Fed. Cir. 2019)................................................................12

*ESW Holdings, Inc. v. Roku, Inc.*,
No. 6-19-CV-00044-ADA, 2021 WL 3742201 (W.D. Tex. Aug. 24, 2021) .......................1, 3

*Foradori v. Harris*,
523 F.3d 477 (5th Cir. 2008) ..................................................................2

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012)....................................................15, 16, 17

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)................................................................10

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
10 F.4th 1358 (Fed. Cir. 2021) ...........................................................12, 15

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)................................................................20

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ....................................................................................11, 13

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010)..................................................................................................11

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
14 F.4th 1323 (Fed. Cir. 2021) ..................................................................................................2

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)..................................................................................... *passim*

*VirtnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)................................................................................................10

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
609 F.3d 1308 (Fed. Cir. 2010)................................................................................................11

## OTHER AUTHORITIES

Fed. R. Civ. P. 59 ....................................................................................................................1

████████████████████████████

## TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
| --- | --- |
| Touchstream | Touchstream Technologies, Inc. |
| Google | Google LLC |
| '251 patent | U.S. Patent No. 8,356,251 (PTX-865) |
| '528 patent | U.S. Patent No. 8,782,528 (PTX-885) |
| '289 patent | U.S. Patent No. 8,904,289 (PTX-883) |
| asserted patents | the '251 patent, the '528 patent, and the '289 patent |
| asserted claims | claims 1 and 8 of the '251 patent, claims 1 and 14 of the '528 patent, and claims 1 and 2 of the '289 patent |
| CES | Consumer Electronics Show |
| GTS | YouTube Remote and Leanback with Google TV System (JTX-1; JTX-3; JTX-21; JTX-51; JTX-63; DTX-118A; DTX-120; DTX-632; Tr. 892:19-904:3 (Levai)) |
| Shodogg | Touchstream's business pseudonym |
| Quadriga | Quadriga Worldwide Ltd. |
| Quadriga agreement | Amended and Restated Software Development and License Agreement between Touchstream and Quadriga (PTX-567) |
| Tr. | Trial Transcript, located at: Dkt. 259 (Day 1, pp. 1-244); Dkt. 260 (Day 2, pp. 245-647); Dkt. 262 (Day 3, pp. 648-1028); Dkt. 264 (Day 4, pp. 1029-1310); and Dkt. 266 (Day 5, pp. 1311-1376). Certain portions of the Trial Transcript are and remain under seal. |

*All emphasis added unless otherwise noted.*

███████████████████████████

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| JTX-1 | *Control YouTube on the Desktop, or the TV ... with the YouTube Remote App for Your Phone*, YouTube Official Blog (Nov. 9, 2010) |
| JTX-3 | *How to Control Google TV or YouTube Leanback with YouTube Remote*, YouTube (Nov. 14, 2010) |
| JTX-21 | U.S. Patent No. 9,490,998 |
| JTX-51 | *Features*, Google TV (Oct. 5, 2010) |
| JTX-63 | YouTube Remote API Server Documentation |
| PTX-567 | Quadriga agreement |
| PTX-863 | '289 patent |
| PTX-865 | '251 patent |
| PTX-885 | '528 patent |
| DTX-118A | *How to Control Google TV or YouTube Leanback with YouTube Remote*, YouTube (Nov. 14, 2010) (video file) |
| DTX-120 | Declaration of Janos Levai |
| DTX-632 | GTS Source Code Printouts |

## I.      INTRODUCTION

Rather than proving infringement and building a damages case based on evidence, Touchstream leveraged a willfulness case it knew had no merit—inflaming the jury into a liability verdict for which the jury awarded hundreds of millions of dollars in damages disconnected from reality and admissible expert opinion.  Touchstream called numerous witnesses who repeatedly discussed a few insubstantial meetings between Touchstream and Google that took place years before trial and which no one remembered in substance and had nothing whatsoever to do with infringement.  Counting on the jury being irked that Google representatives did not remember the details of meetings that, as it turns out, Touchstream representatives also barely recalled, Touchstream then presented a damages case that was based on pure speculation.  None of this proved infringement, rebutted invalidity, or supported a damages claim cognizable under the law, and none of it should have been permitted.  If the Court declines to grant JMOL, a new trial untainted by these prejudicially confusing and evidentially unmoored arguments is required.

A new trial with an explicit construction of "server system" is also required.  Given the parties' dispute as to the plain and ordinary meaning of that term, and the lack of an explicit construction, the jury, rather than this Court, ultimately decided claim construction—a prejudicial legal error.  A new trial is also warranted given the great weight of the evidence against the verdict.

## II.     LEGAL STANDARD

The Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), including where "'(1) the verdict is against the weight of the evidence, (2) the amount of damages awarded is excessive, or (3) the trial was unfair or marred by prejudicial error," *ESW Holdings, Inc. v. Roku, Inc.*, No. 6-19-CV-00044-ADA, 2021 WL 3742201, at *1 (W.D. Tex. Aug. 24, 2021).  Trial error warrants a new trial when, "after considering the record as a whole, the court concludes that manifest injustice

█████████████████████████████

will result from letting the verdict stand." *Foradori v. Harris*, 523 F.3d 477, 506 (5th Cir. 2008).

## III. TOUCHSTREAM'S WILLFULNESS CASE MARRED THE TRIAL WITH PREJUDICIAL ERROR, WARRANTING A NEW TRIAL UNTAINTED BY THAT ISSUE AND EVIDENCE

Weeks before trial, the Court warned Touchstream that its willfulness claim was threadbare. Nevertheless, Touchstream pursued that claim, taking a path that ultimately marred the trial and undermines confidence in the infringement verdict. Touchstream used that claim as a gateway for prejudicial evidence that confused, misled, and inflamed the jury. As the Court held in granting JMOL of no willfulness, Touchstream's willfulness evidence fell well short of what the law requires. Willfulness requires proof that the alleged infringement was "deliberate or intentional," *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021), and that the defendant "had a specific intent to infringe," *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021). Touchstream's willfulness case was built on high-level meetings between the companies (that occurred before any asserted patent issued) and general knowledge of Touchstream's patents, and did not prove either requirement. Nonetheless, the damage had been done—its willfulness case leached into the rest of the case, tainting the trial and confusing and misleading the jury on the surviving issues and severely prejudicing Google's defenses. A miscarriage of justice would result if the verdict were allowed to stand. A new trial is warranted.

### A. Touchstream Prejudicially Leveraged A Legally Inadequate Willfulness Case To Imply That Google Copied Its Technology

Although the Court denied Google's motion for summary judgment of no willfulness, it did so "under th[e] conditions" that, "if there's nothing more than" what Touchstream had shown to date, i.e., evidence of the parties' 2011/2012 meetings and of general knowledge of Touchstream's patents, JMOL of no willfulness "will probably be granted." Dkt. 225 at 55:6-56:19. Given this state of play, the Court added: "And so it's up to the plaintiffs to decide whether

they want to tell the jury at the beginning that there's – they're asking for willfulness.  They have to if they want to get it."  *Id.* at 55:17-20.

Despite having "nothing more than" what it presented to oppose Google's summary judgment motion, Touchstream tried to have things both ways at trial.  From the start, it emphasized its willfulness evidence, threadbare though it was, and told the Court: "Yes.  We are asking for willfulness."  Tr. 10:4-25.[1]  Yet Touchstream avoided directly mentioning its willfulness claim during its opening statement—a remarkable strategy for a plaintiff purportedly seeking treble damages for alleged willfulness.  Instead, Touchstream told the jury it would "prove three things," two of which concerned infringement and the third was "the royalties owed."  *E.g.*, Tr. 53:17-22.  Nevertheless, Touchstream used the meetings between the parties as the centerpiece of its opening.  Tr. 33:21-34:1 ("Google met with that startup again and again and again to learn everything it could about how that startup's technology worked.  Once Google had what it needed, it kicked that startup to the curb and then began developing its infringing Chromecast technology in secret."); Tr. 40:19-44:24 (referencing the meetings and emails between the parties).

Touchstream's presentation of evidence followed the same dance.  Over half of the witnesses it called were for the sole purpose of implying that Google copied Mr. Strober's invention after Touchstream and Google briefly met.  Touchstream presented no argument on willfulness, nor evidence of what it needed to show to establish willfulness:  that Google had a specific intent to infringe the asserted patents.

As its first witness, Touchstream called Mr. Strober.  His testimony largely focused on

---

[1] The colloquy occurred during Touchstream's objection to Google's designation of deposition testimony showing that Touchstream employees had opined that "Google was not infringing."  Tr. 10:4-25.  In overruling Touchstream's objection, the Court reminded Touchstream that, "if you want there to be willfulness," this evidence was relevant.  Tr. 11:23-12:4.

███████████████████████████████

Touchstream's 2011/2012 meetings with Google.   He testified that Touchstream sought a partnership because Touchstream "thought that [it] could integrate into [Google's] existing Google TV."  Tr. 100:10-17.  He then recounted that he had met with Google twice—once over Skype for about an hour with Google's Majd Bakar and Ambarish Kenghe, Tr. 100:24-103:24, and another time at a CES trade show, although he provided almost no detail on the latter, Tr. 104:10-20.  While Mr. Strober claimed that Google showed a lot of interest in Touchstream's product and "wanted to see under the hood," Tr. 103:11-20, he admitted he had no record of sharing any technical information with Google, Tr. 125:11-14.   Nonetheless, Mr. Strober proclaimed, while attempting to hold back tears, that he was "very upset" "about Mr. Bakar taking credit for the invention of Chromecast" because Mr. Strober "feel[s] like [he is] the inventor of Chromecast and the— Touchstream Technologies," Tr. 107:14-19.   He was completely silent as to any evidence that could support a finding that Google had a specific intent to infringe.

Touchstream called other current and former employees for their take on the parties' meetings—again emphasizing only that the meetings occurred, and never pointing to any evidence of a specific intent to infringe or even that Touchstream identified a patent number to Google.  For example, Michael Rinzler, Touchstream's then-President, remembered only the first meeting, which he estimated lasted an hour; he identified no others.  Tr. 188:7-190:3. And he testified to nothing more than that Touchstream demonstrated, and the parties generally discussed, its technology.  Tr. 189:8-22.  He could not recall if Touchstream provided any technical materials. Tr. 189:17-22, 191:2-10.   Herb Mitschele, Touchstream's CEO, testified that Google and Touchstream met four times.  Tr. 263:15-277:2. Like Messrs. Strober and Rinzler, Mr. Mitschele was unable to point to any specific technical information shared.  Tr. 287:1-20.  And he admitted that no one from Touchstream ever shared a patent number with Google.  Tr. 293:22-294:5. He

further admitted that, after Chromecast's June 2013 launch until the filing of this lawsuit in June 2021, no one from Touchstream called, emailed, wrote, or otherwise contacted Google to suggest Touchstream believed Google was infringing.  Tr. 293:12-294:16.

Touchstream also asked its witnesses about the timing of Chromecast's launch, again attempting to paint an inference of copying.  *E.g.*, Tr. 106:8-107:19 (Strober); Tr. 197:2-12 (Rinzler), Tr. 282:3-10 (Mitschele).  But the timeline merely showed that Google launched its Chromecast product a while after its brief meetings with Touchstream.  Touchstream's witnesses could not point to any instance where they notified Google of any purported infringement, *e.g.*, Tr. 126:9-127:8 (Strober); Tr. 293:12-294:16 (Mitschele), and Touchstream otherwise presented no evidence that Google had any specific intent to infringe.

Touchstream also presented video deposition testimony from Google witnesses—Shanna Prevé, a former Google employee; Mr. Bakar, Chromecast's creator; Mr. Kenghe, co-founder and product management lead of Chromecast; and Jack Weixel, Google's then-Head of Technology Partnerships—in which Touchstream's counsel had asked about the parties' meetings and relationship.  Throughout those designations, the witnesses repeatedly testified they had no memory of the now-decade-old meetings.  In fact, Touchstream designated testimony in which the witnesses repeatedly—by Google's count, at least 33 times—answered questions by Touchstream's counsel regarding whether they had any recollection of meeting with Touchstream, and all repeatedly testified they did not:

- "Q.  Do you remember having meetings with the members of the team at Shodogg?  A.  I do not."  Tr. 138:23-25 (Prevé).
- "Q.  Do you remember seeing demos of the Shodogg product on Skype?  A.  No."  Tr. 139:1-3 (Prevé).
- "Q.  Do you remember facilitating meetings between Shodogg and Majd Bakar and Ambarish Kenghe? A.  No."  Tr. 139:4-6 (Prevé).

- "Q.  Do you remember requesting that Shodogg provide a demo to Mr. Bakar and Mr. Kenghe? A.  No."  Tr. 139:7-9 (Prevé).

- "Q.  Do you recall meeting someone named Rajiv Lulla?  A.  I don't."  Tr. 139:21-23 (Prevé).

- "Q.  Do you remember having a call with Rajiv?  A.  I don't."  Tr. 140:1-2 (Prevé).

- "Q.  Do you recall discussing meeting Shodogg at CES?  A.  I don't."  Tr. 140:13-15 (Prevé).

- "Q.  Do you recall requesting a PowerPoint deck giving an overview of Shodogg's product and technology in December of 2011?  A.  I don't."  Tr. 141:6-9 (Prevé).

- "Q. [D]o you recall sending a TV box to Shodogg?  A.  I don't recall."  Tr. 144:15-17 (Prevé).

- "Q.  Do you recall seeing how Shodogg's technology was able to move content quickly and efficiently between different screens?  A.  I don't."  Tr. 144:25-145:3 (Prevé).

- "Q.  Do you recall seeing at all how Shodogg's technology worked?  A.  I don't."  Tr. 145:10-12 (Prevé).

- "Q. … [D]o you have any reason to doubt that a Skype call occurred on 11:00 a.m., Pacific time, on December 22nd?  A.  I have no idea."  Tr. 148:16-19 (Prevé).

- "Q.  Do you know whether you met with the Shodogg team at the Venetian in January?  A.  I don't remember."  Tr. 149:22-24 (Prevé).

- "Q.  So does this e-mail chain refresh your recollection about meeting with a company called Shodogg and various members of their team?  A.  It doesn't."  Tr. 151:2-5 (Prevé).

- "Q.  And you have no recollection of interactions with Shodogg whatsoever; is that right?  A. I don't."  Tr. 156:16-18 (Prevé).

- "Q.  Do you remember meeting with people from a company named Shodogg?  A.  No."  Tr. 169:7-9 (Bakar).

- "Q.  Do you remember attending the booth for Shodogg at CES in 2012?  A.  No."  Tr. 169:10-12 (Bakar).

- "Q.  Do you recall expressing interest to Ms. Prevé in seeing a demo of the Shodogg product before you met with them at CES?  A.  No."  Tr. 172:1-4 (Bakar).

- "Q.  Do you recall having a Skype meeting with Herb Mitschele and others demonstrating the Shodogg technology?  A.  No."  Tr. 173:12-15 (Bakar).

- "Q.  Do you recall indicating to Mr. Mitschele that you intended to meet with him at CES?  A. No."  Tr. 173:21-23 (Bakar).

- "Q.  Does [seeing an invite from Shodogg for CES] refresh your recollection at all on hearing or seeing or meeting with Shodogg?  A.  No."  Tr. 174:22-24 (Bakar).

- "Q.  You don't remember seeing any demo where Shodogg showed – A.  No.  Q.  – the ability to cast content between devices?  A.  No.  I don't remember."  Tr. 175:3-8 (Bakar).

- "Q.  Do you recall having a meeting maker to set up a WebEx/Skype demo of Shodogg?  A. No."  Tr. 176:4-6 (Bakar).

- "Q.  Do you recall meeting with a company named Shodogg in late 2011, early 2012?  A.  I don't."  Tr. 334:5-7 (Kenghe).

- "Q.  Do you recall having a Skype call with Shodogg around this time?  A.  I don't recall."  Tr. 338:24-339:1 (Kenghe).

- "Q.  Do you recall setting up a meeting with Shodogg at CES?  A.  I—I don't recall."  Tr. 340:3-5 (Kenghe).

- "Q.  And you don't recall actually going to the Venetian [at CES] to see the Shodogg booth?  A.  I don't recall that."  Tr. 340:18-20 (Kenghe).

- "Q.  Mr. Kenghe, do you recall Shodogg personnel coming to Mountain View in early 2012 to meet with people on the Google TV team?  A.  No.  I don't."  Tr. 340: 21-24 (Kenghe).

- "Q.  So do you recall sending [an introductory] e-mail to Mr. Geoff Sykes at Shodogg?  A.  I don't."  Tr. 355:24-356:1 (Weixel).

- "Q.  Do you have any reason to believe you did not go meet [with Touchstream] that day?  A.  I don't recall meeting them that day."  Tr. 359:15-17 (Weixel).

- "Q.  Do you recall leaving your house to go meet with Shodogg on a Friday in February of 2012?  A.  No.  I don't."  Tr. 360:4-6 (Weixel).

- "Q.  So does [seeing an email reflecting a meeting] refresh your memory in any way that you did actually meet with Michael and Rajiv of Shodogg at the Google campus on that Friday?  A.  I'm sorry, but I don't remember that meeting."  Tr. 361:5-8 (Weixel).

- "Q.  And when we were looking at Exhibit 12 [emails setting up a phone call with Mr. Rinzler in June 2012].  Do you remember that?  A.  I don't remember the meeting.  I can see it in the—in this document that you've given me."  Tr. 362:10-15 (Weixel).

Touchstream also presented video deposition testimony of George Bonanto, Senior Patent Counsel at Google, and at the top of that clip Touchstream included the statement that "Topic 1" for his testimony was whether Google was aware of Touchstream's intellectual property.   Tr. 554:16-24.  The remainder of the clip concerned Google's citation to one or more of the asserted patents in the prosecution history of Google's inventions; Mr. Bonanto simply confirmed this was what the prosecution record showed.   Tr. 555:5-556:24. This, of course, was not evidence of Google having a specific intent to infringe.  *See EcoFactor, Inc. v. Google LLC*, No. 6:20-cv-00075-ADA, Dkt. No. 236 at 1089-1092 (W.D. Tex. 2022); *Callwave Commc'ns LLC v. AT&T Mobility LLC*, No. 12-1701, 2014 WL 5363741, at *2 (D. Del. Jan. 28, 2014).  Rather, Mr. Bonanto's testimony at most showed that Google was generally aware of Touchstream's patents.

███████████████████████

Meanwhile, the jury heard from a Touchstream advisor, Rajiv Lulla, who attended an in-person, "less than 12 minute[]" meeting.  Tr. 805:5-14, 806:20-814:25.  Mr. Lulla testified that Touchstream's product "was half-baked" when it met with Google, that he "d[id]n't believe we actually did the demo" and instead provided "just kind of a broad brush" of Touchstream's technology, and that "[i]t was way too early" to even mention any Touchstream patents or applications.  Tr. 810:22-25, 811:23-24, 813:19-20, 814:21-25.

By the time Touchstream rested, it was clear its willfulness case had "nothing more than" what it offered at the summary judgment stage.  Dkt. 225 at 55:15-16.  This Court rightly held this evidence legally insufficient to establish willfulness and granted JMOL.  Tr. 1194:25-1195:2.

### B.    Touchstream's Strategy To Pursue An Unmeritorious Willfulness Case At Trial Was Highly Prejudicial To Google's Defenses

With Touchstream's willfulness case properly dismissed, Touchstream's willfulness evidence—the meetings between the parties, what did or did not happen during those meetings, Chromecast's launch, and Touchstream's patents noted in the prosecution of Google's own inventions—became irrelevant to all surviving issues.  Faced with similar records where plaintiffs advanced evidence for claims dismissed at JMOL—evidence unrelated to surviving claims but that a jury could mistakenly think overlap with surviving claims—courts have granted new trials.

In *Cham v. Station Operators, Inc.*, 685 F.3d 87 (1st Cir. 2012), for example, the First Circuit affirmed a district court's grant of a new trial on an FMLA retaliation claim after a plaintiff's hostile work environment and disparate treatment claims had been dismissed.  *Id.* at 97.  The court of appeals explained that the evidence relevant to the dismissed claims had no bearing on the surviving claim, but that evidence "could be both prejudicial and confusing to" the surviving claim.  *Id.*  The court held:  "The admission of evidence that later becomes irrelevant when one or more claims is rejected as a matter of law prior to submission to the jury may be grounds for

granting a new trial, if deemed unduly prejudicial." *Id.* While the court acknowledged that an "appropriate response" in certain cases might be "to instruct the jury to disregard the evidence," it emphasized that "[t]here are times where … irrelevant evidence is sufficiently prejudicial that a limiting instruction will not be sufficient and a new trial is proper." *Id.* at 98. Because the irrelevant evidence in that case could have affected a core finding required for the surviving claim, the court affirmed the district court's conclusion that, even though the defendant did not request a limiting instruction, "there would be a miscarriage of justice if the verdict were to stand." *Id.*

The same is true here. As described above, Touchstream presented the same evidence of alleged willfulness—an attempt to show "circumstantial evidence of copying" by Google, Tr. 1185:22—that this Court warned would be insufficient. And after the Court granted JMOL of no willfulness in the midst of trial, this evidence became irrelevant to, for example, Touchstream's surviving infringement claim. But given the emphasis that Touchstream placed on its willfulness case, and the cumulative manner in which it presented that evidence—repeatedly stressing the parties' meetings and implying without any evidence that Google may have taken Touchstream's proprietary information and copied it for its own products—the risk of jury confusion in evaluating infringement and Google's defense thereto (including its invalidity defense based on Google system art) was incredibly high, and no limiting instruction could have cured the unfair prejudice. For example, while evidence of "copying … is of no import on the question of whether the claims of an issued patent are infringed," *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1351 (Fed. Cir. 2002), Touchstream's pursuit of willfulness was highly prejudicial on alleged infringement given the nature of those two questions and the manner in which Touchstream framed its case. Even in the ordinary infringement case, this Court's standing MIL No. 9 reflects the prejudice of alleged copying to defending against alleged infringement. Dkt. 222 at 2 (precluding

███████████████████████████

"evidence, testimony, or argument that characterizes any other person or entity's actions as 'stealing,' 'copying,' 'misappropriating,' 'pirating,' 'trespassing,' or any similar terms").

Given Touchstream's deliberate and repeated emphasis of its purported evidence of copying, there can be no confidence the jury reached a verdict on evidence solely relevant to the issues before it. For infringement, this is especially true considering Touchstream's failure of proof. *See infra* Part V. A new trial is warranted.

## IV.    A NEW TRIAL ON DAMAGES IS WARRANTED

At minimum, a new damages trial should be held. Although the jury did not award the amount or form of damages Touchstream sought, there can be no doubt that the award was improperly prejudiced and confused by the unreliable testimony of Touchstream's damages expert, Mark Chandler. In multiple respects, Mr. Chandler failed to apply a sound methodology—with each of these errors an independent basis on which his royalty estimate should have been excluded. Indeed, his testimony failed to offer even the theories his expert report attempted. The end result was a royalty estimate exponentially higher than the lone agreement on which he relied as well as every other agreement in evidence, and that necessarily tainted the jury's award. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329-32 (Fed. Cir. 2009) (vacating award "roughly three to four times the average amount" of licenses in evidence). Whether the problem is viewed as erroneously admitted expert opinion or as a failure of proof, the damages cannot be upheld.[2]

### A.    Mr. Chandler Relied On A Noncomparable Agreement And License Fee

"[L]icenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *VirtnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014); *Apple, Inc. v. Wi-Lan, Inc.*, 25 F.4th 960, 972 n.5 (Fed. Cir. 2022) ("Sufficient

---

[2] Google preserved its objections to Mr. Chandler's testimony in its *Daubert* and MIL No. 2 motions, which the Court denied.

comparability is a threshold requirement for licenses to be admissible.").  Further, "where licenses are at issue," the patentee's burden to prove damages "includes 'the burden to prove that the licenses were sufficiently comparable.'"  *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021).  "[A]lleging a loose or vague comparability between different technologies or licenses does not suffice," *id.* at 1379, because "comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them," *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010).

Providing a sound basis for comparability is precisely what Touchstream and Mr. Chandler failed to do.  Mr. Chandler premised his damages theory on a single agreement:  a "Software Development and Licence Agreement" between Touchstream and Quadriga, a hotel services entity, in July 2013.  PTX-567.  But in multiple respects, Touchstream failed to prove this agreement was comparable to the circumstances of the hypothetical negotiation.

As a threshold failure, Touchstream did not show the Quadriga agreement was sufficiently related to the asserted patents to render it reliable for purposes of the hypothetical negotiation.  A "reasonable royalty" opinion must be "carefully tie[d] … to the claimed invention's footprint in the market place."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).  But the Quadriga agreement was not a patent license.  It did not mention any particular patent, much less the three asserted here; it mentioned "patents" only generically, and among many other types of intellectual property in a broad definition of worldwide "Intellectual Property Rights"—"patents, trademarks, service marks, rights in logos, rights in get-up, trade names, internet domain names, … and all rights or forms of protection having equivalent or similar effect anywhere in the world." PTX-567.0006.  Instead, the agreement concerned a collaboration between Quadriga and Touchstream, in which Touchstream would *develop a software product* for Quadriga.  PTX-

567.0001.  As the agreement explained, "Quadriga wishe[d] to have Shodogg modify Shodogg's existing video content application," and "Shodogg wishe[d] to work with Quadriga to provide cloud based software services to enable its video content application and to market and sell the modified application…."  PTX-567.0004.  And neither Mr. Chandler nor any other witness testified that the contracted-for software practiced any of the asserted patents—not even the '251 patent, which was the only one that had issued at the time.

Moreover, even assuming *arguendo* the agreement was sufficiently related to the asserted patents, that agreement obligated Touchstream to provide various services—much more than a license to practice its patents.  Touchstream agreed to:  provide technical specifications, operating manuals, user instruction manuals, and progress updates; conduct product testing; arrange for cloud services; provide engineering and other support for the software product; address "emergency technical difficulties"; and promptly respond to Quadriga inquiries (often specified in terms of hours, not days).  PTX-567.0009-0013.  Moreover, the Quadriga agreement concerned the niche "Hospitality Industry," contemplated perpetual renewals of its initial three-year term unless either party determined otherwise, and had worldwide scope.  PTX-567.0006, .0009, .0013.

While use of past agreements "to inform the hypothetical negotiation does not 'require[] identity of circumstances,'" such agreements "need to be 'sufficiently comparable' for evidentiary purposes and any differences in circumstances must be soundly accounted for."  *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1299 (Fed. Cir. 2019) (citation omitted); *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1375 (Fed. Cir. 2021) (affirming exclusion of expert who "conducted no assessment of the licensed technology versus the accused technology to account for any differences").  Mr. Chandler did not address the many differences between the Quadriga agreement and the circumstances of the hypothetical negotiation in which

Google would be paying only for a bare patent license.  Likewise, he did not explain why the Quadriga agreement was more relevant than three other contemporaneous agreements that specifically concerned the asserted patents, and under one Touchstream received only "$2.3 million" and under the other two it received "nothing."   Tr. 673:25-678:17 (Chandler acknowledging these facts).  At most, Mr. Chandler relied on high-level generalities about the Quadriga agreement, testifying that it "was negotiated," "[i]t was an arm's length discussion," and "[t]here was no litigation."  Tr. 624:4-6.  None of these demonstrated sufficient comparability of the Quadriga agreement, nor accounted for the numerous differences between that agreement and the hypothetical negotiation, nor demonstrated why, notwithstanding the many differences, the parties would have relied on that agreement as a starting point rather than other agreements that specifically and narrowly concerned the asserted patents.  An expert's opinion that does no more than provide "loose or vague comparability" is insufficient.  *Omega Patents*, 13 F.4th at 1379.

Mr. Chandler compounded his errors by using the Quadriga agreement's $0.48 License Fee as the basis for each of his "per activation" royalties—$15.36 for Chromecast dongles, $7.68 for Google-branded Chromecast-enabled device, and $3.84 for third-party Chromecast-enabled devices—without adequate facts or data that this amount would sufficiently inform the hypothetical negotiation.  Mr. Chandler did not apportion between the value of the License Fee allegedly attributable to the asserted patents and the value of the various services Touchstream provided under that agreement.  As Google's damages expert Christopher Martinez explained, Mr. Chandler was "not apportioning out any contribution of other influences," such as "the fact that there w[ere] all those other elements in the Quadriga agreement."  Tr. 1110:8-12.  Mr. Chandler simply adopted the $0.48/unit License Fee wholesale, asserting that "Touchstream would have asked for the same fee structure they got from Quadriga, 48 cents per activated device."

Tr. 633:24-634:1. But the law is clear:  To constitute a reliable methodology for determining patent damages, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

Mr. Chandler's own testimony confirms his approach was unreliable.  He testified that the License Fee was "akin to a patent license" because it allegedly "*included* intellectual property *such as* patents."  Tr. 624:21-22, 626:5.  But he never opined that the entirety of the License Fee was for the three asserted patents and nothing else.  Likewise, Mr. Mitschele, Touchstream's CEO at the time of the Quadriga agreement and who signed it on Touchstream's behalf, did not offer such testimony—even though, in its *Daubert* opposition, Touchstream claimed he viewed the License Fee as related to the asserted patents. Dkt. 155 at 3.  To the contrary, he testified that the License Fee "was for the software that we were providing related to the casting product."  Tr. 261:9-10; *see also* Tr. 260:19-22 ("Q. What was it that Touchstream was providing to Quadriga? A. We were providing a software license surrounding our casting product.").  Yet no witness testified that the software practiced any of the asserted patents.

Ultimately, the plain terms of the Quadriga agreement make clear that the License Fee was not for the asserted patents.  Section 9.3 stated that the License Fee was consideration for "the non-exclusive, nontransferable right *to use the Licensed Materials and Documentation* for the following purposes in the Hospitality Industry in the Licensed Territory."  PTX-567.0013.  The agreement defined "Licensed Materials" as "the Shodogg Modified Application (together with all New Releases and New Versions thereto) and the Deliverables"—i.e., the software development work Touchstream agreed to undertake.  PTX-567.0006.  Nothing in the License Fee provision related to patents, much less the three asserted patents.  No reasonable jury could accept the

License Fee as licensing the asserted patents (much less those patents and nothing else). Mr. Chandler's vague, unsupported say-so regarding alleged relevance of the License Fee was not a reliable basis for the jury's multi-hundred million dollar award.  *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 78 (Fed. Cir. 2012) (affirming exclusion of license having "dubious" "probative value … in that it has very little relation to demonstrated economic demand for the patented technology, and its probative value is greatly outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury").

To make matters worse, Mr. Chandler did not adequately explain why the whole of his $0.48 rate was allegedly attributable to the patented technology in the accused products versus their abundant other functionality (other than "discounts" Mr. Chandler plucked out of thin air for certain accused products, *see* Part IV.B, *infra*).  "[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *MLC*, 10 F.4th at 1373 (citation omitted).  The Federal Circuit has "repeatedly held that when the accused technology does not make up the whole of the accused product, apportionment is required." *Id*.  Yet, as Mr. Martinez explained, without rebuttal, Mr. Chandler merely "assum[ed] that the three patents-in-suit are equal to the entire Chromecast product." Tr. 1110:13-15. As "the various technical experts and the other fact witnesses" explained, "there are any number of other technologies that are included in these products that have nothing to do with the patents-in-suit." Tr. 1110:16-20; *see also* Tr. 774:18-796:12 (Robins) (describing numerous non-accused functionalities); Tr. 922:15-924:3 (Mayer-Patel) (same).  Mr. Chandler never explained why the entirety of the License Fee adequately reflected only the allegedly patented features of the accused products rather than their other functionality (other than, as noted and for only certain products, alleged "discounts" that themselves lack reliability, *see* Part IV.B).

███████████████████████████████

In short, because Touchstream failed to establish sufficient comparability of the Quadriga agreement and its License Fee for purposes of the hypothetical negotiation, yet that agreement and fee were the foundation of its damages request, Mr. Chandler's entire analysis was unreliable.  *See Uniloc*, 632 F.3d at 1317 (Even where an expert later "adjust[s]" a royalty "based on legitimate considerations," if the expert "[b]egin[s] from a fundamentally flawed premise," that flaw "results in a fundamentally flawed conclusion.").  A new trial is warranted for these reasons alone.

### B.      Mr. Chandler's So-Called "Discounts" Were Plucked Out Of Thin Air

Mr. Chandler's flawed methodology did not end there.  While he ultimately did not insist on the full $0.48/unit rate and instead offered "discounts" of 33%, 50%, and 75%, those backdoor attempts to make his opinions seem reasonable were unmoored from the facts of this case.

In *Uniloc*, the expert applied a "25% rule of thumb" on the view that "[i]t's generally accepted.  I've used it.  I've seen others use it.  It's a widely accepted rule."  632 F.3d at 1318.  As the Federal Circuit explained in requiring a new damages trial, the expert "did not testify that the parties here had a practice of beginning negotiations with a 25%/75% split, or that the contribution of" the accused features "justified such a split," and "[h]e did not base his 25 percent baseline on other licenses involving the patent at issue or comparable licenses."  *Id.*  "In short, [the] starting point of a 25 percent royalty had no relation to the facts of the case, and as such, was arbitrary, unreliable, and irrelevant.  The use of such a rule fails to pass muster under *Daubert* and taints the jury's damages calculation."  *Id.*  Likewise, in *LaserDynamics*, the Federal Circuit ordered a new damages trial where an expert's "one-third apportionment to bring his royalty rate down from 6% per ODD to 2% per laptop computer appears to have been plucked out of thin air based on vague qualitative notions of the relative importance of the ODD technology."  694 F.3d at 69.  Driving the point home, the *LaserDynamics* court stressed that "[t]his complete lack of economic analysis to quantitatively support the one-third apportionment echoe[d] the kind of arbitrariness of the '25%

Rule' that [the court] recently and emphatically rejected from damages experts, and would alone justify excluding" the expert's damages opinions.  *Id.*  Mr. Chandler's discounts constituted the same sort of arbitrariness and "fail[] to pass muster," *Uniloc*, 632 F.3d at 1318, providing additional reasons why the damages verdict cannot stand.

     ***Mr. Chandler had no sound basis for his 33% "volume discount" on the $0.48 rate for all accused products.  Tr. 634:4-16.***  This "volume discount" was not a legitimate attempt to apportion to reflect the value of the patented inventions.  It was instead based on Google being "much larger than Quadriga" with "a lot of reach," such that "Google would have pointed out that, We want a volume discount," and "Touchstream would have conceded."  Tr. 634:12-16. Mr. Chandler then opined that a 33% volume discount was "in line" with "other agreements that I know Google has entered into that have volume discounts."  Tr. 634:17-636:1. But he and Touchstream offered *nothing more*—no specific documents, not even a description of the agreements he was referencing, much less any explanation as to how those "other agreements" informed the degree of "volume discount" relevant here.  Mr. Chandler's "discount" was exactly the type of arbitrary, "plucked out of thin air" number the Federal Circuit has repeatedly condemned, *LaserDynamics*, 694 F.3d at 69, and this flawed premise for all accused products "result[ed] in a fundamentally flawed conclusion" regardless of Mr. Chandler's other adjustments for certain products, as discussed next, *see Uniloc*, 632 F.3d at 1317.

     ***Mr. Chandler's further "discount" of 50% for Google-branded Chromecast-enabled devices was just as arbitrary.***  It was undisputed that these accused devices—"Google TV, Nest audio and display devices, smart speakers," and others—differ from one another, and each "ha[s] other functionality" beyond Chromecast.  Tr. 638:12; *see* Tr. 679:4-15, 680:12-21 (similar).  Yet, Mr. Chandler applied a 50% "discount" across all of these products, based on a simplistic

hypothetical conversation in which, in his view, Google and Touchstream "would have negotiated a little bit" about a discount and, solely because "[s]ome of the agreements that Google's entered into call for a 50 percent reduction when there's other technologies involved," would have agreed to 50% as "appropriate." Tr. 639:3-9. Here again, he and Touchstream offered nothing to tie this "discount" to the facts of the case, including each different accused device. He did not point to any specific agreements, experience, facts, or data informing his 50% "discount," whether based on the Quadriga agreement or otherwise, and whether quantitative or qualitative.

   ***Mr. Chandler similarly applied an arbitrary, plucked-from-thin-air "75% discount" for third-party Chromecast-enabled devices.*** These devices also varied substantially from one other and had more functionality than what Touchstream accused. Tr. 602:14-20 (Chandler). Yet, according to Mr. Chandler, "Google would have pushed for a … further discount" for these devices amounting to a 75% discount, on his view that, where a licensee sublicenses the asserted patents to others, "the typical range, historically – and it's again, well-known within the industry – is between 25 percent and 50 percent of that value going back to the original IP owner," and would have landed on 25% "going back" to Touchstream, i.e., a 75% discount, given "the size of Google and their ability to invest and to get this into the market." Tr. 652:2- 653:12. Again, Mr. Chandler and Touchstream did not tie his "discount" to the facts of the case, including each different accused third-party device. Moreover, he admitted he drew his supposed "typical range" from "across all industries" with which he had experience; it was not tied to the field or technology of this case. Tr. 683:14-21. Controlling precedent precludes this attempt to rely on a general "industry norm" that "does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party." *See Uniloc*, 632 F.3d at 1317.

### C.    Touchstream's Billion-Dollar-Revenue Arguments Compounded The Flaws

   Touchstream and Mr. Chandler compounded the prejudice by repeatedly referring to

██████████████████████████████████████

Google and YouTube billion-dollar revenues.  Tr. ███████████████████████████

███████████████████████████████████████, 685:4-6 ("YouTube ad

revenues nearly doubled from 15 – and it's a capital B, but you mean billion – in 2019 to 28.8B in

2021."), 693:11-12 ("YouTube ads revenues increased 9.1 billion from 2020 to 2021."); ██

██████████████████████████████████████████████████████████████████

██████; 1359:25-1360:10 (Touchstream's closing argument comparing damages request to

Google's ad revenue).  Mr. Chandler did not use those revenues in his royalty base or rate, nor

otherwise relate those revenues to the asserted claims or accused functionality.  Instead, he

suggested those revenues justified his nearly $1 billion damages opinion as "reasonable."  Tr.

698:22-699:6, and Touchstream likewise emphasized this in closing, arguing that "we don't get

most of it, we actually get a pretty -- pretty small amount," Tr. 1360:6-7, and "[w]e aren't even

asking for their ad revenue…. No ad revenue, no content revenue, we just want the 32 cents, 16

cents or 8 cents," Tr. 1330:12-20.

The Federal Circuit has made clear that use of total revenues to justify a damages opinion

should be prohibited because such amounts "skew the damages horizon for the jury."  *Uniloc*, 632

F.3d at 1320 ("The disclosure that a company has made $19 billion …in revenue from an infringing

product cannot help but skew the damages horizon for the jury, regardless of the contribution of

the patented component to this revenue.").  Here, just like in *Uniloc*, "the cat was never put back

into the bag" regarding those prejudicial billion-dollar figures, *id.*, even with cross-examination of

Mr. Chandler, thus improperly tainting the jury's award.

*          *          *

Mr. Chandler applied flawed "discounts" to his already infirm starting point of the

Quadriga agreement and its $0.48 rate; he then exacerbated the prejudice by invoking billion-dollar

revenues not tied to the claims.  For any or all of these errors, a new damages trial is warranted.

## V.  A NEW TRIAL WITH "SERVER SYSTEM" CONSTRUED IS NECESSARY

As Touchstream's infringement theory evolved leading up to trial, it became clear that leaving "server system" unconstrued failed to resolve the parties' dispute as to its plain meaning. Google therefore requested that, if the Court did not find noninfringement as a matter of law based on the plain meaning, it provide an explicit construction: "a server system that is distinct from and does not include the [display device/content presentation device]."  Dkt. 130 at 16; *see also* Dkt. 158 at 3-16; Dkt. 184 at 1-10; Dkt. 225 at 33:4-48:10 (further briefing and argument).  The Court determined "to go with plain and ordinary meaning."  Dkt. 225 at 50:17-19.

Given the parties' dispute, however, the result was that they effectively argued claim construction to the jury, presenting expert testimony on the scope of the "server system" term. *E.g.*, Tr. 398:11-401:17, 431:6-432:20 (Almeroth); Tr. 927:24-933:17, 947:17-955:2 (Mayer-Patel).  That was improper.  "When the parties raise an actual dispute regarding the proper scope of the[] claims, the court, not the jury, must resolve that dispute."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  At minimum, a new trial, based on a construction by the Court resolving the proper scope of the "server system" term, is required.

## VI.  THE JURY VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE

As Google's renewed JMOL motion describes, the infringement verdict is at least against the great weight of the evidence, even applying Touchstream's understanding of "server system." Touchstream failed to present sufficient evidence of divided infringement and that all the asserted claims are met by the accused products.  The great weight of the evidence also shows GTS is prior art to the asserted patents, and that Google presented clear and convincing evidence the claims are obvious.  If the Court declines to grant JMOL of no liability, it should at least grant a new trial.

## VII.  CONCLUSION

The Court should order a new trial on all issues, but at least on infringement and damages.

███████████████████

Dated:  September 20, 2023

Respectfully submitted,

By:*/s/ Shaun W. Hassett, with permission for*
*T. Gregory Lanier*

Michael C. Hendershot (admitted *Pro Hac Vice*)
Tharan Gregory Lanier (admitted *Pro Hac Vice*)
Evan M. McLean (admitted *Pro Hac Vice*)
Gurneet Singh (admitted *Pro Hac Vice*)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
(650) 739-3939
Fax: (650) 739-3900
mhendershot@jonesday.com
tglanier@jonesday.com
emclean@jonesday.com
gsingh@jonesday.com

Tracy Ann Stitt (admitted *Pro Hac Vice*)
Jennifer L. Swize (admitted *Pro Hac Vice*)
Edwin O. Garcia (admitted *Pro Hac Vice*)
John R. Boulé III (admitted *Pro Hac Vice*)
JONES DAY
51 Louisiana NW
Washington, DC 20001
(202) 879-3939
Fax: (202) 626-1700
tastitt@jonesday.com
jswize@jonesday.com
edwingarcia@jonesday.com
jboule@jonesday.com

Michael E. Jones
TX State Bar No. 10929400
E-mail: mikejones@potterminton.com
Shaun W. Hassett
TX State Bar No. 24074372
E-mail: shaunhassett@potterminton.com
POTTER MINTON PC
102 N. College Ave., Suite 900
Tyler, TX 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846

*Attorneys for Defendant Google LLC*

████████████████████████

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via electronic mail on September 20, 2023.

I also hereby certify that all counsel of record who have consented to electronic service are being served with a notice of filing of this document, under seal, pursuant to L.R. CV-5(a)(7) on September 20, 2023.

*/s/ Shaun W. Hassett*

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order in this case and Judge Albright's Amended Standing Order Regarding Filing Documents Under Seal in patent Cases and Redacted Pleadings.

*/s/ Shaun W. Hassett*